**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **SB INITIATIVE, INC. a 501(c)(3)  Organization** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | |
| ) | **Docket No.** |
| **CHEEKWOOD BOTANICAL GARDEN** ) | |
| **AND MUSEUM OF ART, a 501(c)(3)** ) | |
| **Organization** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

SB Initiative, Inc., ("Plaintiff"), by and through undersigned counsel, hereby files this Complaint for Declaratory and injunctive relief against Cheekwood Botanical Gardens and Museum of Art ("Defendant"), alleging as follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory judgment pursuant to 28 U.S.C. §§ 2201 et. seq. and for injunctive relief pursuant to the Lanham Act, 15 U.S.C. § 1125, and the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030.

2.      This action is based on claims under the Lanham Act, 15 U. S. C. §§ 1125(a) and 1125(d), the CFAA, and Plaintiff's common law rights under Tennessee law.

3.      This action seeks to:

A. Establish Plaintiff's ownership of the "SWAN BALL" trademark,

B. Establish Plaintiff's ownership and rights to the domain www.swanball.com,

C. Establish Plaintiff's ownership and control of the Swan Ball Frontstream donor database and all non-public intellectual property contained therein,

D. Establish Plaintiff's ownership and control of the Swan Ball MailChimp account and associated intellectual property,

E. Establish Plaintiff's ownership and control of the Swan Ball Clickbid account and associated intellectual property,

F. Enjoin Defendant from using the SWAN BALL mark,

G. Enjoin Defendant from using Plaintiff's non-public intellectual property donor information and from excluding Plaintiff from its own website administration, MailChimp account, and donor database,

H. Secure an Order for submission to the Secretary of State for the State of Tennessee ordering that it cancel the Trademark/Service mark Registration No. 42241 issued by the State was based on the false statements made by Defendant in securing said registration.

I. Secure an Order establishing that Plaintiff is the lawful owner of all funds generated by its 2024 Swan Ball gala and all associated fundraising events;

J. Order Defendant to disgorge all financial and accounting information in its possession pertaining to the 2024 Swan Ball gala;

K. Obtain reimbursement of Plaintiff's attorney's fees pursuant to the Lanham Act.

L. Other monetary damages as supported by the evidence presented.

**THE PARTIES**

4. Plaintiff, SB Initiative, Inc., is a 501(c)(3) nonprofit entity organized under the laws of the State of Tennessee.

5. Defendant, Cheekwood Botanical Gardens and Museum of Art, is a 501(c)(3) corporation located in Davidson County, Tennessee.

6. The Swan Ball Committee (the "Committee") is a volunteer organization of individuals who have created, organized and overseen the production of a charitable fund-raising event in Nashville for over 60 years known as the SWAN BALL.

7. Historically, the Committee has contributed the fruits of its labors to the Defendant to aid the Defendant in maintaining the Cheekwood mansion and gardens ("Cheekwood").

8. The decision-making body of the Committee voted unanimously to incorporate the Committee as SB Initiative, Inc. The Committee has assigned, transferred and conveyed all of its right, title and interest in and to the service mark/trademark SWAN BALL, and any and all other intellectual property and other property rights of the Committee to the Plaintiff.

**JURISDICTION AND VENUE**

9. This action is based on Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114, Sections 43(a),(c), and (d) of the Lanham Act, 15 U.S.C. § 1125(a), (c), and (d), Section 47-18-104 of the Tennessee Code, and the common law of the State of Tennessee.

10. This Court has subject matter jurisdiction over this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121 (actions arising under the Lanham Act), 28 U.S.C. §§ 1331 (federal question), 1338(a) (any Act of Congress relating to patents or trademarks), and 1338 (b) (any action asserting claim of unfair competition joined with a substantial and related claim

under the trademark law) for the claims arising out of the violations of Sections 32(1)(a) and 43(a) and (c) of the Lanham Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C.§ 1367(a) for all other claims asserted in this Complaint because those claims are so closely related to the federal claims asserted herein as to form part of the same case and controversy.

11. Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

12. This Court has personal jurisdiction over Defendant pursuant to Tenn. Code 20-2-222 because Defendant is organized and doing business in Tennessee and the unlawful, tortious conduct complained of herein has caused, and continues to cause, injury to Plaintiff within Tennessee and in this District.

## STATEMENT OF FACTS

13.     The SWAN BALL is a series of fundraising events culminating in an annual white-tie gala event held in Nashville, Tennessee.

14.     The SWAN BALL gala was founded by Mrs. Jane Anderson Dudley.

15.     The first SWAN BALL gala, organized by Mrs. Dudley, was held in 1963.

16.     Mrs. Dudley chose both the location and the date of the first SWAN BALL gala.

17.     The event was named the "Swan Ball" by Mrs. Dudley because she chose the Swan Lawn at Cheekwood as the venue for the first event.

18.     Mrs. Dudley requested and received permission from Defendant to conduct the SWAN BALL gala on Cheekwood grounds.

19.     Mrs. Dudley personally chose the specific individuals to constitute an initial Advisory Committee according to her own criteria.

20.     The initial Advisory Committee was comprised of Hortense Ingram, Martha Lawrence, Leah Rose Werthan, Alice Earthman and Jeanne Zerfoss.

21.     Neither Mrs. Dudley nor any member of her Advisory Committee were employed by Defendant.

22.     Defendant had, and continues to only have, limited knowledge of the Committee, its existence, its operations and its structure.

23.     Mrs. Dudley did not form the Committee as a body of the Defendant.

24.     Only one Advisory Committee meeting was held regarding the first gala, at which meeting the ticket price of fifty dollars ($50.00) was set.

25.     No employee or representative of Defendant was present at the first Advisory Committee meeting, nor did any employee or representative of Defendant provide input or approval for the guest list, ticket price, the name, decorations, menu or entertainment.

26.     Mrs. Dudley served as the chairman of the Swan Ball for three years, but remained an honorary chairman and was heavily involved in the production of the gala event until her death.

27.     Mrs. Dudley was adamant that the Swan Ball gala was not a party given by Cheekwood, but was always a party given by a "group of friends" who then "chose to give the proceeds" to support Defendant's maintenance of Cheekwood programs, mansion and grounds.

28.     The SWAN BALL gala has been held every year since 1963, with the exception of 2020 and 2021.

29.     Mrs. Dudley and her initial Advisory Committee comprised the original membership committee for the Swan Ball gala.

30.     Since 1963, the Swan Ball Committee's membership has been determined by the existing members of the Committee and not by Defendant.

31.     The Swan Ball Committee has added additional committees and organizational structure over the years, the existence and membership of which were and are determined by the Committee, and not by the Defendant.

32.     As it was in the beginning and has continued to be the case with respect to every Swan Ball gala since 1963, no employee or representative of Defendant has provided input or approval for the ticket price, the name, decorations or entertainment, selection of Committee members or any other decisions relating to the Committee or its activities.

33.     The Swan Ball Committee has used the name "SWAN BALL" annually since 1963 to refer to that year's event, or prior or upcoming SWAN BALL galas.

34.     Defendant has never used the term "Swan Ball" outside of the use referencing the event organized annually by the Swan Ball Committee.

35.     The SWAN BALL gala has been organized and produced since its inception exclusively by volunteers of the Swan Ball Committee.

36.     Each annual SWAN BALL gala is chaired by two Swan Ball co-chairmen.

37.     The co-chairmen are chosen by the Nominating Committee of the Swan Ball volunteer organization. No officer or employee of Defendant is a member of the Nominating Committee, nor is the selection of the Chairmen subject to Defendant's advice or approval.

38.     The structure of the Swan Ball Committee has historically included an Executive Committee, an Advisory Committee, Mini-Committee, Invitations Committee, Nominating Committee, Patrons' Committee, Dance Committee, Late Party Committee, Auction Committee, and various other fundraising committees and party hosts.

39.     Neither membership, leadership, nomination nor function of these committees has been subject to Defendant's participation, input, or approval.

40.     No member of these committees is an employee of Defendant, nor do the members of these committees receive compensation from Defendant.

41.     The functions of each of the above-mentioned committees have, since the inception of the event, been entirely self-governing, with no oversight or control by Defendant.

42.     Members or Chairmen of the Swan Ball Committees have had no authority to contract on behalf of Defendant.

43.     Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to contract on behalf of the Swan Ball Committee.

44.     The Swan Ball gala co-chairmen for a given year choose the theme for that year's SWAN BALL gala. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's theme. Defendant has never made an attempt to approve or deny same.

45.     The Swan Ball co-chairmen for a given year choose the entertainer for that year's Swan Ball. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's entertainer. Defendant has never made an attempt to approve or deny same.

46.     Contracts for the entertainer for a SWAN BALL gala are made on behalf of the Swan Ball, or in the name of the individual chairman signing the contract, not in the name of Defendant nor signed by an employee of the Defendant.

47.     Defendant is neither a party to agreements made with the entertainers nor bound by the provisions of those agreements.

48.     The Swan Ball co-chairmen for a given year choose the Event Designer for that year's Swan Ball. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's entertainer. Defendant has never made an attempt to approve or deny same.

49.     Contracts for the Event Designer for a SWAN BALL gala are on behalf of the SWAN BALL, not on behalf of Defendant nor signed by an employee of the Defendant.

50.     Defendant is neither a party to agreements made with the Event Designer nor bound by the provisions of those agreements.

51.     The Swan Ball co-chairmen for a given year choose the caterer for that year's SWAN BALL gala. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's caterer, menu, or dinner schedule. Defendant has never made an attempt to approve or deny same.

52.     Contracts for the caterer for a SWAN BALL gala are made on behalf of the Swan Ball, not the Defendant, nor signed by an employee of the Defendant.

53.     Defendant is neither a party to agreements made with the caterer nor bound by the provisions of those agreements.

54. The Swan Ball co-chairmen choose the location for the Swan Ball Auction event; the venue is reserved at Belle Meade Country Club by the Swan Ball co-chairmen under their personal membership numbers; contracts for all party/event related expenses are executed by the Swan Ball co-chairmen. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's auction event. Defendant has never made an attempt to approve or deny same.

55. The Swan Ball co-chairmen for a given year choose the auctioneer for that year's SWAN BALL Auction. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's auctioneer. Defendant has never made an attempt to approve or deny same.

56. Contracts for the auctioneer for a SWAN BALL gala are made on behalf of the Swan Ball, not the Defendant, nor signed by an employee of the Defendant.

57. Defendant is neither a party to agreements made with the auctioneer nor bound by the provisions of those agreements.

58. The Swan Ball co-chairmen for a given year choose the floral decoration for that year's Swan Ball gala. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's floral decoration. Defendant has never made an attempt to approve or deny same.

59. Contracts for the provision of floral decorations for a SWAN BALL gala are made on behalf of the Swan Ball, not the Defendant nor signed by an employee of the Defendant.

60.     Defendant is neither a party to agreements made for the floral decorations nor bound by the provisions of those agreements.

61.     The Swan Ball co-chairmen for a given year choose the program for that year's Swan Ball. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's program.

62.     Contracts for the provision of the program for a SWAN BALL gala are made on behalf of the Swan Ball, not the Defendant nor signed by an employee of the Defendant.

63.     Defendant is neither a party to agreements made for the program nor bound by the provisions of those agreements. Defendant has never made an attempt to approve or deny same.

64.     The Swan Ball co-chairmen for a given year choose the design of the invitations for that year's Swan Ball. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's invitation design. Defendant has never made an attempt to approve or deny same.

65.     Contracts for the design and production of the invitation for a SWAN BALL gala are made on behalf of the Swan Ball, not the Defendant, nor signed by an employee of the Defendant.

66.     Defendant is neither a party to agreements made for the design and production of the invitation nor bound by the provisions of those agreements.

67.     The Swan Ball co-chairmen for a given year choose all other vendors for that year's Swan Ball. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to

override the Swan Ball Committee's choice of that year's vendors. Defendant has never made an attempt to approve or deny same.

68.     Contracts for all vendors for a SWAN BALL gala are made on behalf of the Swan Ball, not the Defendant nor signed by an employee of the Defendant.

69.     Defendant is neither a party to agreements made with the vendors nor bound by the provisions of those agreements.

70.     In the event the Event Designer does not also serve s the Event Coordinator, the Swan Ball co-chairmen for a given year choose the Event Coordinator for that year's Swan Ball. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's Event Coordinator. Defendant has never made an attempt to approve or deny same.

71.     Contracts for Event Coordinator for a SWAN BALL gala are made on behalf of the Swan Ball, not the Defendant nor signed by an employee of the Defendant.

72.     Defendant is neither a party to agreements made with the Event Coordinator nor bound by the provisions of those agreements.

73.     The Swan Ball co-chairmen for a given year, in consultation with the Swan Ball Mini and Executive Committees, (but not with the Defendant) determine the ticket price for that year's Swan Ball Gala. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of that year's ticket price. Defendant has never made an attempt to approve or deny same.

74.     The Swan Ball gala Invitations Committee for a given year determines the individuals who will receive an invitation to that year's Swan Ball. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice as to who will receive an invitation.

75.     Defendant's CEO and one other employee of Defendant are typically, without any obligation for the Committee to do so, invited to attend the Swan Ball each year, but no other employee of Defendant is invited, and the invitation to the Defendant's CEO and any other person is purely the decision of the Plaintiff.

76.     Every year, if an invitation to attend the SWAN is extended to the CEO or other employee or representative of Defendant, the invitation must be proposed to, and approved by, the Invitations Committee.

77.     Defendant has no authority to approve, issue, or deny an invitation to the SWAN BALL.

78.     Purely as a courtesy, during a board term, each then serving Cheekwood board member is extended an invitation, initiated and approved by the Committee.

79.     The Swan Ball Patron's Committee invites the patrons to participate in that year's Swan Ball at an agreed upon donation amount, determined by the Patron's and Executive Committees. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Committee's choice of any aspect of the Patrons' list or donation amount. Defendant has never made an attempt to approve or deny same.

80.     The Swan Ball Co-Chairmen pursue Patron's and party hosts to underwrite the Patron's party for their specific year, choosing carefully the location for that year's Swan Ball Patrons'

Party. Neither officers nor employees nor any member of the Board of Trustees or Executive Committee nor any other governing member or body of Defendant has the authority to override the Swan Ball Co-Chairmen's choice of any aspect of the Patrons' Party. Defendant has never made an attempt to approve or deny same.

81.     Defendant is not entitled to designate anyone associated with the Defendant, nor anyone else, to attend the SWAN BALL gala.

82.     Members or Chairmen of the Swan Ball Committee, operating on behalf of the Swan Ball gala, have consistently contracted for vendors or entertainment in their individual capacity or on behalf of Swan Ball.

83.     Until 2022, the Committee maintained its own accounting and bookkeeping by a Committee volunteer Treasurer, and occasionally using an outside accounting firm engaged by the Committee.

84.     In 2022 as a part of the preparation for the 2023 gala, at Defendant's urging, the Committee engaged LBMC to conduct accounting and bookkeeping for the Committee.

85.     Defendant first offered to begin performing the ministerial accounting for Swan Ball "in-house" at Defendant's business office for the 2024 Swan Ball.

86.     Not knowing that Defendant was planning a coup to try to take over the SWAN BALL gala, Plaintiff accepted Defendant's offer.

87.     In 2023, when the Committee was in preparation for the 2024 gala, Defendant nefariously and covertly took complete control over accounting and bookkeeping services relating to the Swan Ball account.

88. After Defendant began providing bookkeeping services for the Committee, any invoice relating to the Swan Ball gala or attendant events or incurred by the Committee had to be approved by the Committee prior to payment.

89. Initially, Defendant provided full access to relevant the accounting and bookkeeping conducted on behalf of the Committee to the 2024 Co-Chairmen, relevant volunteers and dedicated Swan Ball staff.

90. In late March 2024, Defendant stopped providing accounting information to the Co-Chairmen, members of the Committee, and dedicated Swan Ball staff, and revoked access to the Google Document in which this information was kept and updated.

91. Without access to this information, the Co-Chairmen of the gala and the Committee are unable to complete the financial responsibilities associated with closing out the 2024 event.

92. Each year, through 2022, the Committee would open a new bank account for the next year's fundraising gala in the name of the Committee for that year.

93. The new bank account was opened by the Committee Co-Chairmen or volunteer Treasurer with the Truist bank or its predecessor institution.

94. Until 2023, only that year's Co-Chairmen, the volunteer Treasurer, or individuals to whom the Chairmen or Committee specifically temporarily delegated authority by the Co-Chairmen or Treasurer had signatory authority on that year's bank account.

95. All monies related to the Committee's activities flowed into this account and were paid out of this account.

96. Defendant was never an account holder nor had signatory authority on the Committee bank account until it unilaterally and without authorization by the Committee seized it in 2023.

97.     Upon information and belief, Defendant holds a separate bank account or accounts through which it pays its own vendors and expenses.

98.     The Committee is not privy to, nor has access to, Defendant's bank accounts.

99.     Until recently, all monies contributed by the Committee to Defendant were paid by written check or wire transfer from that year's gala bank account.

100.    Contributions were occasionally also made by the Committee to Defendant based on special requests by the Defendant in exigent circumstances.

101.    In 2005, the then Director of Cheekwood approached the 2005 Swan Ball Co-Chairmen and requested a special contribution from the Swan Ball account by check for roof repairs to the Cheekwood mansion roof.

102.    The Co-Chairmen communicated the Director's request to the Committee leadership.

103.    Committee leadership discussed and approved the Defendant Director's request for funds.

104.    The funds requested by the Defendant's Director were disbursed to Defendant after approval by the Committee, via check, from that year's gala bank account.

105.    In November of 2022, Defendant gave the Chairman of the Executive Board of the Committee a document titled "Cheekwood Estate & Gardens, Swan Ball Standard Operating Procedures."

106.    Defendants proposed Standard Operating Procedures contained certain all-new and different procedures for the interaction between Committee and Defendant.

107.    Plaintiff and Defendant met to discuss Defendant's all new Proposed Standard Operating Procedure in early 2023.

108.    At some point in early 2024, unbeknownst to Plaintiff, Defendant provided to Swan Ball Staff a document also titled "Cheekwood Estate & Gardens, Swan Ball Standard Operating Procedures."

109.    Defendant's Proposed Standard Operating Procedure and List of Directives purported to take control of certain aspects of the Swan Ball planning and approval process which had never been done before in the Swan Ball gala's 60-year history.

110.    Among other things, this Standard Operating Procedure proposed to have an annual budget for the Swan Ball gala prepared by Defendant's Chief Financial Officer, and for the year's Ball Co-Chairmen to report regularly to Defendant's CFO and CEO – neither of which had ever been done before.

111.    In March of 2024 representatives of Defendant emailed to the Plaintiff's Executive Board and to the 2025 gala Co-Chairmen a document entitled "Board Directives Swan Ball 2025 (2).docx.

112.    In response to the entirely new proposed relationship, as well as these attempts by Defendant to assert control over the operations of the Committee, the Committee's Executive Board voted unanimously to formalize its autonomous and independent historical operation as a separate not for profit corporation.

113.    As such, on May 23, 2024, the Committee formalized itself as SB Initiative, Inc., a continuation of the Committee and as the Committee's successor-in-interest by filing with the Tennessee Secretary of State office.

114.    On May 23, 2024, by written assignment, the Committee assigned its entire interest in the SWAN BALL trademark/service mark, and its entire interest in all assets of the Committee, to SB Initiative, Inc. That assignment was formalized in writing.

115.    On May 26, 2024, SB Initiative, Inc., as the Committee's successor-in-interest, filed a federal trademark application to register its mark "SWAN BALL," first used by the Committee in 1963 and in continuous use by the volunteer organization Committee since that time.

116.    On June 4, 2024, Defendant filed an application with the USPTO to register the mark "SWAN BALL", despite the fact that Defendant did not originate the mark, does not own the mark, has been on notice since 1963 that the mark was in use by the Committee, was or should have been aware of the Committee's prior application regarding the mark, has never used the mark "SWAN BALL" in any context other than to refer to the event produced by the Committee, and has never controlled the nature and/or quality of the goods and services described in the Application.

117.    Although Defendant is the record owner of Tennessee Trademark/Service mark No. 42241 SWAN BALL, the Committee has never authorized Defendant to represent itself as the owner of the mark.

118.    Plaintiff was unaware of Defendant's Tennessee Trademark registration and discovered Defendant's Tennessee Trademark registration in the process of preparing to establish its right to the SWAN BALL mark.

119.    Any items paid "by Defendant" for Swan Ball expenses are paid out of the Swan Ball Committee funds, bank account, or are reimbursed by the Committee.

120.    The Committee maintains an office on Cheekwood property.

121.    Two permanent staff members work in the Swan Ball office.

122.    The permanent staff are paid through Defendant's payroll.  The revenues generated by the SWAN BALL gala ("Swan Ball Funds") are used by the Committee to reimburse Defendant in the full amount of these employees' salaries and expenses.

123.    The Committee purchased and paid for the domain www.swanball.com in February of 2004.

124.    The domain www.swanball.com is hosted by GoDaddy, the contract for which is with Swan Ball and is paid for from Swan Ball funds.

125.    Until 2023, website administration of the domain www.swanball.com has been contracted between the Swan Bal Co-Chairmen and an independent company or Volunteer.

126.    Most recently, from 2021 until 2023, the domain was maintained by Widgets & Stones, pursuant to a contract between the Committee and that entity.

127.    Over the years, Website Administration has been contracted between the Swan Ball Co-Chairmen and an independent Company or Volunteer.  Most recently from 2021 until 2023, all decisions with regard to the content, appearance, security, information, availability, and existence of the aforementioned website were made by the Committee, with no input or approval from Defendant.

128.    In 2023 Defendant offered for the administration of the aforementioned website to be conducted by in-house Cheekwood Information Technology personnel.

129.    In the last few weeks, Defendant, without authorization, has taken all administrative control of the domain www.swanball.com and has denied Swan Ball volunteers access or control over the domain.

130.    On June 4, 2024, the domain information was "updated" without Plaintiff's permission.

131.    The Committee maintains a donor database, currently housed with Frontstream (also known as/previously known as Panorama or GiftWorks).

132.    The Frontstream database contains information including the names, addresses, email addresses, committee involvement, and historical donation amounts of Swan Ball donors and attendees.

133.    The contract with Frontstream is between Frontstream and Swan Ball.

134.    The data contained within the Frontstream database is proprietary and non-public.

135.    The data contained within the Frontstream database is a result of the work of Swan Ball volunteers.

136.    The purpose of the database is to track donations to the SWAN BALL gala.

137.    The purpose of the database is not to track donations to Defendant.

138.    The data contained in the Frontstream database is proprietary to the Swan Ball Committee.

139.    At some point between January and May of 2024, a representative of Defendant contacted Frontstream and falsely represented to the company that the database belonged to Defendant, and as a result illegally obtained "primary user" administrative rights to the account.

140.    Immediately after illegally obtaining primary user rights to the account, Defendant locked the account and denied access to Committee volunteers, as well as dedicated Swan Ball staff.

141.    In May of 2024, Defendant revoked access to the 2024 Swan Ball Budget document, formerly kept as a Google document, from Committee volunteers and Swan Ball staff.

142.    The yearly budget document contains all information pertaining to donations received, underwriters' fund received, monies paid to vendors and on contracts, and that year's balance.

143.    As a result of Defendant's actions, the Committee has been prevented from sending donors appropriate correspondence related to their charitable donations and related tax

deductions, reconciling the 2024 Swan Ball budget, and is restricted in its ability to plan for future events and cannot access its proprietary data for any reason.

144.    The Committee contracted with, and maintains an account with, the online service "Clickbid."

145.    The Clickbid website is a cloud-based fundraising platform for nonprofits that specializes in mobile bidding and virtual events.

146.    The Committee uses Clickbid to host a Flash Sale prior to Christmas, preview items available for the live auction, and host a silent auction.

147.    Access to these auctions is protected access available only to Swan Ball gala invitees.

148.    Clickbid stores and maintains data, information and analytics for auction purchases made via the site.

149.    The information stored by Clickbid with regard to purchases made by SWAN BALL donors and invitees is proprietary and non-public.

150.    In early June 2024, after the June 1, 2024 Swan Ball gala event, Defendant gained access to Plaintiff's Clickbid account and changed all login information so that neither Plaintiff nor any of its volunteers or the dedicated employees can gain access to the site.

151.    Defendant has refused to allow Plaintiff access to the Clickbid Site.

152.    The Committee contracted with, and maintains an account with, the service "MailChimp."

153.    The MailChimp account contains information including the names and email addresses of Swan Ball donors, attendees and other individuals and organizations associated with the event.

154.    The contract with MailChimp is between MailChimp and Swan Ball.

155.    The data contained within the MailChimp account is proprietary and non-public.

156. The data contained within the MailChimp account is a result of the work of Swan Ball volunteers.

157. The purpose of the MailChimp account is to communicate with donors, attendees and vendors of Swan Ball.

158. The MailChimp account has only ever been used to communicate with donors, attendees and vendors of Swan Ball, with regard to matters pertaining to Swan Ball.

159. At some point between January and May of 2024, an individual associated with Defendant improperly obtained administrative access to the MailChimp account and revoked access to all Committee personnel.

160. An actual, present, and justiciable controversy exists between Plaintiff and Defendant concerning ownership of the Swan Ball trademark and associated assets.

## COUNT I - Declaratory Judgment of Trademark Ownership and Lanham Act Injunction

161. Plaintiff repeats and realleges paragraphs 1-160 as if fully set forth herein.

162. This action is based on Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114, Sections 43(a) and (c) of the Lanham Act, 15 U.S.C. § 1125(a) and (c), Section 47-18-104 of the Tennessee Code, and the common law of the State of Tennessee.

163. Plaintiff adopted in 1963, and has used in commerce continuously since that time, the mark SWAN BALL to identify and distinguish its gala from the gala(s) of others. Plaintiff continues to use its mark annually to identify and distinguish its charitable fundraising event, and by virtue of its adoption and continuous use of the SWAN BALL mark, it is the lawful owner of said mark.

164. Defendant has never used the SWAN BALL mark as a trademark or a service mark, but it is now threatening to do so, and is attempting to claim ownership of the mark.

165.    Defendant's only reference to the SWAN BALL event is to acknowledge that the event takes place on the grounds of Defendant's gardens.  Plaintiff has not authorized Defendant's application for registration of the SWAN BALL trademark or use of the SWAN BALL trademark to advertise, offer for sale, sell and/or promote Defendant's activities.

166.    At all relevant times, Defendant has actual and direct knowledge of Plaintiff's prior use and ownership of the SWAN BALL trademark.  Defendant's conduct is therefore willful and reflects Defendant's intent to exploit the goodwill and strong brand recognition associated with the SWAN BALL trademark.

167.    Defendant's conduct is willful, intentional, and represents a conscious disregard for Plaintiff's rights in the SWAN BALL trademark and a calculated decision to misappropriate the enormous goodwill represented by the SWAN BALL trademark.

168.    Defendant's conduct is likely to cause and, on information and belief, has caused confusion in the community regarding the SWAN BALL gala.

169.    The activities complained of herein have and continue to irreparably harm Plaintiff and dilute the distinctive quality of the SWAN BALL trademark. Further, Defendant's egregious conduct makes this an exceptional case.

170.    Plaintiff seeks a declaratory judgment from this Court pursuant to 28 United States Code §§ 2201 et seq.  declaring that Plaintiff SB Initiative, Inc., as the successor-in-interest to the rights of the Committee, is the sole owner of the "SWAN BALL" trademark.

171.    Plaintiff seeks an injunction prohibiting Defendant from pursuing registration of the "SWAN BALL" trademark, from representing itself as owning the "SWAN BALL" trademark, and from using or attempting to use the "SWAN BALL" trademark in commerce other than as a reference to the event authorized and organized by Plaintiff.

**COUNT II - Declaratory Judgment Establishing Ownership of the Domain www.swanball.com And Anti-Cybersquatting Transfer Order And Anti-Cybersquatting Transfer Order**

172. Plaintiff repeats and realleges paragraphs 1-160 as if fully set forth herein.

173. Plaintiff seeks a declaratory judgment from this Court pursuant to 28 United States Code §§ 2201 et seq. declaring that Plaintiff is the sole owner of the domain under state law governing ownership of domain names.

174. Defendant has a bad faith intent to profit from the SWAN BALL mark.

175. Defendant has used and is using the www.swanball.com domain, which is identical or confusingly similar to the SWAN BALL mark.

176. The SWAN BALL mark is distinctive [and/or famous] and was distinctive [and/or famous] at the time of registration of the www.swanball.com domain.

177. Defendant has not had and does not have reasonable grounds to believe that its use of the www.swanball.com domain name, including its withdrawal of access by Plaintiff's representatives to the domain, is a fair use or otherwise lawful.

178. Plaintiff is entitled to [damages and] an order transferring control of the www.swanball.com domain name to Plaintiff, as successor in interest to the Committee, under 15 U.S.C. § 1125(d)(1)(C).

**COUNT III – Violation of the Computer Fraud and Abuse Act (CFAA) Relating to the Domain www.swanball.com**

179. Plaintiff repeats and realleges paragraphs 1-160 as if fully set forth herein.

180. Plaintiff's website, www.swanball.com, is hosted on a computer system that is used in or affects interstate or foreign commerce or communication.

181.    Defendant's actions to take control of the website and exclude representatives of the Committee and Plaintiff from accessing the domain for administrative purposes constitute unauthorized access to and/or exceeding authorized access to a protected computer and obtaining information from the protected computer, in violation of the CFAA.

182.    Without this Court's intervention, Defendant's unauthorized access caused or will cause damage or loss to Plaintiff, in the form of disruption to Plaintiff's operations and services (including marketing for next year's Swan Ball event) and costs incurred in an attempt to regain control of the website, in an amount exceeding $5,000 during a one-year period.

183.    Plaintiff is entitled to [damages and] an injunction against Defendant's continued control of the www.swanball.com domain under 18 U.S.C. § 1030(g).

**COUNT IV - Declaratory Judgment Establishing Ownership of the MailChimp Account**

184.    Plaintiff repeats and realleges paragraphs 1-160 as if fully set forth herein.

185.    Plaintiff seeks a declaratory judgment from this Court pursuant to 28 United States Code §§ 2201 et seq.  declaring that Plaintiff is the sole owner of the MailChimp account and all proprietary, non-public data contained therein under state law governing ownership of electronic accounts.

**COUNT V – Violation of the Computer Fraud and Abuse Act Relating to the MailChimp Account**

186.    Plaintiff repeats and realleges paragraphs 1-160 as if fully set forth herein.

187.    Plaintiff's MailChimp account is hosted on a computer system that is used in or affects interstate or foreign commerce or communication.

188.    The MailChimp account belongs to Plaintiff because Plaintiff is the party that contracted with MailChimp to provide donor data management services.

189.    Defendant's actions to take control of the MailChimp account and exclude representatives of the Committee and Plaintiff from accessing the account constitute unauthorized access to and/or exceeding authorized access to a protected computer and obtaining information from the protected computer, in violation of the CFAA.

190.    Without this Court's intervention, Defendant's unauthorized access caused or will cause damage or loss to Plaintiff, in the form of disruption to Plaintiff's operations and services (including marketing for next year's Swan Ball event) and costs incurred in an attempt to regain control of the MailChimp account, in an amount exceeding $5,000 during a one-year period.

191.    Plaintiff is entitled to [damages and] an injunction against Defendant's continued control of the MailChimp account under 18 U.S.C. § 1030(g).  Specifically, Plaintiff is entitled to a permanent injunction enjoining Defendant and its agents, servants, employees, attorneys, and all persons in active concert or participation with Defendant from using, accessing, or retaining any data or information from Plaintiff's MailChimp account or any other proprietary, non-public information belonging to the Plaintiff.

**COUNT VI - Declaratory Judgment Establishing Ownership of the Frontstream Database**

192.    Plaintiff repeats and realleges paragraphs 1-160 as if fully set forth herein.

193.    Plaintiff's Frontstream account is hosted on a computer system that is used in or affects interstate or foreign commerce or communication.  The Frontstream account is the property of Plaintiff because Plaintiff entered into a contract with Frontstream to provide data storage and management services.

194.    Defendant's actions to take control of the Frontstream account and exclude representatives of the Committee and Plaintiff from accessing the account constitute

unauthorized access to and/or exceeding authorized access to a protected computer and obtaining information from the protected computer, in violation of the CFAA.

195.    Defendant knowingly and with intent to defraud accessed the Frontstream account without authorization or in excess of authorized access and by means of such conduct furthered the intended fraud and obtained a thing of value.

196.    Without this Court's intervention, Defendant's unauthorized access caused or will cause damage or loss to Plaintiff, in the form of disruption to Plaintiff's operations and services (including marketing for next year's Swan Ball event) and costs incurred in an attempt to regain control of the Frontstream account, in an amount exceeding $5,000 during a one-year period.

197.    Plaintiff is entitled to [damages and] an injunction against Defendant's continued control of the Frontstream account under 18 U.S.C. § 1030(g).  Specifically, Plaintiff is entitled to a permanent injunction enjoining Defendant and its agents, servants, employees, attorneys, and all persons in active concert or participation with Defendant from using, accessing, or retaining any data or information from Plaintiff's Swan Ball donor database or any other proprietary, non-public information belonging to the Plaintiff.


**COUNT VII – Violation of the Computer Fraud and Abuse Act Relating to the Frontstream Database**

198.    Plaintiff repeats and realleges paragraphs 1-160 as if fully set forth herein.

199.    Plaintiff's Frontstream account is hosted on a computer system that is used in or affects interstate or foreign commerce or communication.

200.    Defendant's actions to take control of the Frontstream account and exclude representatives of the Committee and Plaintiff from accessing the account constitute

unauthorized access to and/or exceeding authorized access to a protected computer and obtaining information from the protected computer, in violation of the CFAA.

201.     Defendant knowingly and with intent to defraud accessed the Frontstream account without authorization or in excess of authorized access and by means of such conduct furthered the intended fraud and obtained a thing of value.

202.     Without this Court's intervention, Defendant's unauthorized access caused or will cause damage or loss to Plaintiff, in the form of disruption to Plaintiff's operations and services (including marketing for next year's Swan Ball event) and costs incurred in an attempt to regain control of the Frontstream account, in an amount exceeding $5,000 during a one-year period.

203.     Plaintiff is entitled to [damages and] an injunction against Defendant's continued control of the Frontstream account under 18 U.S.C. § 1030(g).  Specifically, Plaintiff is entitled to a permanent injunction enjoining Defendant and its agents, servants, employees, attorneys, and all persons in active concert or participation with Defendant from using, accessing, or retaining any data or information from Plaintiff's Swan Ball donor database or any other proprietary, non-public information belonging to the Plaintiff.

## COUNT VIII - Declaratory Judgment Establishing Ownership of the Clickbid Website Account

204.     Plaintiff repeats and realleges paragraphs 1-162 as if fully set forth herein.

205.     Plaintiff seeks a declaratory judgment from this Court pursuant to 28 United States Code §§ 2201 et seq.  declaring that Plaintiff is the sole owner of the Clickbid auction account and all proprietary, non-public data contained therein under state law governing ownership of electronic accounts.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. A declaratory judgment declaring Plaintiff the sole owner of the "SWAN BALL" trademark, and directing that the registration of Tennessee Trademark/Servicemark No. 42241 be cancelled pursuant to Tenn. Code § 47-25-509;

B. An Order for submission to the Secretary of State for the State of Tennessee establishing that the Trademark/Service mark Registration No. 42241 issued by the State was based on the false statements made by Defendant in securing said registration.

B. A declaratory judgment establishing Plaintiff as a legal entity separate and independent from Defendant;

C. A permanent injunction enjoining Defendant from using Plaintiff's "SWAN BALL" mark without authorization;

D. An Order directing Defendant to reinstate Plaintiff as the administrative entity for managing:

    1.     The website www.swanball.com,

    2.     The Frontstream database, and

    3.     The Swan Ball MailChimp account;

E. An order prohibiting the Defendant from using, accessing, or excluding Plaintiff from the Frontstream database; administering or excluding Plaintiff from Plaintiff's website; and using, accessing, or excluding Plaintiff from the MailChimp account;

F. An order directing Defendant to relinquish any and all control over the Cheekwood/Swan Ball bank accounts, records and funds as well as to turn over to Plaintiff all financial data for the 2024 Swan Ball or any previous Swan Ball currently in Defendant's custody and control ; and

G.  Damages for Defendant's violations of the Lanham Act, the Tennessee Consumer Protection

Act, and the CFAA;

H.  Reimbursement of Plaintiff's reasonable attorney's fees pursuant to Tenn. Code § 29-14-101

et seq. and 15 U.S.C. § 1117(a); and

I.  All such other and further relief as the Court deems just and equitable.




Respectfully submitted,

/s/
Chanelle Acheson
Counsel for Plaintiff
WaddeyAcheson
chanelle@waddeyacheson.com
Bar # 30008

Jack Waddey
Counsel for Plaintiff
WaddeyAcheson
Jack@waddeyacheson.com
Bar # 00002665

W. David Bridgers
Counsel for Plaintiff
Holland & Knight
David.Bridgers@hklaw.com
Bar # 016603