**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **SB INITIATIVE, INC,** ) | |
| ) | **Civil No. 3:24-cv-821** |
| **Plaintiff/Counter-Defendant,** ) | |
| ) | **DISTRICT JUDGE ELI J.** |
| **v.** ) | **RICHARDSON** |
| ) | **MAGISTRATE JUDGE BARBARA D.** |
| **CHEEKWOOD BOTANICAL GARDEN** ) | **HOLMES** |
| **AND MUSEUM OF ART,** ) | |
| ) | **JURY DEMAND** |
| **Defendant/Counter-Plaintiff.** ) | |

_____

**CHEEKWOOD BOTANICAL GARDEN AND MUSEUM OF ART'S ANSWER TO SB
INITATIVE, INC.'S COMPLAINT, DEFENSES, AND COUNTERCLAIMS**
_____

In response to the allegations contained in Plaintiff SB Initiative, Inc.'s ("SBI") Complaint

for Declaratory Judgment and Injunctive Relief ("Complaint"), Defendant Cheekwood Botanical

Garden and Museum of Art ("Cheekwood") states as follows:

**RESPONSES TO SPECIFIC ALLEGATIONS
CONTAINED IN THE COMPLAINT**

1.       Paragraph 1 of the Complaint is merely a recitation of statutes and, therefore,

requires no response.  To the extent a response is required, Cheekwood admits that SBI attempts

to assert causes of action for declaratory judgment pursuant to 28 U.S.C. §§ 2201, for injunctive

relief pursuant to the Lanham Act, 15 U.S.C. § 1125, and the Computer Fraud and Abuse Act

(CFAA), 18 U.S.C. § 1030.  Cheekwood denies that SBI has standing to assert any such claims

against Cheekwood, has sufficiently pleaded such claims, or that this Court has subject matter

jurisdiction over such claims.  Cheekwood expressly denies that SBI is entitled to any relief

whatsoever against it.

1

2.     Paragraph 2 of the Complaint is merely a recitation of statutes and Tennessee common law and, therefore, requires no response.  To the extent a response is required, Cheekwood admits that SBI attempts to assert declaratory judgment claims under the Lanham Act, 15 U.S.C. §§ 1125(a) and 1125(d), and Tennessee common law, and claims under the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030.  Cheekwood denies that SBI has standing to assert any such claims against Cheekwood, has sufficiently pleaded such claims, or that this Court has subject matter jurisdiction over such claims.  Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

3.     Paragraph 3 of the Complaint is merely a recitation of SBI's prayer for relief, and, therefore, requires no response.  To the extent a response is required, Cheekwood admits SBI attempts to request the items listed in paragraph 3 of the Complaint as purported remedies for its claims.  Cheekwood denies that SBI has standing to assert any such claims against Cheekwood, has sufficiently pleaded such claims, that this Court has subject matter jurisdiction over such claims, or that the items requested in paragraph 3 of the Complaint are available or may be awarded as remedies for SBI's purported claims.  Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

4.     Admitted that SBI appears to be formed as a Tennessee nonprofit with the Tennessee Secretary of State.  Cheekwood lacks information sufficient to form a belief as to whether SBI has applied for, qualifies for, or has received tax exempt status under the IRS Code and, therefore, denies those allegations.

5.     In response to the allegations contained in paragraph 5 of the Complaint, Cheekwood states that its correct entity name is "Cheekwood Botanical Garden and Museum of

Art." Cheekwood admits the truth of the remainder of the allegations contained in paragraph 5 of the Complaint.

6.      Denied. For drafting clarity only, the committee referenced by SBI in paragraph 6 of the Complaint is referred to in this Answer as the "Committee." Cheekwood does not adopt or admit any of the various characterizations of the Committee offered by SBI in the Complaint.

7.      Denied.

8.      Denied.

9.      Paragraph 9 of the Complaint is merely a recitation of statutes and Tennessee common law and, therefore, requires no response. To the extent a response is required, Cheekwood denies that this action is based on Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114, because SBI does not own and has not asserted ownership of a federally registered trademark, is not a "registrant" as required by 15 U.S.C. § 1114, and thus lacks standing to assert a claim under Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114. Cheekwood admits that SBI attempts to assert declaratory judgment claims under the Lanham Act, 15 U.S.C. §§ 1125(a), 1125(c), and 1125(d), Section 47-18-104 of the Tennessee Code, and Tennessee common law. Cheekwood denies that SBI has standing to assert any such claims against Cheekwood, has sufficiently pleaded such claims, or that this Court has subject matter jurisdiction over such claims. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

10.      Paragraph 10 of the Complaint is merely a recitation of statutes and, therefore, requires no response. To the extent a response is required, Cheekwood denies this Court has subject matter jurisdiction over SBI's claims because SBI lacks standing. Cheekwood further denies this Court has subject matter jurisdiction over SBI's request to cancel Cheekwood's Tennessee trademark registration because actions to require cancellation of a mark registered under

3

Tenn. Code Ann. § 47-25-501 *et seq.* "shall be brought in the circuit court of Davidson County." Tenn. Code Ann. § 47-25-515. Cheekwood denies that SBI is entitled to any relief whatsoever against it.

11. Paragraph 11 of the Complaint is merely a recitation of statutes and, therefore, requires no response. To the extent a response is required, Cheekwood denies that SBI has standing to assert its alleged claims against Cheekwood, has sufficiently pleaded such claims, that this Court has subject matter jurisdiction over such claims, or that SBI is entitled to any relief whatsoever against it. Cheekwood further denies this Court is the proper venue over SBI's request to cancel Cheekwood's Tennessee trademark registration because actions to require cancellation of a mark registered under Tenn. Code Ann. § 47-25-501 *et seq.* "shall be brought in the circuit court of Davidson County." Tenn. Code Ann. § 47-25-515. Notwithstanding, Cheekwood does not contest venue in this Court for purposes of this action.

12. Paragraph 12 of the Complaint is merely a recitation of statutes and, therefore, requires no response. To the extent a response is required, Cheekwood admits that Cheekwood is a not-for-profit corporation formed in and having its principal place of business in Tennessee, such that this Court has personal jurisdiction over Cheekwood. Cheekwood denies the truth of the remainder of the allegations contained in paragraph 12 of the Complaint. Cheekwood denies that SBI is entitled to any relief whatsoever against it.

13. Admitted.

14. Admitted that, in 1962, Dr. Garth Fort, chairman of Cheekwood's board, and Walter Sharp, a Cheekwood board member, asked Mrs. Jane Anderson Dudley to chair the first SWAN BALL Gala for the benefit of Cheekwood. Admitted that Mrs. Dudley agreed to do so and became

4

the iconic first and founding chair of the SWAN BALL Gala. The remainder of the allegations in paragraph 14 are denied.

15.     Admitted that the first SWAN BALL Gala was held in 1963. Admitted that Mrs. Dudley organized the first SWAN BALL Gala on behalf of, for the benefit of, and in conjunction with Cheekwood staff and board members and Nashville civic leaders. The remainder of the allegations in paragraph 15 are denied.

16.     Admitted that the first SWAN BALL Gala took place on Cheekwood's property on a date and at a location approved by Cheekwood. The remainder of the allegations in paragraph 16 are denied.

17.     Admitted that the SWAN BALL Gala was named for Cheekwood's Swan Lawn. The remainder of the allegations in paragraph 17 are denied.

18.     Denied.

19.     Admitted that, in or around 1962, Mrs. Dudley convened several Nashville volunteers to assist with the Swan Ball. Cheekwood lacks knowledge sufficient to form a belief as to truth of the remainder of the allegations contained in paragraph 19 of the Complaint and, therefore, denies those allegations.

20.     Admitted, except as to the capitalized term "Advisory Committee," which is not defined by SBI in the Complaint. Denied as to any allegation, express or implied, purporting to assign an accepted meaning to the undefined term "Advisory Committee."

21.     Admitted that Mrs. Dudley, and Mmes. Ingram, Lawrence, Werthan, Earthman, and Zerfoss, were Cheekwood volunteers not Cheekwood employees. Denied as to any allegation, express or implied, purporting to assign an accepted meaning to the term "Advisory Committee," which is not defined by SBI in the Complaint.

5

22.    Denied.

23.    Denied.

24.    Admitted, except as to the capitalized term "Advisory Committee," which is not defined by SBI in the Complaint. Denied as to any allegation, express or implied, purporting to assign an accepted meaning to the undefined term "Advisory Committee."

25.    Denied.

26.    Admitted.

27.    Denied that Swan Ball proceeds—solicited and donated solely for Cheekwood— could be given to an entity other than Cheekwood. Cheekwood lacks knowledge or information sufficient to form a belief as to Mrs. Dudley's state of mind or precise comments in the early to mid-1960s, and, therefore, denies the remainder of the allegations contained in paragraph 27 of the Complaint.

28.    Admitted.

29.    Cheekwood lacks information sufficient to form a belief as to the truth of the allegations contained in paragraph 29 of the Complaint and, therefore, denies them.

30.    Denied.

31.    Admitted that additional committees have been formed to assist with planning the Swan Ball on behalf of and in conjunction with Cheekwood. Admitted that Cheekwood has not historically sought to micromanage the organization and membership of Swan Ball committees, provided that the organization or membership of the committees does not compromise Cheekwood's philanthropic mission or the quality of its Swan Ball. The remainder of the allegations in paragraph 31 are denied.

32.    Denied.

33.    Denied.

34.    Denied.

35.    Denied.

36.    Admitted that two SWAN BALL volunteers typically serve as "co-chairs" or "Ball chairs" for the annual Swan Ball.  Denied that there were two co-chairs for "each annual SWAN BALL gala" conducted for the past 61 years.

37.    Admitted that Cheekwood has not historically sought to control selection of the co-chairmen, provided that the individuals selected do not compromise Cheekwood's philanthropic mission or the quality of its Swan Ball.   Denied that the selection of the co-chairs is not subject to Cheekwood's advice or approval.  Denied that the co-chairs are always chosen by "the Nominating Committee."  Cheekwood lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in paragraph 37 of the Complaint and therefore denies them.

38.    Admitted that, over time, Swan Ball volunteers working on behalf of and in conjunction with Cheekwood have added committees and sub-committees, including an Executive Committee, Advisory Committee, Mini-Committee, Invitations Committee, Nominating Committee, Patrons' Committee, Dance Committee, Late Party Committee, and Auction Committee.  The remainder of the allegations in paragraph 38 are denied.

39.    Denied.

40.    Denied.

41.    Denied.

42.    Denied.

7

43.     Admitted.  The "Swan Ball Committee" is not a legal entity that can enter into contracts or delegate authority to enter into contracts.

44.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically choose the theme for that year's Swan Ball on behalf of Cheekwood.  Denied that Cheekwood does not have authority to approve, override, or provide input on the Swan Ball theme.  Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

45.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select the entertainer for that year's Swan Ball on behalf of Cheekwood.  Denied that Cheekwood does not have authority to approve, override, or provide input on the Swan Ball entertainer.  Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

46.     Denied.

47.     Denied.

48.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select the event designer for that year's Swan Ball on behalf of Cheekwood.  Denied that Cheekwood does not have authority to approve, override, or provide input on the Swan Ball event designer (or "entertainer," as alleged by SBI in paragraph 48).  Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

8

49.     Denied.

50.     Denied.

51.      Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select the caterer for that year's Swan Ball on behalf of Cheekwood.   Denied that Swan Ball volunteers can select a caterer without Cheekwood approval, as major vendors for the Swan Ball, including caterers, must be selected from Cheekwood's approved list of vendors. The remainder of the allegations in paragraph 51 are denied.

52.     Denied.

53.     Denied.

54.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select the location for the Swan Ball auction ("Swan Ball Auction"), an associated fundraising event in support of and in connection with Cheekwood and the Swan Ball, and for years have selected the Belle Meade Country Club using personal membership numbers.  Admitted that Cheekwood authorizes certain Swan Ball volunteers, in conjunction with Cheekwood's Swan Ball Office employees, to negotiate and sign contracts for event-related vendors and expenses on behalf of Cheekwood.   Denied that Cheekwood does not have authority to approve, override, or provide input on the Swan Ball Auction.  Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

55.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select the auctioneer for that year's Swan Ball on behalf of Cheekwood.   Denied that Cheekwood does not have authority to approve,

9

override, or provide input on the Swan Ball auctioneer. Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

56.     Denied.

57.     Denied.

58.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select the floral decoration for that year's Swan Ball Auction on behalf of Cheekwood. Denied that Cheekwood does not have authority to approve, override, or provide input on the Swan Ball floral decoration. Cheekwood establishes venue guidelines outlining Cheekwood's control and limitations on decorations, use of the Cheekwood Mansion rooms, moving of furniture, catering requirements, lighting requirements, use of candles, and other required protocol. Denied that Cheekwood has "never made an attempt to approve or deny" the choice of floral decoration, and, in fact, has denied floral decorations proposed by the Swan Ball co-chairmen.

59.     Denied.

60.     Denied.

61.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select the program for that year's Swan Ball on behalf of Cheekwood. Denied that Cheekwood does not have authority to approve, override, or provide input on the Swan Ball program. Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

62.     Denied.

63.     Denied.

64.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select the design for the invitations for that year's Swan Ball on behalf of Cheekwood.  Denied that Cheekwood does not have authority to approve, override, or provide input on the Swan Ball invitation design.  Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select the event coordinator, if needed, for that year's Swan Ball on behalf of Cheekwood.  Denied that Cheekwood does not have authority to approve, override, or provide input on the Swan Ball event coordinator.  Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

71.     Denied.

72.     Denied.

73.     Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, determine the ticket price for that year's Swan Ball. Denied that Cheekwood does not have authority to approve, override, or provide input on the Swan

11

Ball ticket price. Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Admitted that the members of the Swan Ball Patron's Committee, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select each year's Swan Ball Patron's donation amount for the Swan Ball. Denied that Cheekwood does not have authority to approve, override, or provide input on Swan Ball Patrons. Cheekwood lacks information sufficient at this stage to form a belief as to whether Cheekwood has "never made an attempt to approve or deny same" over the past 61 years and, therefore, denies those allegations.

80. Admitted that the Swan Ball co-chairmen, in conjunction with other volunteers and Cheekwood's Swan Ball Office employees, typically select Swan Ball Patrons and Swan Ball Patron's party hosts to underwrite the Swan Ball Patron's party and location. The remainder of the allegations in paragraph 80 are denied.

81. Denied.

82. Denied.

83. Denied.

84. Denied.

85. Denied.

86.     Denied.

87.     Denied.

88.     Denied.

89.     Denied.

90.     Denied.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Admitted that funds raised on behalf of Cheekwood in conjunction with the Swan Ball are deposited into a Swan Ball bank account established by Cheekwood for that year. Admitted that payment for event-related vendors and expenses for the Swan Ball is disbursed from Cheekwood's Swan Ball bank account funded by donations to Cheekwood. Denied that the bank accounts established by Cheekwood for each Swan Ball are funded by the Committee. The remainder of the allegations in paragraph 95 are denied.

96.     Denied.

97.     Admitted that Cheekwood holds bank accounts in addition to the Swan Ball bank accounts Cheekwood establishes each year. The remainder of the allegations in paragraph 97 are denied.

98.     Admitted, except to the extent Cheekwood grants limited access to a member of the Committee.

99.     Denied.

100.    Denied.

13

101.    Admitted that, in 2005 as today, Swan Ball proceeds have traditionally been used for general operations in support of mission-based activities but may be used for another purpose when special needs arise in the ordinary course of business.  Admitted that, in 2005, Cheekwood required funding for roof repairs necessitating early transfer of proceeds.  Admitted that, as a courtesy and because the early transfer was an exception to standard operating procedure in 2005, Cheekwood communicated the need for an off-schedule transfer of Swan Ball proceeds to the Ball co-chairs that year to be used for roof repairs to the Cheekwood mansion.  Denied that an early transfer of Swan Ball proceeds constituted a "special contribution" from the Swan Ball bank account.  The remainder of the allegations in paragraph 101 are denied.

102.    Cheekwood lacks information or knowledge sufficient to admit or deny the allegations contained in paragraph 102 of the Complaint and, therefore, denies those allegations.

103.    Admitted that, in 2005, the Committee and Cheekwood agreed to make an early, off-schedule transfer of funds donated to Cheekwood for roof repairs to the Cheekwood mansion. Denied that the funds belonged to the Committee or that the Committee had any authority to withhold donor funds donated to Cheekwood.  The remainder of the allegations in paragraph 103 are denied.

104.    Admitted that, in 2005, the off-schedule transfer of funds to defray roof repair costs was made. Denied that the funds belonged to the Committee or that the Committee had any authority to withhold donor funds donated to Cheekwood.  The remainder of the allegations in paragraph 104 are denied.

105.    Admitted.

106.    Admitted that, in the Swan Ball Standard Operating Procedures ("SOP"), Cheekwood established a series of best practices and parameters to improve the Swan Ball's

14

fundraising efficiency ratio over time, some of which were "all-new and different" from prior procedures. Further admitted that Cheekwood assumed greater responsibility for improving fundraising efficiency for the Swan Ball in order to reign in lavish spending, align the event with reasonable charitable objectives, and demonstrate financial responsibility. The remainder of the allegations in paragraph 106 are denied.

107. Denied. Plaintiff did not exist in 2023. The SOP were not "all new."

108. Denied.

109. Denied.

110. Denied.

111. Denied. Neither Plaintiff nor "Plaintiff's Executive Board" existed in March of 2024.

112. Cheekwood lacks knowledge or information sufficient to form a belief as to whether the alleged vote was unanimous, and, therefore, denies that allegation. The remainder of the allegations in paragraph 112 are denied.

113. Denied. The Committee did not "formalize itself" by incorporating SB Initiative, Inc.; SBI is not a "continuation" of the Committee; and SBI is not a successor-in-interest to the Committee.

114. Denied. Neither the SWAN BALL Mark nor an assignable interest in the mark was owned at any time by the Committee. The SWAN BALL Mark has not been and could not have been assigned by the Committee. Any corresponding written assignment is not effective, valid, or binding.

115. Admitted that, on May 26, 2024, SBI filed a federal trademark application to register the SWAN BALL Mark. The remainder of the allegations in paragraph 115 are denied.

116. Admitted that, on June 4, 2024, Cheekwood filed an application with the USPTO to register Cheekwood's SWAN BALL Mark. The remainder of the allegations in paragraph 116 are denied.

117. Admitted that Cheekwood owns Tennessee Trademark / Service Mark No. 42241, and that Cheekwood's ownership of the SWAN BALL Mark has been publicly recorded with the Tennessee Secretary of State since July 1, 2004. The remainder of the allegations in paragraph 117 are denied.

118. Cheekwood lacks knowledge or information sufficient to form a belief as to when SBI "discovered" Cheekwood's publicly available and recorded trademark registration and, therefore, denies those allegations. Denied that members of the Committee were not aware of Cheekwood's registration. The remainder of the allegations in paragraph 118 are denied.

119. Denied.

120. Denied.

121. Admitted that two permanent staff members work in Cheekwood's Swan Ball Office, both of whom are Cheekwood employees.

122. Admitted that the permanent staff of the Swan Ball Office are paid through Cheekwood's payroll. The remainder of the allegations in paragraph 122 are denied.

123. Cheekwood lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 123 of the Complaint and, therefore, denies them.

124. Denied.

125. Denied.

126. Denied.

127. Denied.

16

128.    Denied.

129.    Denied.

130.    Denied.

131.    Denied.

132.    Admitted.

133.    Denied.

134.    Admitted.

135.    Denied.

136.    Denied.

137.    Denied.

138.    Denied.

139.    Denied.

140.    Denied.

141.    Denied.

142.    Admitted.

143.    Denied.

144.    Denied.

145.    Admitted.

146.    Admitted that Swan Ball volunteers, in conjunction with Cheekwood's Swan Ball Office employees, use Cheekwood's Clickbid account to host a Flash Sale prior to Christmas, preview items available for the live auction, and host a silent auction.  The remainder of the allegations in paragraph 146 are denied.

147.    Denied.

148.    Admitted.

149.    Admitted.

150.    Denied.

151.    Admitted.  Plaintiff has never had access to the ClickBid site.

152.    Denied.

153.    Admitted.

154.    Denied.

155.    Admitted.

156.    Denied.

157.    Admitted.

158.    Admitted.

159.    Denied.

160.    Denied that Plaintiff has standing to seek declaratory judgment concerning ownership of the SWAN BALL trademark and associated assets.  Further denied that SBI is entitled to any relief whatsoever against Cheekwood.

161.    In response to the allegations contained in paragraph 161 of the Complaint, Cheekwood incorporates by reference its responses to paragraphs 1 to 160 of the Complaint as if fully set forth herein.

162.    Paragraph 162 of the Complaint is merely a recitation of statutes and Tennessee common law and, therefore, requires no response.  To the extent a response is required, Cheekwood denies that this action is based on Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114, because SBI does not own and has not asserted ownership of a federally registered trademark, and thus is not a "registrant" as required by 15 U.S.C. § 1114.  SBI thus lacks standing to assert a claim under

Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114. Cheekwood admits that SBI attempts to assert declaratory judgment claims under Section 43(a) and (c) of the Lanham Act, 15 U.S.C. §§ 1125(a) and 1125(c), Section 47-18-104 of the Tennessee Code, and Tennessee common law. Cheekwood denies that SBI has standing to assert any such claims against Cheekwood, has sufficiently pleaded such claims, or that this Court has subject matter jurisdiction over such claims. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

163. Denied.

164. Denied.

165. Denied.

166. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

167. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

168. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

169. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

170. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

171. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

172.     In response to the allegations contained in paragraph 172 of the Complaint, Cheekwood incorporates by reference its responses to paragraphs 1 to 160 of the Complaint as if fully set forth herein.

173.     Paragraph 172 of the Complaint is merely a recitation of statutes and, therefore, requires no response.  To the extent a response is required, Cheekwood admits that SBI attempts to assert a declaratory judgment claim under 28 U.S.C. §§ 2201 *et seq.*  Cheekwood denies that SBI has standing to assert any such claims against Cheekwood, has sufficiently pleaded such claims, or that this Court has subject matter jurisdiction over such claims.  Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

174.     Denied.

175.     Admitted that Cheekwood owns, maintains, and has used its domain www.swanball.com.  Admitted that Cheekwood owns the SWAN BALL Mark.  Denied as to the remainder of the allegations contained in paragraph 175 of the Complaint.

176.     Admitted that Cheekwood's SWAN BALL Mark is distinctive and famous, and was distinctive and famous at the time of registration of the domain www.swanball.com on behalf of and in conjunction with Cheekwood.  Denied as to the remainder of the allegations contained in paragraph 176 of the Complaint.

177.     Denied.  Expressly denied that "Plaintiff's representatives" have had or are entitled to have any access whatsoever to Cheekwood's domain for the Swan Ball.

178.     Denied.  Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

20

179.     In response to the allegations contained in paragraph 179 of the Complaint, Cheekwood incorporates by reference its responses to paragraphs 1 to 160 of the Complaint as if fully set forth herein.

180.     Denied.

181.     Denied.

182.     Denied.  Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

183.     Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

184.     In response to the allegations contained in paragraph 184 of the Complaint, Cheekwood incorporates by reference its responses to paragraphs 1 to 160 of the Complaint as if fully set forth herein.

185.     Paragraph 185 of the Complaint is merely a recitation of statutes and, therefore, requires no response.  To the extent a response is required, Cheekwood admits that SBI attempts to assert a declaratory judgment claim under 28 U.S.C. §§ 2201 *et seq.*  Cheekwood denies that SBI has standing to assert any such claims against Cheekwood, has sufficiently pleaded such claims, or that this Court has subject matter jurisdiction over such claims.   Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

186.     In response to the allegations contained in paragraph 186 of the Complaint, Cheekwood incorporates by reference its responses to paragraphs 1 to 160 of the Complaint as if fully set forth herein.

187.     Denied.

188.     Denied.

189. Denied.

190. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

191. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

192. In response to the allegations contained in paragraph 192 of the Complaint, Cheekwood incorporates by reference its responses to paragraphs 1 to 160 of the Complaint as if fully set forth herein.

193. Denied.

194. Denied.

195. Denied.

196. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

197. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

198. In response to the allegations contained in paragraph 198 of the Complaint, Cheekwood incorporates by reference its responses to paragraphs 1 to 160 of the Complaint as if fully set forth herein.

199. Denied.

200. Denied.

201. Denied.

202. Denied. Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

203.     Denied.  Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

204.     In response to the allegations contained in paragraph 204 of the Complaint, Cheekwood incorporates by reference its responses to paragraphs 1 to 162 of the Complaint as if fully set forth herein.

205.     Paragraph 205 of the Complaint is merely a recitation of statutes and, therefore, requires no response.  To the extent a response is required, Cheekwood admits that SBI attempts to assert a declaratory judgment claim under 28 U.S.C. §§ 2201 *et seq.*  Cheekwood denies that SBI has standing to assert any such claims against Cheekwood, has sufficiently pleaded such claims, or that this Court has subject matter jurisdiction over such claims.  Cheekwood expressly denies that SBI is entitled to any relief whatsoever against it.

206.     The remainder of the allegations in the Complaint, being merely prayers for relief, require no response.  Notwithstanding, Cheekwood denies that SBI is entitled to any relief whatsoever against it.

207.     To the extent any response is necessary to the Complaint's section headings, the allegations contained therein are denied.

208.     Any allegations contained in the Complaint that are not expressly admitted above are hereby denied.

## DEFENSES

209.     The burden of proof with respect to any of the defenses and issues listed below are as provided by the applicable federal or Tennessee law.  Characterizing the defenses below as "Affirmative Defenses" does not shift the burden of proof to Cheekwood with respect to any issues for which SBI carries the burden of proof.

210. SBI's Complaint fails to state a claim upon which relief can be granted because Cheekwood has not performed any act, and is not proposing to perform any act, in violation of any right validly belonging to SBI.

211. SBI's Complaint fails to sufficiently plead claims as required by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

212. SBI's claims are barred, in whole or in part, because the U.S. District Court for the Middle District of Tennessee lacks subject matter jurisdiction over SBI's claims.

213. SBI's claims are barred, in whole or in part, because SBI lacks standing.

214. SBI's request that the Court cancel Cheekwood's Tennessee trademark registration is barred, in whole or in part, because this Court lacks jurisdiction and/or this Court is the improper venue, because actions to require cancellation of a mark registered under Tenn. Code Ann. § 47-25-501 *et seq.* "shall be brought in the circuit court of Davidson County." Tenn. Code Ann. § 47-25-515.

215. SBI's request that the Court order refusal of registration of Cheekwood's pending federal application is barred, in whole or in part, because the basis for a federal court's remedial power to determine the right to register under 15 U.S.C. § 1119 is limited to lawsuits "involving a registered mark," and SBI does not own any marks, much less federal registrations therefor.

216. SBI's request for injunctive relief is barred because SBI has delayed in asserting the claims; the claims are not likely to succeed on the merits; the claims do not demonstrate irreparable harm; the balance of harms does not weigh in SBI's favor; and issuance of an injunction is not in the public interest.

217. SBI's claims should be denied for the reasons stated in Cheekwood's Counterclaims in this case.

24

218. SBI's claims are barred, in whole or in part, by the doctrine of unclean hands, based on, *inter alia*, SBI's conduct as alleged herein and in Cheekwood's Counterclaims in this case.

219. SBI's claims are barred, in whole or in part, by the doctrine of laches, waiver, and/or undue delay.

220. SBI's claims are barred, in whole or in part, by the doctrine of acquiescence, estoppel, licensee estoppel, and/or merger.

221. SBI's claims are barred, in whole or in part, by the applicable statute of limitations.

222. SBI's claims are barred, in whole or in part, by absence of priority.

223. SBI's claims are barred, in whole or in part, by lack of ownership.

224. Without admitting that the Complaint states a claim, there has been no damage in any amount, manner, or at all by reason of any act alleged against Cheekwood in the Complaint, and therefore the relief prayed for in the Complaint cannot be granted.

225. Any award of judgment sought by SBI would unjustly enrich SBI.

226. Cheekwood reserves the right to amend its pleadings at the appropriate time, including, but not limited to, Cheekwood's Answer and Counterclaims.

227. Cheekwood reserves the right to assert additional defenses at the close of discovery.

## <u>CHEEKWOOD BOTANICAL GARDEN AND MUSEUM OF ART'S COUNTERCLAIMS AGAINST SB INITIATIVE, INC.</u>

Defendant/Counter-Plaintiff Cheekwood Botanical Garden and Museum of Art, for its causes of action against Plaintiff/Counter-Defendant SB Initiative, Inc., states as follows:

### I.     <u>THE PARTIES</u>

1. Cheekwood Botanical Garden and Museum of Art ("Cheekwood") is a Tennessee nonprofit corporation with its principal place of business at 1200 Forrest Park Drive, Nashville TN 37205.

25

2.     SB Initiative, Inc. ("SBI") is a Tennessee nonprofit corporation with its principal office listed in the Tennessee Secretary of State records as 1030 16th Avenue S., Suite 165, 2nd Floor, Nashville, TN 37212.

## II.     NATURE OF THE ACTION

3.     This is an action for trademark infringement, unfair competition, false designation of origin, and false association arising under Section 43 of the Trademark Act of 1946 ("Lanham Act"), as amended, 15 U.S.C. § 1051 *et seq.*; for trademark infringement and trademark dilution under the Tennessee Trademark Act, Tenn. Code Ann. § 47-25-501 *et seq.*; for unfair competition and violation of Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*; for unfair competition under Tennessee common law; for refusal of SBI's federal trademark application; for cybersquatting in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); and for violations of the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030.

## III.     JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over Cheekwood's Counterclaims under 28 U.S.C. § 1331 as it involves a federal question; and under 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) in that this case arises under the Lanham Act.

5.     This Court also has subject matter jurisdiction over Cheekwood's unfair competition claims herein under the provisions of 28 U.S.C. § 1338(b) in that said claims are joined with a substantial and related claim under the Lanham Act.

6.     This Court has supplemental jurisdiction over Cheekwood's claims that arise under Tennessee law pursuant to 28 U.S.C. § 1367(a) because they are substantially related to Cheekwood's claims that arise under the Lanham Act.  Furthermore, this Court has supplemental jurisdiction because both Cheekwood's state and federal claims are derived from a common

nucleus of operative facts and considerations of judicial economy dictate the state and federal issues be consolidated for a single trial.

7.      This Court has general jurisdiction over SBI because, among other reasons, SBI is incorporated in this District and has its principal place of business in this District.  This Court further has specific personal jurisdiction over SBI based on SBI's continuous and systematic minimum contacts with Tennessee through its purported charitable fundraising services and activities both in and/or directed at this District and has caused or immediately threatens to cause injuries to Cheekwood within this District.

8.      Further, this Court has personal jurisdiction under Tennessee's long-arm statute, Tenn. Code Ann. § 20-2-201 *et seq.*, because, upon information and belief, (1) SBI has transacted business in Tennessee; (2) the tortious acts or omissions occurred in Tennessee; (3) the damages occurred in Tennessee to a not-for-profit corporation with its principal place of business in Tennessee; and (4) jurisdiction based on SBI's contacts with Tennessee (including, but not limited to, sales of products and services) is not inconsistent with the Constitution of the State of Tennessee or the Constitution of the United States. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, among other reasons, SBI transacts business in this District, SBI is subject to personal jurisdiction in this District, a substantial part of the events giving rise to Cheekwood's claims occurred in this District, and Cheekwood is suffering harm in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     CHEEKWOOD AND ITS PHILANTHROPIC MISSION

9.      Cheekwood is a nonprofit corporation and Nashville institution comprised of a 55-acre botanical garden, arboretum, and art museum located on the historic Cheek estate.

10. Designed by Bryant Fleming and originally built between 1929 and 1932 as the home of Leslie and Mabel Cheek, Cheekwood's property is considered one of the finest examples of an American Country Place Era estate.

11. Huldah Cheek Sharp and Walter Sharp donated the extraordinary Cheek estate to be converted into a botanical garden and museum of art for public enrichment in 1957.

12. In May 1960, the Tennessee Fine Arts Center and Botanical Gardens at Cheekwood opened its doors to the public.

13. Cheekwood is listed in the National Register of Historic Places by the United States Department of the Interior.

14. Today, Cheekwood's grounds features 13 distinct gardens, both historic and modern; an education and events building that once functioned as the Cheek family's stable and garage; a 1.5 mile woodland trail devoted to the permanent exhibit of modern and contemporary sculpture, as well as temporary exhibitions; and period rooms and galleries in the historic mansion for the exhibition and display of its permanent collections of American Art from the 18th to mid-20th century.

15. Cheekwood's mission is to celebrate and preserve Cheekwood's estate and gardens as a historical landmark where beauty and excellence in art and horticulture nurture the spirit and serve as inspiration for a diverse and broad audience.

16. Cheekwood's vision is to be a locally celebrated and nationally recognized destination renowned for its distinctive beauty, historical significance, and excellence in art and horticulture.

17. Cheekwood's guiding principles are: (1) BEAUTY that nurtures the spirit; (2) PRESERVATION for future generations; (3) EDUCATION that enriches and inspires; (4)

28

COLLABORATION that embraces a broad community; and (5) FINANCIAL RESPONSIBILITY in stewarding its resources.

18.     In an increasingly technology-dependent world, Cheekwood provides a peaceful space for reconnection to nature and exploration of history, horticulture, and art for visitors of all ages and backgrounds.

19.     Today, Cheekwood presents world-class art exhibitions; maintains spectacular gardens and an historic estate; and puts on family activities, festivals, and programming for all ages celebrating the four seasons.

20.     Cheekwood welcomes on average 400,000 visitors to its grounds annually, making it one of Nashville's top cultural attractions.

21.     Cheekwood is committed to embracing, pursuing, and celebrating inclusion, diversity, equity, and accessibility among its board, staff, leadership, partners, vendors, volunteers, members, supporters, and visitors.

22.     Through its partnerships, art exhibitions, garden and festivals, school and community outreach programs, public and family programs, and other developing initiatives, Cheekwood strives to pursue and showcase new and previously underrepresented ideas, artists, advisors, partners, instructors, innovators, and audiences so that all voices can be heard, respected, and supported.

23.     To combat barriers to cultural institutions, Cheekwood provides programs and services for historically underserved communities, and seeks to preserve the institution's role as a cultural hub in Middle Tennessee.

29

## B.    CHEEKWOOD'S COMPLIANCE WITH NONPROFIT REQUIREMENTS AND BEST PRACTICES

24.    Cheekwood is established as a not-for-profit entity under federal and state law in compliance with corporate, tax, and charitable solicitation laws.

25.    Cheekwood is a tax-exempt entity under IRS Code section 501(c)(3).

26.    Cheekwood annually files information returns as a tax-exempt entity with the IRS, including IRS Form 990.

27.    Cheekwood is registered to solicit charitable donations with the Tennessee Secretary of State.

28.    *Guidestar*, a charity oversight organization that collects, organizes, and presents comprehensive information about all IRS-registered nonprofit organizations in the U.S., issues a Seal of Transparency to nonprofits that demonstrate a commitment to transparency.

29.    Cheekwood maintains *Guidestar*'s highest ranking, Platinum Seal of Transparency.

30.    According to *Guidestar*'s website, in 2021, approximately 5% of all nonprofits registered with the IRS had earned a *Guidestar* Seal of Transparency.  Of those seal holders, only 15% had earned a Platinum Seal of Transparency.

31.    *Charity Navigator* is a charity assessment organization that evaluates and rates 501(c)(3) tax-exempt organizations on the cost-effectiveness and overall health of a charity's programs.

32.    *Charity Navigator*'s ratings include measures of stability, efficiency, and sustainability, to inform donors of not just where their dollars are going but what their dollars are doing.

33.     *Charity Navigator* analyzes charity performance across four key domains (called "beacons"): impact and measurement, accountability and finance, leadership and adaptability, and culture and community.

34.     *Charity Navigator* rates 501(c)(3) nonprofits from zero stars to four stars. *Charity Navigator* awards a four star-rating to charities that exceed or meets best practices and industry standards across almost all beacons.

35.     Cheekwood maintains *Charity Navigator*'s highest rating as a Four Star Charity.

36.     For fiscal year 2022, *Charity Navigator* evaluated Cheekwood a score of 100 for "accountability and finance," a score of 100 for "leadership and adaptability, and a score of 86 for "culture and community."

37.     The Better Business Bureau's charitable affiliate, the BBB Wise Giving Alliance, has developed the BBB Standards for Charity Accountability, which is used in reviewing publicly soliciting charities that are tax exempt under section 501(c)(3) of the IRS Code.

38.     BBB Wise Giving Alliance established the following standard for "Fund Raising Expenses":

> Fund Raising Expenses - Spend no more than 35% of related contributions on fund raising. Related contributions include donations, legacies, and other gifts received as a result of fund raising efforts.

## C.     THE HISTORY OF CHEEKWOOD'S SWAN BALL

39.     The Swan Ball is an annual white-tie charity event established in 1963 to raise funds for Cheekwood (the "Swan Ball").

40.     In 1962, Dr. Garth Fort, then-president of the new Tennessee Fine Arts Center and Botanical Gardens at Cheekwood (Cheekwood's former name and referred to herein as "Cheekwood"), discussed the idea of a fundraising ball for Cheekwood with Jane Anderson Dudley, a leading hostess and prominent Nashville philanthropist.

31

41.     A week later, Dr. Fort and Walter Sharp (a member of Cheekwood's Board) asked Mrs. Dudley to chair a fundraising ball for Cheekwood, envisioned as a grand gala to be held under a tent in Cheekwood's Swan Lawn overlooking the rolling hills of Nashville.

42.     A short time later, Cheekwood appointed Mrs. Dudley as the founding chair of what would become known as the Swan Ball benefiting Cheekwood.

43.     Mrs. Dudley served as chair for the first two Swan Balls.

44.     Thereafter, Mrs. Dudley was made an honorary chair and remained heavily involved in the production of the Swan Ball—and one of Cheekwood's greatest champions—until her death in 2017.

45.     The Swan Ball is named for Cheekwood's Swan Lawn, one of the Cheek estate's historic styled gardens designed by Bryant Fleming.

46.     Cheekwood has hosted each Swan Ball on its eponymous Swan Lawn since 1963.

47.     Over the years, additional fundraising events and activities leading up to the Swan Ball have been organized and held for Cheekwood under the trademark SWAN BALL (the "SWAN BALL Mark").

48.     The Swan Ball and associated SWAN BALL fundraising events and activities are organized by Cheekwood's employees and volunteers, on behalf of Cheekwood, on Cheekwood's property, using Cheekwood's resources, with Cheekwood's authorization and supervision, in accordance with Cheekwood's policies and procedures, consistent with Cheekwood's vision and guiding principles, and for the singular purpose of raising funds to fulfill Cheekwood's philanthropic mission.

**D.     CHEEKWOOD'S SWAN BALL MARK**

49.     Cheekwood is the sole owner of common law and registered trademark rights in and to the SWAN BALL Mark.

50.     Cheekwood adopted and has continuously used the SWAN BALL Mark in U.S. commerce in connection with charitable fundraising and organizing charitable auctions, galas, and other events since at least as early as 1962.

51.     For more than 60 years, Cheekwood has used the SWAN BALL Mark continuously and extensively in interstate commerce to identify its services and to distinguish such services from those offered and provided by others.

52.     Cheekwood has developed substantial goodwill and consumer recognition of SWAN BALL as a trademark identifying Cheekwood and its services.

53.     Since its first use, Cheekwood has spent significant resources developing and promoting the SWAN BALL Mark and the services offered under the mark.  Cheekwood promotes its services through its website, as well as through print media and other promotional campaigns, including, without limitation, within the State of Tennessee.

54.     Among other intellectual property holdings, Cheekwood is the owner of Tennessee registration no. 42241 for the SWAN BALL Mark for "[c]haritable fundraising services involving auction and gala events with proceeds going to Cheekwood Botanical Garden and Museum of Art" (the "Registration").  A true and correct copy of Cheekwood's Registration is attached as **Exhibit 1**.

55.      The Registration issued on July 1, 2004, and has been valid and subsisting since that date.

56.     Cheekwood has timely renewed the Registration since its issuance.

57.     On July 29, 2004, Cheekwood's Botanical Garden Committee reported to Cheekwood's board that it had completed the process to register several names with the State of Tennessee Trademark Office, including the SWAN BALL Mark.

58.     The Swan Ball 2004 committee representative sitting on Cheekwood's board was informed of Cheekwood's registration of the SWAN BALL Mark on and received a copy of the report on July 29, 2004.

59.     Cheekwood is the owner of the U.S. application no. 98584547 for the SWAN BALL Mark for "Charitable fundraising services; Charitable fundraising services by means of organizing and conducting galas, events, and auctions" ("Cheekwood's Application").

60.     Cheekwood has also established, through continuous, long-term use in commerce, common law rights in the SWAN BALL Mark.  Through its continuous, long-term use for the past sixty-plus years, the SWAN BALL Mark has become so intertwined with Cheekwood and its services that it is understood by consumers to refer to the name and identity of Cheekwood.

61.     Cheekwood has expended considerable time, resources, and effort in promoting the SWAN BALL Mark and developing substantial goodwill associated therewith throughout the United States, including, without limitation, in the State of Tennessee.

62.     The SWAN BALL Mark is inherently distinctive when used in conjunction with Cheekwood's charitable fundraising services.

63.     Due to the continuous use of the SWAN BALL Mark by Cheekwood, the SWAN BALL Mark has come to indicate a single source of charitable fundraising services involving auction and gala events.  The SWAN BALL Mark further has come to indicate Cheekwood as the single source of such high-quality fundraising services.

64.     As a result of Cheekwood's long and exclusive use of the SWAN BALL Mark, the SWAN BALL Mark has become, through widespread and favorable public acceptance and recognition, an exclusive asset of substantial value as a symbol of Cheekwood, its philanthropic mission, its quality fundraising services, and its goodwill.

34

65.     Cheekwood and its use of the SWAN BALL Mark are well-known and famous.

66.     The SWAN BALL Mark points uniquely and unmistakably to Cheekwood and is so connected to Cheekwood and its charitable fundraising services that the SWAN BALL Mark is understood by the public to reference the name or identity of Cheekwood.

67.     Cheekwood consistently lists SWAN BALL as one of the names used by Cheekwood to solicit funds in its charitable organization registration renewals filed with the Tennessee Secretary of State.  A true and correct copy of excerpt from Cheekwood's 2023 renewal form is attached as **Exhibit 2.**

E.     **CHEEKWOOD'S MANAGEMENT OF THE SWAN BALL AND ITS VOLUNTEER COMMITTEES**

1.     **EARLY SWAN BALL VOLUNTEERS**

68.     Like most nonprofit organizations, volunteers play an important role at Cheekwood, and are an essential part of Cheekwood's operations.

69.     Since Mrs. Dudley accepted Cheekwood's request to chair the first Swan Ball, Cheekwood has relied on thousands of volunteers to help plan and organize the Swan Ball and associated fundraising events and activities for and on behalf of Cheekwood.

70.     The Swan Ball has historically been chaired by one or two volunteer "Ball chairs."

71.     When Mrs. Dudley agreed to serve as Cheekwood's first Ball chair, she enlisted the help of prominent Nashville civic and social leaders, men and women alike, to make the first Swan Ball a financial success for Cheekwood.

2.     **THE COMMITTEE AND CHEEKWOOD'S LEGAL AND FINANCIAL OVERSIGHT OF THE SWAN BALL**

72.     The "Ball chairs" and volunteers organizing the  Swan Ball and associated SWAN BALL events and activities operate as an "internal committee[] & function[]" and an

35

unincorporated fund raising agent of Cheekwood. A true and correct copy of an exemplar organization chart from September 2006 is attached hereto as **Exhibit 3** and excerpted below.



73. For drafting purposes only, the group of volunteers referred to by SBI in its Complaint as the Swan Ball Committee shall be referred to herein as the "Committee." Cheekwood does not adopt or admit any of the various characterizations of the Committee offered by SBI in the Complaint.

74. The Committee is not a corporation, partnership, limited liability partnership, limited liability company, sole proprietorship, charitable organization, or joint venture.

75. The Committee is not a juridical person or legal entity of any kind.

76.     In auditing Cheekwood's financial statements, independent auditors concluded that the Committee, the SWAN BALL co-chairs, and the volunteers comprising the Committee operate under the "auspices" of Cheekwood, and Cheekwood is "financially and legally responsible for the actions of the Swan Ball."

77.     Cheekwood maintains control over the nature and quality of the charitable services offered under its SWAN BALL Mark.

78.     All activities for the Swan Ball and associated fundraising events are conducted under Cheekwood's 501(c)(3) tax-exempt status and Charitable Solicitations Permit approved annually by the Tennessee Secretary of State.

79.      All activities for the Swan Ball and associated fundraising events are included in Cheekwood's audited financial statements.

80.     All activities for the Swan Ball and associated fundraising events are accounted for within Cheekwood's annual Form 990, which is submitted to the IRS.

81.     Cheekwood issues all IRS Form 1099 tax documents required to report payments to vendors and contractors in connection with the Swan Ball and associated events and activities.

82.     Cheekwood issues all tax acknowledgement letters to Swan Ball donors as required by the IRS.

83.     Cheekwood's tax acknowledgement letters to Swan Ball donors are sent on Cheekwood letterhead and signed by Cheekwood's CEO.  A true and correct copy of an exemplar tax acknowledgement letter issued by Cheekwood is attached hereto as **Exhibit 4**.

84.     Cheekwood registers the raffles conducted in connection with the Swan Ball and associated auction (the "Swan Ball Auction") with the Tennessee Secretary of State.



| | CGA Number | Event Name | Charity Name | Event Date | County | Fiscal Year Ending | Status |
|---|---|---|---|---|---|---|---|
| Details | CGA4031 | SWAN BALL AUCTION PARTY RAFFLE | CHEEKWOOD BOTANICAL GARDEN AND MUSEUM OF ART | 5/17/2023 | Davidson | 6/30/2023 | Approved |
| Details | CGA4130 | SWAN BALL AUCTION PARTY RAFFLE | CHEEKWOOD BOTANICAL GARDEN AND MUSEUM OF ART | 5/18/2022 | Davidson | 6/30/2022 | Approved |
| Details | CGA3151 | SWAN BALL | CHEEKWOOD BOTANICAL GARDEN AND MUSEUM OF ART | 5/17/2018 | Davidson | 6/30/2018 | Approved |
| Details | CGA1351 | SWAN BALL | CHEEKWOOD BOTANICAL GARDEN AND MUSEUM OF ART | 6/11/2011 | Davidson | 6/30/2011 | Cancelled |
| Details | CGA470 | SWAN BALL | CHEEKWOOD BOTANICAL GARDEN AND MUSEUM OF ART | 5/22/2010 | Davidson | 6/30/2010 | Cancelled |
| Details | CGAL271 | SWAN BALL | CHEEKWOOD BOTANICAL GARDEN AND MUSEUM OF ART | 6/9/2007 | Davidson | 6/30/2007 | Cancelled |
| Details | CGAL152 | SWAN BALL | CHEEKWOOD BOTANICAL GARDEN AND MUSEUM OF ART | 6/10/2006 | Davidson | 6/30/2006 | Approved |

« ‹ **1** › » 10 ▾ items per page                                              1 - 7 of 7 items




**Secretary of State Tre Hargett**

Tre Hargett was elected by the Tennessee General Assembly to serve as Tennessee's 37th secretary of state in 2009 and re-elected in 2013, 2017, and 2021. Secretary Hargett is the chief executive officer of the Department of State with oversight of more than 300 employees. He also serves on 16 boards and commissions, on two of which he is the presiding member. The services and oversight found in the Secretary of State's office reach every department and agency in state government.

**About the Office**

The Tennessee Secretary of State has oversight of the Department of State. The Secretary of State is one of three Constitutional Officers elected by the General Assembly, in joint session. The Secretary of State is elected to a four-year term. The constitution mandates that it is the secretary's duty to keep a register of the official acts and proceedings of the governor, and, when required, to "lay same, all papers, minutes and vouchers relative thereto, before the General Assembly."

85.     The Committee is not and has never been chartered or incorporated under the laws of Tennessee.

86.     The Committee is not and has never been registered as a business entity with the Tennessee Secretary of State.

87.     The Committee is not and has never been registered to solicit charitable donations in the State of Tennessee.

88.     The Committee is not and has never been a 501(c)(3) tax-exempt entity.

89.     The Committee has never filed an IRS Form 990.

90.     The Committee has never issued an IRS Form 1099.

91.     The Committee has never issued a tax acknowledgement letter.

92.     The Committee may not lawfully solicit or receive tax exempt donations for its own account.

93.     Any donations received by the Committee for its own account (and not for Cheekwood) would not be tax deductible.

94.     All proceeds solicited and received by the Committee have been and remain the property of Cheekwood.

95. All charitable fundraising services performed by the Committee have been on behalf of and under the auspices of Cheekwood.

96. The Committee has never applied to or been approved by the Tennessee General Assembly to hold a raffle.

97. Any raffle held by The Committee has been on behalf of and under the auspices of Cheekwood.

### 3. CHEEKWOOD'S SWAN BALL BANK ACCOUNTS

98. Cheekwood establishes a dedicated bank account for the Swan Ball on an annual basis (the "SWAN BALL Bank Account").

99. Cheekwood establishes the annual SWAN BALL Bank Account using Cheekwood's taxpayer identification number and status as a non-profit corporation under Cheekwood's master services agreement with Truist Bank, Cheekwood's main bank.

100. The annual SWAN BALL Bank Account holds the monetary donations raised by that year's Swan Ball and associated events.

101. Expenses incurred in connection with the Swan Ball and associated events, such as payments to or for vendors, entertainers, and website and IT-related subscriptions, are paid from Cheekwood's annual SWAN BALL Bank Account.

102. Cheekwood approves signatories and credit card users added to Cheekwood's bank accounts, including the annual SWAN BALL Bank Account.

103. Around December or January, after all expenses are paid, the net proceeds of the Swan Ball and associated events are transferred from the annual SWAN BALL Bank Account to Cheekwood's bank account designated for operating funds.

### 4. CHEEKWOOD'S OVERSIGHT OF AND ROLE IN PLANNING THE SWAN BALL

104. Cheekwood's senior team and staff oversee and are intimately involved with the planning and execution of the Swan Ball and associated events.

105. For example, Cheekwood maintains communication with the Committee through Cheekwood's Swan Ball Office, a permanent office located at Cheekwood that is dedicated to the planning and management of the Swan Ball and associated events and activities (the "Swan Ball Office").

106. Cheekwood staffs the Swan Ball Office with two full-time employees on Cheekwood's payroll. Cheekwood is responsible for the Swan Ball Office staff members' payroll taxes, benefits, and W-2s.

107. The Swan Ball Office is currently staffed by Cheekwood's Swan Ball Director and Swan Ball Office Manager and Auction Coordinator.

108. Cheekwood's Swan Ball Office maintains information and data regarding the Swan Ball and associated events, including without limitation event planning and logistics, accounting and financial data, fundraising activities, invitation lists, donor lists, and information regarding the chairs of the Committee and other key volunteers.

109. The primary contact email for Cheekwood's Swan Ball Office is swanball@cheekwood.org, an email address owned and managed by Cheekwood under its primary domain.

110. Cheekwood's CEO is involved at an executive level in planning the Swan Ball and related activities, including, but not limited to, meeting with Committee chairs on a monthly basis between July through May of the following year; working with chairs to coordinate underwriter solicitations and benefits, including Cheekwood passes, and approving materials describing what

40

underwriter funds support at Cheekwood; recommending Swan Ball invitees and prospective Swan Ball Patrons and collaborating and providing input on Swan Ball themes, entertainment, and Swan Award winners.

111. Cheekwood's CEO has sole decision-making authority over use of the Cheek Mansion, Swan Lawn, and Cheekwood garden areas for the Swan Ball and associated events, including without limitation, developing and enforcing policies governing use of the mansion and gardens.

112. The Committee must adhere to Cheekwood's policies and must request Cheekwood's CEO's permission for any new proposed uses outside of Cheekwood's policies, which the CEO has discretion to deny, and has denied in the past.

113. Cheekwood's CEO is part of the annual "leadership committee" of the Committee. Exemplary letters from the Committee to Cheekwood's CEO confirming the CEO's role with the Swan Ball leadership committee are attached hereto as **<u>Exhibit 5</u>**.

114. The COO of Cheekwood is involved in operational aspects of the Swan Ball and related events, including, but not limited to, acting as lead on operations for all logistics and production; attending all pre-production and production meetings with event planners to review plans, policies, and conflicts; advising on all decisions relating to access, vendor guidelines, conflicts with other Cheekwood events, security, parking, transportation, lighting, and sound approvals; obtaining Special Occasion Permits for consumption of donated alcohol; coordinating outside security for the Swan Ball and associated events; developing emergency and evacuation policies; and coordinating with Metro and Belle Meade law enforcement.

41

115. Cheekwood's VP of Gardens & Facilities and facilities staff of Cheekwood are intimately involved with coordinating and providing support for the Swan Ball and related onsite events, expending upwards of 200 hours a year to set up, install, coordinate, and support the event.

116. Members of Cheekwood's senior team and staff, including Cheekwood's CEO, CFO, COO, VP of Gardens & Facilities, and Chief External Relations Officer are listed in recent Swan Ball programs as members of the Committee. True and correct copies of recent Swan Ball programs are attached as hereto **Exhibit 6**.

117. Up through the 2024 Swan Ball, Cheekwood authorized certain Swan Ball volunteers, in conjunction with Cheekwood's Swan Ball Office employees, to negotiate and sign contracts for event-related vendors and expenses on behalf of Cheekwood.

118. Event-related vendors and expenses for the Swan Ball and associated events and activities require Cheekwood's issuance of an appropriate IRS Form 1099 and/or certificate of insurance, and are subject to Cheekwood's ultimate approval.

119. Major vendors for the Swan Ball and associated events and activities, such as caterers, tent rentals, and table and chair rentals, must be selected from Cheekwood's approved vendors list.

120. The Committee must request Cheekwood's permission to use a major vendor that is not on Cheekwood's approved vendor list, which Cheekwood has discretion to deny, and has denied.

121. The Swan Ball and associated events and activities must conform with Cheekwood's venue guidelines, which establish clear control and limitations of and for the event, including but not limited to, decorations, catering, and the CEO's singular exceptions granted to the Swan Ball, including use of the mansion rooms, moving of furniture, and lighting.

42

122. The Swan Ball is covered under Cheekwood's liability insurance policies.

123. Vendors provide certificates of insurance to Cheekwood. When required by contract, Cheekwood issues certificates of insurance to vendors for the Swan Ball, associated events, and on-site activity.

124. Public facing documents using the SWAN BALL Mark connect the Swan Ball and associated events and activities to Cheekwood.

125. The invitations, promotional materials, sponsorship letters, and other documents comprising the "public face" of the Swan Ball and associated events connects the gala and events to Cheekwood.

126. The funds raised through the Swan Ball and associated events are donated by the various donors to benefit Cheekwood, not the Committee.

127. Solicitation packets sent to potential underwriters of the Swan Ball and associated events and activities contain Cheekwood fact sheets, refer to Cheekwood in the cover letter and other materials, confirm that the Swan Ball and associated events and activities are for the benefit of Cheekwood, and direct donors to send any requested forms or checks to Cheekwood's Swan Ball Office.

128. Solicitation packets for potential Swan Ball Auction donors also contain Cheekwood fact sheets, refer to Cheekwood in the cover letter and other materials, confirm that the Swan Ball and associated events and activities are for the benefit of Cheekwood, and contain auction contracts and auction brochure marketing forms for donors to fill out and return.

129. The auction brochure marketing form thanks donors "for [their] generous donation to Cheekwood's Swan Ball" and directs donors to forward all materials to Cheekwood's Swan Ball Office, using Cheekwood's address, telephone number, and email address

43

<swanball@cheekwood.org>. A true and correct copy of an exemplary auction brochure marketing form included in solicitation packets for the Swan Ball Auction is attached as **Exhibit 7.**

130. Past auction brochures for the Swan Ball Auction direct donors to make checks out to Cheekwood.

131. Every year, Cheekwood representatives, including the CEO and members of Cheekwood's Board of Trustees, attend and participate in the Swan Ball and events, and express their gratitude to volunteers, partners, vendors, and donors for their charitable contributions to Cheekwood.

132. Cheekwood's CEO also serves as the emcee of the Swan Ball and welcomes guests, acknowledges the presence of dignitaries, and introduces and thanks the Committee chairs with gifts of appreciation for their service to and on behalf of Cheekwood.

133. Cheekwood recognizes and thanks all patrons and underwriters of the Swan Ball and associated events and activities as Cheekwood donors in its Annual Report and Cheekwood Society Dinner program.

**5. CHEEKWOOD'S SWAN BALL WEBSITE, DONOR DATABASE, AND OTHER INFORMATION TECHNOLOGY ASSETS**

134. Cheekwood owns and maintains the domain and associated website located at <www.swanball.com> (the "SWAN BALL Website").

135. Cheekwood owns the GoDaddy account used to register and renew the SWAN BALL Website.

136. The SWAN BALL Website describes Cheekwood's philanthropic mission and how the Swan Ball was established to raise funds for Cheekwood to further that mission. A true and correct copy of exemplary screenshots from the SWAN BALL Website is attached as **Exhibit 8**.

44

137.    The SWAN BALL Website provides Cheekwood's address, email address, and telephone number as the contact information for the Swan Ball and associated events and activities.



*See* Exhibit 8.

138.    The SWAN BALL Website provides links to various Swan Ball subcommittees, all of which instruct visitors to contact Cheekwood's Swan Ball Office with any questions and provide Swan Ball Office telephone numbers owned by Cheekwood. *See* Exhibit 8.

139.    Until recently, the SWAN BALL Website was registered with a Cheekwood-owned GoDaddy account with the primary account holder being Cheekwood's email account <swanball@cheekwood.org>.

140.    Cheekwood transferred management of the SWAN BALL Website and domain registration from Cheekwood's existing GoDaddy account held by <swanball@cheekwood.com> to another Cheekwood-owned GoDaddy account established for Cheekwood's other domains.

141.    The SWAN BALL Website and domain is administered and updated by Cheekwood's IT department.

142.    The SWAN BALL Website and domain renewals and website design vendors are paid for by Cheekwood, from donor funds deposited into Cheekwood's annual SWAN BALL Bank Accounts.

143.    Cheekwood has owned and maintained the SWAN BALL Website and domain at all relevant times, including long before SBI was incorporated.  A true and correct list of GoDaddy

45

invoice records dating back to 2012 for the domain <www.swanball.com> is attached hereto as **Exhibit 9**.

144. Since before SBI's incorporation, the account holder for the SWAN BALL domain and associated GoDaddy account was and is Cheekwood's email address <swanball@cheekwood.org> hosted on Cheekwood's domain. *See* Exhibit 9.

145. Since before SBI's incorporation, the address for the SWAN BALL domain and associated GoDaddy account was and is Cheekwood's Swan Ball Office address. *See* Exhibit 9.

146. Since before SBI's incorporation, the name on the invoices for the SWAN BALL Website and domain registration listed Cheekwood's Swan Ball Coordinator (a Cheekwood employee), and later listed the name on the invoice as "Swan Ball Cheekwood" or just "Swan Ball." *See* Exhibit 9.

147. Since before SBI's incorporation, the SWAN BALL domain renewals were and are paid for by credit cards drawing on Cheekwood's annual SWAN BALL Bank Account.

148. Cheekwood lists the SWAN BALL Website and domain on Cheekwood's cyber insurance application.

149. The website design vendor handles the updates requested by Cheekwood staff and SWAN BALL volunteers.

150. Cheekwood also owns and maintains the Panorama/Giftworks donor database hosted by FrontStream Holdings, LLC ("FrontStream").

151. Until approximately 2016, Cheekwood hosted and maintained the database containing information regarding donors, invitees, and underwriters for the Swan Ball and associated events and activities, among other proprietary information, on Cheekwood servers.

152.    In or around 2016, Cheekwood converted and moved the donor databases for the Swan Ball and associated events to FrontStream's digital fundraising platform (the "FrontStream Account").

153.    The primary account holder for Cheekwood's FrontStream Account is and has always been Cheekwood's email address <swanball@cheekwood.org> hosted on Cheekwood's domain.

154.    Cheekwood's IT department is responsible for the management of the FrontStream Account.

155.    Cheekwood renewed its FrontStream Account on October 31, 2019.  The contract was signed by Cheekwood's then-Swan Ball Coordinator, a Cheekwood 1099 contractor working in Cheekwood's Swan Ball Office.

156.    The FrontStream renewal contract identifies "Swan Ball/Cheekwood Museum of Art" on the "Bill To" line, along with Cheekwood's physical address and tax identification number.

157.    The data contained in the FrontStream Account relates to Cheekwood donors and is maintained on a routine basis by Cheekwood's employees in the Swan Ball Office.

158.    The FrontStream Account is managed by Cheekwood's Swan Ball Office employees.

159.    Cheekwood's Swan Ball Office employees have the primary responsibility for maintaining the data in the database and providing lists and other information when requested by Committee volunteers.

160.    Cheekwood also owns and maintains the email marketing accounts and mailing lists used for the Swan Ball and associated events and activities hosted by The Rocket Science Group d/b/a Mailchimp ("Mailchimp Account").

161.    The account holder for Cheekwood's Mailchimp account ("Mailchimp Account") is Cheekwood's email address <swanball@cheekwood.org> hosted on Cheekwood's domain.

162.    Invoices for the Mailchimp Account are issued to Cheekwood's Swan Ball Office address and telephone number, and use Cheekwood's taxpayer identification number.

163.    The data contained in the Mailchimp Account relates to Cheekwood donors and is managed on a routine basis by Cheekwood's employees in the Swan Ball Office.

164.    Cheekwood's Swan Ball Office employees have the primary responsibility for maintaining the data in the Mailchimp Account and providing lists and other information when requested by Committee volunteers.

165.    Communication with Cheekwood's donors, attendees, and vendors regarding the Swan Ball and associated events through the MailChimp Account is initiated through the system and administered by Cheekwood's Swan Ball Office employees.

166.    Cheekwood also owns and maintains an online auction service platform hosted on ClickBid for the Swan Ball, Swan Ball Auction, and associated events and activities ("ClickBid Account").

167.    The account holder for the Cheekwood's ClickBid account is Cheekwood's email address <swanball@cheekwood.org> hosted on Cheekwood's domain.

168.    Invoices for the Clickbid Account are issued to Cheekwood's main address and telephone number, and Cheekwood issued an appropriate 1099 using Cheekwood's taxpayer identification number.

169.    The data contained in the ClickBid Account relates to Cheekwood donors and is managed on a routine basis by Cheekwood's employees in the Swan Ball Office.

170.     Cheekwood's Swan Ball Office employees have the primary responsibility for maintaining the data in the ClickBid Account and providing lists and other information when requested by Committee volunteers.

171.     The ClickBid auction process for the Swan Ball, Swan Ball Auction, and associated events and activities, is managed by Cheekwood employees in its Swan Ball Office.

172.     Cheekwood's Swan Ball Office staff assigns and revokes permissions within the ClickBid Account.

173.     Cheekwood is responsible for issuing tax acknowledgement letters and gift receipts to donors as required by the IRS, as well as reporting individual donor data above certain levels in its Form 990.

174.     Cheekwood is responsible for maintaining access to current donor information, including, without limitation, information stored in the FrontStream Account, Mailchimp Account, and Clickbid Account, for IRS reporting purposes.

175.     Cheekwood's IT assets used for the Swan Ball and associated events and activities, including without limitation, the SWAN BALL Website and domain, FrontStream Account, Mailchimp Account, and ClickBid Account (collectively, "Cheekwood IT"), are and have been managed by Cheekwood's IT department and Swan Ball Office employees and paid for by Cheekwood's SWAN BALL Bank Accounts funded by Cheekwood's donors.

176.     Since before SBI's incorporation, infrastructure support for Cheekwood IT is and has been provided by Cheekwood.

177.     At all relevant times, Cheekwood has maintained authority and control over which members of the Committee or other volunteers are granted access to Cheekwood IT.

178.     Cheekwood has never authorized SBI to access Cheekwood IT.

49

**F.  CHEEKWOOD'S OVERSIGHT OF AND CONCERN REGARDING SWAN BALL FINANCES**

179.    Through the hard work of thousands of volunteers and Cheekwood staff members, and the support of Cheekwood donors, patrons, and the Nashville community, the Swan Ball has become an esteemed charity ball, an international social event, and a treasured Nashville tradition.

180.    Cheekwood affords its Swan Ball volunteers discretion with respect to certain planning, creative, organizational, and day-to-day matters for the Swan Ball.   However, Cheekwood requires that its volunteers act in accordance with Cheekwood's philanthropic mission, guiding principles, policies and procedures, and as needed, specific instructions.

181.    Cheekwood maintains control over the nature and quality of the charitable services offered under its SWAN BALL Mark by, among other means, assessing the financial outcomes of the Swan Ball and associated events and meeting with the Committee to implement new procedures and improve outcomes, as needed.

182.    Charity oversight organizations, such as *Charity Navigator*, *Guidestar*, and *Charity Watch*, use IRS Form 990 to rate charities for transparency, financial accountability, and various nonprofit ratios (or key performance indicators), including the charity's "fundraising efficiency ratio."

183.    A nonprofit's fundraising efficiency ratio measures how much revenue is generated for every dollar that is spent on fundraising.

184.    Charity rating agencies and the Better Business Bureau have set fundraising efficiency ratios of 60–70% return as the industry standard.

185.    Over time, Cheekwood became concerned with the increasing expense of the Swan Ball and associated events and activities, resulting in a fundraising efficiency ratio much lower than the industry standard.

50

186.    For example, in 2023 the fundraising efficiency ratio for the Swan Ball and associated events and activities was 36%.  The events raised approximately $3.26 million but cost approximately $2.09 million, resulting in net proceeds of only approximately $1.17 million.

187.    In 2022, the fundraising efficiency ratio for the Swan Ball and associated events and activities was even lower at 26%.  The events raised approximately $3.09 million but cost approximately $2.29 million, resulting in net proceeds of only approximately $800,000.

188.    Over the past three years, the average fundraising efficiency ratio for the Swan Ball and associated events and activities was 32% in comparison to the 60–70% industry standard.

189.    Consistent with Cheekwood's standard practice for addressing issues of financial accountability with the Committee—established decades before SBI existed—Cheekwood's leadership met with the Committee chairs and volunteers in 2022 and 2023 to present the data and discuss proposals for improving fundraising efficiency.

190.    In or around November 2022, Cheekwood drafted Swan Ball Standard Operating Procedures and circulated them to the 2022 Committee.

191.    The Swan Ball Standard Operating Procedures outline the governance structure and standard operating procedures for the Swan Ball and associated events and activities.  A true and correct copy of the November 2022 Swan Ball Standard Operating Procedures is attached as **Exhibit 10**.

192.    The Swan Ball Standard Operating Procedures also outlined a series of best practices and parameters developed by Cheekwood to reduce expenses and improve the Swan Ball's fundraising efficiency ratio to at least 50% over time.

51

193.    The Swan Ball Standard Operating Procedures provide that it "may be updated at any time, but no less than annually, with changes discussed with the Cheekwood Finance and Executive Committees." *See* Exhibit 10.

194.    Between November 2022 and October 2023, Cheekwood representatives met with members of the Committee at least six times to discuss the continued financial underperformance and the previously circulated Standard Operating Procedures and subsequently revised versions, and to develop mutually agreeable strategies for improving financial performance.

195.    In March 2024, taking into account feedback from the Committee discussed in the October 2023 meeting, Cheekwood circulated Swan Ball Board Directives which outlined a plan for gradually achieving a fundraising efficiency ratio of 50% by the year 2026.

196.    Cheekwood arrived at the 50% target ratio (rather than 60–70%, which is the industry standard for similar events) specifically to account for the cost to construct a tent on Cheekwood's grounds for the Swan Ball.

197.    On May 21, 2024, Cheekwood again met with Committee volunteers to discuss the fundraising efficiency ratio and ideas for achieving the target of 50% by 2026.

198.    In the May 21, 2024, meeting, Cheekwood provided data showing, among other things, the fundraising efficiency ratio of each Swan Ball event, consideration of tent expenses, and the status of discussions, excerpted below.

52



## Swan Ball's Financials

### 2023 Ratio by Function

Ball: 16%
Patrons: 70%
Late Party: 13%
Auction: 61%

**$384 of the $2,400 Ball ticket goes to Cheekwood**

**$49 of the $375 Late Party ticket goes to Cheekwood**

## Consideration of Tent Costs

The cost of constructing the tent is significant ==but is considered in the 50% ratio request==.

- At the 69% average benchmarking ratio, with NO tent costs, Swan Ball Expenses should be ==$1.01M== (compared with the current $1.61M without tent now).

- Adding the Tent Costs of $463k to the average benchmarking expense of $1.01M would be: $1.47M, yielding a ==55% Ratio.==

53

## Current Status

We have been in discussions for nearly two years regarding the Financial Ratio.

Last Fall, in a compromise, Cheekwood agreed to achieve the 50% ratio over time and set the goals as follows:
- 41% in 2024
- 46% in 2025
- 50% in 2026 and thereafter

How are we going to achieve acceptable financial results together?

199. Based on statements and participation of volunteers, Cheekwood believed the Committee was working with Cheekwood in good faith to address financial underperformance, implement best practices, and improve charitable outcomes.

200. Members of the Committee requested that further discussions on the financial ratio be deferred until after the Swan Ball on June 1, 2024.

201. Unbeknownst to Cheekwood, the very volunteers with whom they were meeting were implacably opposed to reform and had no intention of adopting best practices or improving charitable outcomes. This faction was already scheming to seize ownership and control of the Swan Ball.

202. Cheekwood later discovered that, as early as March 2024, the faction that later incorporated SBI had set in motion a series of legal maneuvers for separating Cheekwood from the Swan Ball.

54

## G. SBI'S WANTON, KNOWING, AND INTENTIONAL UNLAWFUL ACTIONS

203. Without Cheekwood's knowledge or consent and beginning long after Cheekwood had established extensive and valuable goodwill in connection with the SWAN BALL Mark, SBI commenced using, and is currently using, in interstate commerce and commerce affecting interstate commerce, the term "SWAN BALL" (the "Infringing Mark") in connection with the sale, offering for sale, advertising, and promotion of its charitable fundraising services.

### 1. SBI'S BAD FAITH ADOPTION OF THE INFRINGING MARK

204. On March 26, 2024, Elizabeth Litterer Nichols filed the following application with the USPTO to register the SWAN BALL Mark (the "First Application").

| Mark / Application No. | Filing Date | Goods/Services |
| --- | --- | --- |
| SWAN BALL<br><br>U.S. app. no. 98468757 | March 26, 2024 | IC036.  Charitable fund raising; Charitable fundraising services by means of organizing and conducting galas |

205. Ms. Nichols was a member of the Committee and participated in Cheekwood's meetings with the Committee to address the financial ratio analysis.

206. The Nichols Application was filed on a Section 1(b) intent-to-use basis.

207. In signing the Nichols Application, Ms. Nichols averred that:

- Ms. Nichols believes that she is entitled to use the mark in commerce;

- Ms. Nichols has a bona fide intention to use the mark in commerce and had a bona fide intention to use the mark in commerce as of the application filing date on or in connection with the goods/services in the application; and

- To the best of Ms. Nichols's knowledge and belief, the facts recited in the application are accurate.

- To the best of Ms. Nichols's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in

55

connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

208.    SBI did not exist at the time the Nichols Application was filed.

209.    Ms. Nichols filed the Nichols Application in her individual capacity.

210.    Upon information and belief, Ms. Nichols is now a member of SBI's board.

211.    On May 23, 2024—two days after Cheekwood met with members of the Committee—SBI was secretly incorporated as a Tennessee nonprofit corporation.

212.    On May 26, 2024, SBI filed a separate application with the USPTO to register the SWAN BALL Mark ("SBI Application") as set forth below.

| Mark / Application No. | Filing Date | Goods/Services and First Use Date |
|---|---|---|
| SWAN BALL<br><br>U.S. app. no. 98569484 | May 26, 2024 | IC036.  Charitable fundraising services.<br><br>First use anywhere: June 30, 1963<br>First use in commerce: June 30, 1963 |

213.    The SBI Application, unlike the Nichols Application, was filed on a Section 1(a) use in commerce basis.

214.    The SBI Application claims a date of first use in commerce of June 30, 1963.

215.    SBI did not exist in June 1963.

216.    The SBI Application is signed by SBI's "Executive Committee Chair Person."

217.    In signing the SBI Application, SBI and its "Executive Committee Chair Person" averred that:

- The signatory believes that SBI is the owner of the SWAN BALL trademark sought to be registered;

- The mark is in use in commerce and was in use in commerce as of the filing date of the application on or in connection with the goods/services in the application;

- The specimen(s) shows the mark as used on or in connection with the goods/services in the application and was used on or in connection with the goods/services in the application as of the application filing date;

56

- To the best of the signatory's knowledge and belief, the facts recited in the application are accurate; and

- To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

218.    The signatory for the SBI Application is a former chairperson of the Swan Ball.

219.    The signatory for the SBI Application was a member of the executive committee of the Committee, and participated in Cheekwood's meetings with the Committee to address the financial ratio analysis.

220.    SBI submitted seven pages of screenshots of Cheekwood's SWAN BALL Website for its specimen of use in support of the Application, with knowledge that SBI does not own the website or the website content, and that the "specimens" demonstrate use not by SBI but by Cheekwood.

221.    At the time the Application was filed, SBI and the individual signatory were aware that SBI did not exist on the claimed date of first use.

222.    The Nichols Application was expressly abandoned on June 15, 2024.

223.    The SBI Application remains pending.

224.    Upon information and belief, SBI selected the Infringing Mark solely because of the fame and reputation built up in the mark by Cheekwood over many years and at great expense, and SBI's sole intention in selecting the mark was to trade on the goodwill of Cheekwood.

225.    SBI was on actual notice of Cheekwood's pre-existing rights to the SWAN BALL Mark prior to its adoption of the Infringing Mark.

## 2. SBI'S ATTEMPTS TO ACCESS CHEEKWOOD DATA AND REGISTRATION OF WEBSITES USING THE INFRINGING MARK

226.     On or around May 17, 2024, May 31, 2024, June 4, 2024, and June 7, 2024, several former Swan Ball volunteers who are, upon information and belief, now associated with SBI, attempted covertly to gain unauthorized access to Cheekwood's computers and files, Cheekwood's Swan Ball Mailchimp Account, and the Cheekwood's FrontStream Account, onsite and online.

227.     On or around June 7, 2024, former Swan Ball volunteers who are, upon information and belief, now associated with SBI, came to the Swan Ball Office and took possession of certain boxes containing Swan Ball records purportedly in connection with the 2025 Swan Ball theme.

228.     As a result of these attempts, Cheekwood has had to implement additional physical and electronic security measures to safeguard its assets and protect sensitive donor information.

229.     As a result of SBI's attempts to improperly access Cheekwood IT (or those acting in concert with SBI), Cheekwood was also "hardlocked" out of its own FrontStream Account, causing damage and interruption to Cheekwood's operations.

230.     Upon information and belief, SBI registered and currently owns the following domains incorporating Cheekwood's SWAN BALL Mark (collectively, the "Infringing Domains"):

<nashvilleswanball.com>

<swanballpatrons.com>

<2025swanball.com>

231.     The Infringing Domains are not linked to active websites.  A true and correct copy of screenshots of the current webpages for the Infringing Domains is attached hereto as **Exhibit 11**.

58

232.    Upon information and belief, the domain <nashvilleswanball.com> was registered by SBI through its counsel of record.  A true and correct copy of the WHOIS information for the domain <nashvilleswanball.com> is attached hereto as **Exhibit 12**.

233.    Upon information and belief, the domains <swanballpatrons.com> and <2025swanball.com> was registered by SBI through Domains by Proxy, LLC a domain privacy and shielding company.  A true and correct copy of the WHOIS information for the domains <swanballpatrons.com> and <2025swanball.com> is attached hereto as **Exhibit 13**.

234.    The domains <nashvilleswanball.com> and <swanballpatrons.com> were both registered on June 6, 2024; the domain <2025swanball.com> was registered on July 20, 2024.  *See* Exhibits 12, 13.

235.    The domains <swanballpatrons.com> and <2025swanball.com> lead to nearly identical landing pages announcing that it is "launching soon," and invites users to "subscribe" for updates.  *See* Exhibit 11.

236.    Upon information and belief, SBI also owns and operates a social media account using the Infringing Mark, including, without limitation, the Instagram account under the handle @nashvilleswanball created in June 2024 (accessible at www.instagram.com/nashvilleswanball).  A true and correct copy of exemplary screenshots from the @nashvilleswanball Instagram account is attached hereto as **Exhibit 14**.

237.    SBI's use of the Infringing Mark is without Cheekwood's permission or authority and is likely to cause or has caused confusion, mistake, and deception among consumers and customers.

238.    Through its use of the Infringing Mark, including, but not limited to, on the Infringing Website, social media account, and registration of the Infringing Domains, SBI seeks to

unfairly trade off the valuable goodwill and reputation built by Cheekwood in its SWAN BALL Mark.

239.     SBI's uses of the Infringing Mark in interstate commerce to advertise, promote, and sell its services were never approved, permitted or endorsed by Cheekwood, and occurred after Cheekwood had established extensive and valuable goodwill in connection with its charitable fundraising services identified by the SWAN BALL Mark.

240.     SBI's use of the Infringing Mark in interstate commerce and commerce affecting interstate commerce was and continues to be without Cheekwood's consent, and began long after Cheekwood had established extensive and valuable goodwill in connection with its goods and services identified by the SWAN BALL Mark.

241.     Cheekwood's first use in commerce of the SWAN BALL Mark predates SBI's first use of the Infringing Mark and, therefore, Cheekwood has priority over SBI's first use of the Infringing Mark.

### 3.     SBI'S PRE-SUIT DEMANDS TO CHEEKWOOD

242.     On June 10, 2024, SBI sent a letter to Cheekwood's Board of Trustees announcing the incorporation of SBI (the "June 10 Letter").  A true and correct copy of the June 10 Letter is attached as **Exhibit 15**.

243.     The June 10 Letter is not signed by an officer or director of SBI or any individual and is instead "signed" by the "SB Initiative, Inc. Board of Directors."

244.     The June 10 Letter does not identify any individual member of SBI's board.

245.     The June 10 Letter claims that the "Swan Ball Committee" has "acquired new legal status" and "formalized its operations" through the incorporation of SBI.

246.     The June 10 Letter does not identify any individual member of the "Swan Ball Committee" purportedly involved in the incorporation of SBI.

247.    The next day, on June 11, 2024, SBI sent an undated legal demand letter to Cheekwood (the "June 11 Letter"). A true and correct copy of SBI's June 11 Letter is attached hereto as **Exhibit 16**.

248.    In the June 11 Letter, SBI claims that "the Swan Ball Committee has incorporated itself as a formal legal entity" and demands access to the <www.swanball.com> domain, the FrontStream Account, and MailChimp Account; non-use of donor information; and abandonment of Cheekwood's federal trademark application.

249.    The June 11 Letter does not identify any individual member of SBI's board.

250.    The June 11 Letter does not identify any individual member of the "Swan Ball Committee" purportedly involved in the incorporation of SBI.

251.    On July 1, 2024, Cheekwood's Executive Committee convened to discuss SBI's various letters and demands, and voted without opposition to refuse SBI's demands and defend Cheekwood interests, its donors, and the Swan Ball.

252.    Following the vote of Cheekwood's Executive Committee on July 1, 2024, Cheekwood scheduled a meeting of Cheekwood's full Board of Trustees to vote on Cheekwood's response to SBI's letters and demands.

253.    Shortly after Cheekwood notified its Trustees of the meeting, SBI sent a second letter to Cheekwood's Board of Trustees, making several inaccurate statements and reiterating the legal demands in its June 11 Letter (the "July 1 Letter"). A true and correct copy of SBI's July 1 Letter is attached as **Exhibit 17**.

254.    The July 1 Letter is not signed by an officer or director of SBI or any individual and is instead "signed" by the "SB Initiative, Inc. Board of Directors." *See* Exhibit 17.

61

255. The July 1 Letter was sent from the email address <board@nashvilleswanball.com> hosted on one of the Infringing Domains and using the display name "Nashville Swan Ball Board." *See* Exhibit 17.

256. As with SBI's prior letters, the July 1 Letter does not identify any individual member of SBI's board and any individual member of the "Swan Ball Committee" purportedly involved in the incorporation of SBI. *See* Exhibit 17.

257. On July 2, 2024, Cheekwood's Board of Trustees voted without opposition that it will not accede to SBI's demands and will protect Cheekwood's interests, its donors, and the Swan Ball.

258. Cheekwood's Board of Trustees also voted to postpone and cease all planning for the 2025 Swan Ball and associated events and activities until the dispute with SBI is resolved.

259. Cheekwood responded to SBI's June 11 Letter on July 2, 2024 ("Cheekwood's Response Letter"), explaining Cheekwood's position, correcting SBI's inaccurate statements, declining SBI's demands, and requesting that SBI cease its unlawful conduct and infringement of Cheekwood's SWAN BALL Mark. A true and correct copy of Cheekwood's Response Letter is attached as **<u>Exhibit 18</u>**.

260. In Cheekwood's Response Letter, Cheekwood requested SBI's response by July 8, 2024, and invited SBI to have "a rational conversation with your client about the future of Cheekwood's Swan Ball." *See* Exhibit 18.

261. In a July 3, 2024 email, SBI informed Cheekwood that SBI "will respond to [Cheekwood's] letter in due time, but given the holiday weekend, it will not be by July 8."

262. SBI filed this action against Cheekwood on July 8, 2024.

263. To date, SBI has failed to comply with Cheekwood's demands.

62

264. SBI's use of the Infringing Mark in connection with SBI's online presence and services, maintenance of the SBI Application, and registration, maintenance, and use of the Infringing Domains, has been made notwithstanding and with both actual and constructive notice of Cheekwood's well-known and prior established rights in the SWAN BALL Mark.

265. SBI's continued use of the Infringing Mark constitutes malicious, willful, fraudulent and deliberate infringement.

266. In selecting and using Cheekwood's SWAN BALL Mark in connection with the sale and offering of its charitable fundraising services, notwithstanding its actual knowledge of Cheekwood's rights, SBI has acted and continues to act with wanton disregard for Cheekwood's rights, and with the willful intent and purpose of improperly taking or benefiting from the favorable reputation and valuable goodwill which Cheekwood has established in the SWAN BALL Mark

## H. SBI'S CONTINUING INFRINGEMENT OF THE SWAN BALL TRADEMARK

267. On July 10, 2024, Cheekwood's Board of Trustees issued a statement that, "due to the current litigation initiated by this new entity, Cheekwood has no choice but to postpone and cease all planning for the 2025 Swan Ball until this matter is resolved." A true and correct copy of Cheekwood's July 10, 2024 statement is attached as **Exhibit 19**.

268. Upon information and belief, SBI has used, is using, and has taken significant steps toward using the Infringing Mark in connection with its charitable fundraising services, including, without limitation, soliciting and contacting volunteers, vendors, donors, and/or venues in connection with SBI's planned "Swan Ball 2025."

269. Upon information and belief, SBI has solicited and/or contracted with an auctioneer in connection with SBI's planned "Swan Ball 2025."

63

270.     Upon information and belief, SBI has an immediate capability and intent to provide charitable fundraising services and produce charitable fundraising events under the Infringing Mark.

271.     For example, on or around June 28, 2024, SBI asserted that, "we will need to know whether Cheekwood will want to hold the Swan Ball at their location in 2025" because "the planning process for each event is a year long process, and if we need to look for another venue we will need to start that process now."

272.     In its July 1 Letter, SBI stated that, as of June 10, 2024, "our 2025 Chairmen were continuing the planning process for Swan Ball 2025" and that "[o]ur 2025 Chairmen are well underway with plans for another successful event[.]" *See* Exhibit 17.

273.     On July 10, 2024, the Tennessean reported that Jana Davis, "a member of the SB Initiative who chaired the Swan Ball in 2019," issued a comment to the Tennessean that "the ball will happen in 2025 regardless of whether it will be at Cheekwood or another location."

274.     On July 11, 2024, the Nashville Scene reported that Ms. Davis, a "Swan Ball board member who chaired the event in 2019 and is among the volunteer board members suing Cheekwood," issued a comment to the Nashville Scene that "Plans are already underway for our ball—for 2025, our Swan Ball . . . And we look forward to working with a grateful beneficiary."

275.     Cheekwood has not authorized SBI to perform any actions on Cheekwood's behalf, including, without limitation, soliciting funds, entering into contracts, or otherwise planning a 2025 Swan Ball.

276.     On July 22, 2024, SBI sent another demand letter to Cheekwood (the "July 22 Letter").  A true and correct copy of the July 22 Letter is attached as **<u>Exhibit 20</u>**.

64

277.     In the July 22 Letter, SBI states that "the Committee is willing to commit to donating the majority of the remaining Funds to Cheekwood," provided that Cheekwood agree to SBI's demands, including, without limitation:

- Refraining from disbursing any funds in Cheekwood's 2024 Swan Ball Bank Account unless agreed to by SBI;

- Providing SBI with "a full accounting of all income and all monies distributed into and from" Cheekwood's 2024 Swan Ball Bank Account;

- Granting SBI "access to [Cheekwood's] ledgers and other relevant data related to the incurred obligations for the [2024 Swan Ball and associated events and activities];"

- Reserving "a sufficient amount of the Funds . . . to address the fees associated with this dispute."

*See* Exhibit 20.

278.     In the July 22 Letter, SBI threatens "to seek a preliminary injunction to prevent Cheekwood from withdrawing money" from Cheekwood's 2024 Swan Ball Bank Account, to "oppose the distribution of the net proceeds to Cheekwood until the litigation is resolved, and to seek attorney fees related to pursuing the injunction" should Cheekwood decline SBI's demands. *See id.*

279.     Cheekwood responded to the July 22 Letter on July 26, 2024 ("Cheekwood's July 26 Response").  A true and correct copy of Cheekwood's July 26 Response is attached as **Exhibit 21**.

280.     In the July 26 Response, Cheekwood confirmed that Cheekwood had previously paid all outstanding invoices for the 2024 Swan Ball and would pay any additional event-related invoices received pursuant to the relevant contract, and declined the remainder of SBI's demands. *See* Exhibit 21.

65

281.     Given SBI's registration of the Infringing Domains and the name "Nashville Swan Ball Board" to send emails, its repeated public statements that SBI is actively taking steps to produce a charitable fundraising event in 2025 under Cheekwood's SWAN BALL Mark, SBI's demands for access to Cheekwood's data and funds raised for Cheekwood, and its application to register the Infringing Mark with the USPTO, and upon information and belief, SBI has been and continues to use Cheekwood's SWAN BALL Mark to solicit patrons, sponsors, donors, volunteers, entertainers, vendors, venues, staff, employees, and/or beneficiaries for an event that is not hosted by, affiliated with, connected to, associated with, originating from, sponsored, or approved by Cheekwood.

## I.     HARM TO CHEEKWOOD

282.     SBI's use of the SWAN BALL Mark is without Cheekwood's permission or authority and is likely to cause confusion, mistake, and deception among consumers and customers.

283.     SBI's use of the SWAN BALL Mark is the same as the mark previously used by Cheekwood.

284.     SBI's use of the SWAN BALL Mark would be recognized as Cheekwood's previously used mark because it points uniquely and unmistakably to Cheekwood.

285.     The fame or reputation of Cheekwood is such that, when the SWAN BALL Mark is used in connection with SBI's purported goods and services, a connection with Cheekwood would be presumed.

286.     Cheekwood is not connected with any activities performed by SBI under the SWAN BALL Mark.

287.     In selecting and using the SWAN BALL Mark in connection with the sale and offering of its identical services, notwithstanding its actual knowledge of Cheekwood's rights, SBI has acted and continues to act with wanton disregard for Cheekwood's rights, and with the willful

66

intent and purpose of improperly taking or benefiting from the favorable reputation and valuable goodwill which Cheekwood has established in the SWAN BALL Mark.

288.    SBI's actions have caused and continue to cause SBI's purported services to be passed off as made, authorized, sponsored, or endorsed by or otherwise connected or associated with Cheekwood.

289.    The SWAN BALL Mark utilized by SBI is a colorable imitation of and confusingly similar to Cheekwood's SWAN BALL Mark.

290.    SBI's activities are likely to cause confusion, to cause mistake, and to deceive consumers and others as to the source, nature, and quality of the charitable fundraising services offered by SBI.

291.    SBI's wrongful and illegal activities are likely to cause confusion, and to cause mistake, and to deceive consumers and others as to the origin, sponsorship, or approval of the charitable fundraising services offered by SBI with or by Cheekwood.

292.    Upon information and belief, SBI has offered for sale, continues to offer for sale, and sells its purported services under the SWAN BALL Mark.

293.    Cheekwood has been damaged by SBI's activities complained of herein, and unless such activities are preliminarily and permanently enjoined, Cheekwood and its goodwill and reputation will suffer irreparable injury of an insidious and continuing sort that cannot be adequately calculated or compensated in money damages.

# V. CAUSES OF ACTION

## COUNT I

## FEDERAL TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND FALSE ASSOCIATION AND FALSE DESIGNATION OF ORIGIN IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

294. Cheekwood incorporates by reference the preceding paragraphs as if fully set forth herein.

295. Cheekwood is the owner of valid and protectable common law rights in the SWAN BALL Mark, as described above.

296. SBI's use of the Infringing Mark in connection with its charitable fundraising services as alleged herein constitutes infringement of the SWAN BALL Mark through use in commerce that is likely to cause confusion, or to cause mistake, or to deceive, as to the origin, sponsorship, or approval of SBI's use of the Infringing Mark and charitable fundraising services and commercial activities with or by Cheekwood.

297. SBI's use of the Infringing Mark in connection with its charitable fundraising services as alleged herein constitutes a false association and false designation of origin which is likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection, or association of SBI with Cheekwood and as to the origin, sponsorship, or approval of SBI's approval of SBI's use of the Infringing Mark and charitable fundraising services and commercial activities with or by Cheekwood.

298. SBI's willful and deliberate infringement of the SWAN BALL Mark as alleged herein has caused and is likely to continue to cause substantial injury to the public and to Cheekwood.

299. SBI's acts constitute violations of 15 U.S.C. § 1125.

68

300. SBI's infringement of the SWAN BALL Mark and acts as alleged herein has caused and is likely to continue to cause irreparable harm to Cheekwood. Unless restrained and enjoined by this Court, SBI will persist in its infringement, thereby causing Cheekwood further irreparable harm.

301. SBI's infringement of the SWAN BALL Mark and acts as alleged herein has caused have caused Cheekwood damages, and Cheekwood seeks judgment pursuant to 15 U.S.C. § 1117 for SBI's profits made by SBI's infringement of the SWAN BALL Mark and acts as alleged herein , for the damages sustained by Cheekwood, for all costs necessary to remediate the infringement of the SWAN BALL Mark and acts as alleged herein  and their effects, and for the costs, expenses, and reasonable attorneys' fees (as this is an exceptional case) incurred in bringing the present action and prior attempts to remedy SBI's actions.

302. Cheekwood further seeks judgment for three times the amount of SBI's profits or Cheekwood's damages, whichever is greater, due to the nature of SBI's willful conduct.

303. Pursuant to 15 U.S.C. § 1116 and equity, Cheekwood is entitled to preliminary and permanent injunctive relief against SBI to stop the illegal infringing conduct.

304. Pursuant to 15 U.S.C. § 1118 and equity, Cheekwood is entitled to impoundment and destruction of infringing articles.

## COUNT II

### TRADEMARK DILUTION IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(c)

305. Cheekwood incorporates the preceding paragraphs as though fully set forth herein.

306. Cheekwood and its SWAN BALL Mark have been famous for a significant amount of time.

69

307. SBI's use of Cheekwood's SWAN BALL Mark, or variants thereof similar to or likely to cause confusion with the SWAN BALL Mark, have been used in commerce for SBI's commercial gain.

308. Even if the Court finds SBI's use of the Infringing Mark is not likely to cause confusion with Cheekwood's SWAN BALL Mark, SBI has engaged in dilution by blurring because SBI's use of the SWAN BALL Mark, or variants thereof similar to or likely to cause confusion with the SWAN BALL Mark, has already caused or is likely to cause an association arising from the similarity between SBI's Infringing Mark and Cheekwood's mark that impairs the actual or acquired distinctiveness of Cheekwood's SWAN BALL Mark.

309. Even if the Court finds SBI's use of the Infringing Mark is not likely to cause confusion with Cheekwood's SWAN BALL Mark, SBI has engaged in dilution by tarnishment because SBI's use of the SWAN BALL Mark, or variants thereof similar to or likely to cause confusion with the SWAN BALL Mark, has already caused or is likely to cause damage to Cheekwood's reputation caused by association of its mark with SBI's mark.

310. SBI's acts have already caused or are likely to cause an association arising from the similarity between the Infringing Mark and Cheekwood's mark that lessens the capacity of Cheekwood's mark to identify and distinguish its goods and services.

311. SBI willfully intended to trade on the recognition of Cheekwood and its famous mark.

312. SBI's acts are in violation of 15 U.S.C. § 1125(c).

313. SBI's acts have caused Cheekwood damages, and Cheekwood seeks judgment pursuant to 15 U.S.C. § 1117 for SBI's profits made by SBI through its unlawful acts, for the damages sustained by Cheekwood, for all costs necessary to remediate the unlawful acts and their

70

effects, and for the costs, expenses, and reasonable attorney fees (as this is an exceptional case) incurred in bringing the present action and prior attempts to remedy SBI's actions.

314.    Cheekwood further seeks judgment for three times the amount of SBI's profits or Cheekwood's damages, whichever is greater, due to the nature of SBI's conduct.

315.    Pursuant to 15 U.S.C. §§ 1116 and 1125(c)(1) and equity, Cheekwood is entitled to preliminary and permanent injunctive relief against SBI to stop the illegal conduct.

316.    Pursuant to 15 U.S.C. § 1118, Cheekwood is entitled to impoundment and destruction of infringing articles.

## COUNT III

### TRADEMARK INFRINGEMENT IN VIOLATION OF THE TENNESSEE TRADEMARK ACT, TENN. CODE ANN. § 47-25-512

317.    Cheekwood incorporates by reference the preceding paragraphs as if fully set forth herein.

318.    Cheekwood is the owner of valid and protectable registered and common law rights in the SWAN BALL Mark, as described above.

319.    Cheekwood owns Tennessee registration no. 42241 for the SWAN BALL Mark for "[c]haritable fundraising services involving auction and gala events with proceeds going to Cheekwood Botanical Garden and Museum of Art."  The Tennessee registration dates to July 1, 2004, and has been valid and subsisting since that date.

320.    SBI's use of the Infringing Mark in connection with its charitable fundraising services as alleged herein constitutes infringement of the SWAN BALL Mark through use in commerce that is likely to cause confusion, or to cause mistake, or to deceive, as to the origin, sponsorship, or approval of SBI's use of the Infringing Mark and charitable fundraising services and commercial activities with or by Cheekwood.

71

321.    SBI's use of the Infringing Mark and other representations constitute a false association and false designation of origin which is likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection, or association of SBI with Cheekwood and as to the origin, sponsorship, or approval of SBI's charitable fundraising services by Cheekwood.

322.    Upon information an belief, SBI has used and intends to apply the Infringing Mark on advertising charitable fundraising services.

323.    SBI's infringement of the SWAN BALL Mark as alleged herein has caused and is likely to continue to cause substantial injury to the public and to Cheekwood.

324.    SBI's unauthorized past and intended uses of the SWAN BALL Mark are knowing, intention, and willful.

325.    As a result of SBI's acts of trademark infringement, Cheekwood has and is suffering substantial and irreparable harm, for which it has no adequate legal remedy.

326.    Unless and until SBI is enjoined by this Court, SBI will continue to commit acts of trademark infringement, and will likely continue to cause consumer confusion and irreparable harm to Cheekwood.

327.    Pursuant to Tenn. Code Ann. §§ 47-25-512, 47-25-514(a), 47-25-516, and Tennessee common law, Cheekwood is entitled to recover SBI's profits, all damages that Cheekwood has sustained from SBI's infringement and unfair competition, up to three times the damages and profits, and the costs of the action, including attorneys' fees.

## COUNT IV

### TRADEMARK DILUTION IN VIOLATION OF THE TENNESSEE TRADEMARK ACT, TENN. CODE ANN. § 47-25-513 *et seq.*

328.    Cheekwood incorporates by reference the preceding paragraphs as if fully set forth herein.

72

329.    Cheekwood's SWAN BALL Mark is distinctive and famous in Tennessee because of Cheekwood's 60-plus year use of the mark in connection with its fundraising events and activities.  The Swan Ball has received significant media and press attention over the decades not only within Tennessee, but nationwide.  Attendees of the Swan Ball come from worldwide.

330.    SBI, with full knowledge of the public recognition of Cheekwood's famous SWAN BALL Mark, intended to and willfully traded on goodwill associated with Cheekwood's mark.

331.    Even if the Court finds SBI's use of the Infringing Mark is not likely to cause confusion with Cheekwood's SWAN BALL Mark, SBI's use of the Infringing Mark has created a likelihood of dilution of the distinctive quality of Cheekwood's SWAN BALL Mark and a likelihood of injury to Cheekwood's business reputation.

332.    SBI's acts constitute violations of Sections 47-25-513(a) and (b) of the Tennessee Code.

333.    By making unauthorized past and intended uses of the same SWAN BALL Mark in connection with the same charitable fundraising services in the same geographic region before the same consumers in the same channels of trade, SBI has and is causing dilution of the distinctive quality of the SWAN BALL Mark.

334.    SBI's unauthorized past and intended uses of the SWAN BALL Mark are knowing, intention, and willful.

335.    As a result of SBI's acts of trademark dilution, Cheekwood has and is suffering irreparable harm, for which it has no adequate legal remedy.

336.    Unless and until SBI is enjoined by this Court, SBI will continue to commit acts of trademark dilution, and will likely continue to cause irreparable harm to Cheekwood.

73

337.     Pursuant to Tenn. Code Ann. §§ 47-25-513(b) and 47-25-514(a), Cheekwood is entitled to recover SBI's profits, all damages that Cheekwood has sustained from SBI's infringement and unfair competition, up to three times the damages and profits, and the costs of the action, including attorneys' fees.

## COUNT V

## VIOLATIONS OF TENNESSEE CONSUMER PROTECTION ACT, TENN. CODE ANN. § 47-18-101 *et seq.*

338.     Cheekwood incorporates by reference the preceding paragraphs as if fully set forth herein.

339.     SBI's producing and offering of charitable fundraising services under the SWAN BALL Mark as alleged herein constitutes the offering of or providing of "services" and constitutes "trade," "commerce," and a "consumer transaction" as defined in Tenn. Code Ann. § 47-18-103(23) and (24).

340.     SBI's willful and knowing acts, including its use of Cheekwood's SWAN BALL Mark, constitute unfair methods of competition and unfair or deceptive acts or practices in violation of Tenn. Code. Ann. §§ 47-18-104(b)(1)–(3), (5), and (21).

341.     SBI's acts, including its use of Cheekwood's SWAN BALL Mark, were known by SBI to be deceptive and misleading, or through the exercise of reasonable care or investigation could or might have been ascertained to be deceptive and misleading.

342.     SBI's acts were conducted with the intent or purpose, either directly or indirectly, of selling or disposing of services, or to induce the public to enter into obligations relating to such services.

74

343. SBI's conduct has caused Cheekwood to suffer an ascertainable loss of money or property, real, personal, or mixed, or any other article or commodity, or thing of value wherever situated.

344. SBI's willful and deliberate infringement of the SWAN BALL Mark as alleged herein has caused and is likely to continue to cause substantial injury to the public and to Cheekwood, and Cheekwood is entitled injunctive relief and all other available statutory remedies, including an award of three times the actual damages sustained under Tenn. Code Ann. § 47-18-109(a) and its attorneys' fees and costs under Tenn. Code Ann. § 47-18-109(e).

345. SBI's infringement of the SWAN BALL Mark as alleged herein has caused and is likely to continue to cause irreparable harm to Cheekwood. Unless restrained and enjoined by this Court, SBI will persist in its infringement, thereby causing Cheekwood further irreparable harm.

346. Cheekwood has no adequate remedy at law.

## COUNT VI

### TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION UNDER TENNESSEE COMMON LAW

347. Cheekwood incorporates by reference the preceding paragraphs as if fully set forth herein.

348. SBI's use of the SWAN BALL Mark in the offering of SBI's charitable fundraising services constitutes infringement of Cheekwood's SWAN BALL Mark and unfair competition at common law.

349. Services offered under Cheekwood's SWAN BALL Mark and Infringing Mark are competitors and compete for a common pool of donors and relevant consumers. As alleged herein, SBI has engaged in unfair, deceptive, or fraudulent conduct, which is likely to cause, if it has not already, customer confusion in violation of Tennessee common law.

75

350. SBI is liable to Cheekwood for unfair competition under Tennessee law, because SBI's conduct is tortious and has deprived Cheekwood of customers and other prospects.

351. SBI's acts of trademark infringement and unfair competition as alleged herein have caused Cheekwood damages, and Cheekwood seeks judgment for SBI's profits made by SBI's trademark infringement and unfair competition, for the damages sustained by Cheekwood, for all costs necessary to remediate the trademark infringement and unfair competition and their effects, and for the costs incurred in bringing the present action and prior attempts to remedy SBI's actions.

352. Cheekwood further seeks judgment for punitive damages of at least three times the amount of SBI's profits or Cheekwood's damages, whichever is greater, due to the nature of SBI's willful conduct.

353. SBI's trademark infringement and unfair competition as alleged herein has caused irreparable harm to Cheekwood. Unless restrained and enjoined by this Court, SBI will persist in its trademark infringement and unfair competition as alleged herein, thereby causing Cheekwood further irreparable harm.

354. Cheekwood has no adequate remedy at law.

## COUNT VII

## CYBERSQUATTING IN VIOLATION OF THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT, 15 U.S.C. § 1125(d)

355. Cheekwood incorporates by reference the preceding paragraphs as if fully set forth herein.

356. As alleged herein, the SWAN BALL Mark is a distinctive or famous mark entitled to protection.

357. On information and belief, SBI is the registrant of the Infringing Domains, and traffics and uses the Infringing Domains.

76

358.     On information and belief, SBI registered, maintained, and is presently using the Infringing Domains with a bad faith intent to profit.

359.     As alleged herein, SBI registered the Infringing Domains with the bad faith intent to profit from them.

360.     As alleged herein, SBI does not have any trademark rights in the SWAN BALL Mark or the Infringing Domains.

361.     SBI does not have prior use of the Infringing Domains in connection with the bona fide offering of any goods or services.

362.     Upon information and belief, SBI registered, maintained, and currently uses the Infringing Domains with the intent to divert consumers from Cheekwood's websites including the SWAN BALL Website, which harms the goodwill represented by the SWAN BALL Mark, either for commercial gain or with the intent to tarnish or disparage the SWAN BALL Mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Infringing Domain by Cheekwood.

363.     On information and belief, SBI registered the Infringing Domains which SBI knew are identical or confusingly similar to Cheekwood's SWAN BALL Mark that was distinctive at the time of registration of such Infringing Domain, or dilutive of Cheekwood's famous SWAN BALL Mark that was famous at the time of registration of such Infringing Domain, without regard to the goods or services of the parties.

364.     SBI's Infringing Domains are identical or confusingly similar to Cheekwood's SWAN BALL Mark.

365.     SBI's acts have caused Cheekwood damages, and Cheekwood seeks judgment pursuant to 15 U.S.C. § 1117 for SBI's profits made by SBI through its unlawful acts, for the

damages sustained by Cheekwood, for statutory damages (should Cheekwood so elect), for all costs necessary to remediate the unlawful acts and their effects, and for the costs, expenses, and reasonable attorneys' fees (as this is an exceptional case) incurred in bringing the present action and prior attempts to remedy SBI's actions.

366.    On information and belief, SBI has acted knowingly and willfully, entitling Cheekwood to recovery of the maximum allowable statutory damages under 15 U.S.C. § 1117(d), $100,000.00 per domain in lieu of actual damages, should Cheekwood so elect.

367.    Pursuant to 15 U.S.C. § 1125(d)(1)(C), Cheekwood is entitled to an order forfeiting, cancelling, or transferring the Infringing Domains to Cheekwood.

## COUNT VIII

### CONVERSION

368.    Cheekwood incorporates by reference the preceding paragraphs as if fully set forth herein.

369.    Upon information and belief, individuals acting on behalf of SBI entered Cheekwood's Swan Ball Office and removed tangible property in the form of boxes of Swan Ball records.

370.    As alleged herein, SBI appropriated Cheekwood's property to SBI's own use and benefit by removing boxes of records from the Swan Ball Office and intentionally exercising dominion over Cheekwood's tangible property, in defiance of Cheekwood's rights.

371.    SBI's actions have been made willfully and knowingly.

372.    SBI's acts have caused Cheekwood damages, and Cheekwood is entitled to all available remedies, including preliminary and permanent injunctive relief, return of the tangible property, damages, SBI's profits, enhanced damages, and costs.

**COUNT IX**

**UNJUST ENRICHMENT**

373.    Cheekwood incorporates by reference the preceding paragraphs as if fully set forth herein.

374.    Upon information and belief, SBI's use of Cheekwood's SWAN BALL Mark permitted SBI to procure donors or funds that it otherwise would not have been able to obtain.

375.    Cheekwood has conferred a benefit, directly or indirectly, upon SBI through SBI's use of the SWAN BALL Mark in the offering of SBI's charitable fundraising services.

376.    SBI has received appreciable benefits from using the SWAN BALL Mark in the offering of SBI's charitable fundraising services.

377.    SBI accepted the benefit under circumstances where it would be inequitable to retain the benefit without payment of the value of the benefit. SBI's acts have caused Cheekwood damages such that monetary and injunctive relief are appropriate.

378.    SBI has been unjustly enriched by virtue of its use of the SWAN BALL Mark in the offering of SBI's charitable fundraising services to the detriment of Cheekwood, as well as consumers in the marketplace.

379.    SBI's actions have been made willfully and knowingly.

380.    SBI's acts have caused Cheekwood damages and unjustly enriched SBI as alleged herein.

381.    Cheekwood is entitled to all available remedies, including preliminary and permanent injunctive relief, damages, SBI's profits, enhanced damages, and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant/Counter-Plaintiff Cheekwood prays:

79

1.    That the Court enter a judgment in favor of Cheekwood and against SBI as to all the causes of action alleged herein;

2.    An order requiring that SBI and any subsidiaries, officers, agents, servants, employees, owners, and representatives, and all other persons or entities in active concert or participation with SBI, be preliminarily enjoined, permanently enjoined, and restrained from:

    a.    Making any unauthorized use of the SWAN BALL Mark, or any reproduction, counterfeit, copy, or colorable limitation thereof, in connection with the sale of any goods or offering of any services;

    b.    Manufacturing, distributing, advertising, marketing, promoting, displaying, offering for sale, and/or selling any infringing goods or services, with marks that look confusing similar to any of the SWAN BALL Mark, as well as any other forms of markings, packaging, labels, wrappers, containers, articles, products, displays, signs, circulars, kits, literature, materials, receptacles, catalogs, price lists, promotional materials, or websites and the like bearing any unauthorized, infringing, or otherwise unlawful reproduction, counterfeit, copy, or colorable imitation of the SWAN BALL Mark;

    c.    Using any mark, trade dress, design, statement, or representation that may be calculated to falsely represent or that has the effect of falsely representing that the services or products of SBI are in any way sponsored by, originate with, or are associated or approved by Cheekwood;

    d.    Falsely representing itself or its goods or services as affiliated with, connected with, associated with, or approved by Cheekwood;

    e.    Advertising, marketing, promoting, offering for sale, selling, importing, exporting, distributing, and/or transferring infringing and/or counterfeit goods and services and/or anything confusingly similar thereto, or any reproduction, counterfeit, copy, or colorable imitation thereof, and/or any other unauthorized, infringing, or otherwise unlawful use of the SWAN BALL Mark, through any means whatsoever, including, but not limited to, retail, wholesale, via the Internet, mail order, telephone, or any other method of interstate or intrastate commerce;

    f.    Doing any other act or thing calculated or likely to cause confusion or mistake in the minds of members of the public, including prospective customers of Cheekwood, as to the source of the goods or services offered, distributed, marketed, advertised, or sold by SBI, or as to whether there is a connection between Cheekwood and SBI; and

80

g.     Assisting, aiding, or abetting any other person or entity in engaging in any of the activities set forth in paragraphs (a) through (f) above.

3.     That, within thirty (30) days of issuance of preliminary and/or permanent injunction, the Court order SBI to file a sworn statement under oath and subject to penalty of perjury that they have fully complied with the terms of the injunction;

4.     That this Court, pursuant to 15 U.S.C. § 1118 and equity, order that all labels, signed, prints, packages, wrappers, receptacles, pictures, websites, and advertisements in the possession or under the control of SBI bearing Cheekwood's SWAN BALL Mark or any mark, word, designation, name, or domain name that is confusingly similar to the SWAN BALL Mark and all plates, molds, matrices, and other means of making the same, shall be delivered to Cheekwood and destroyed;

5.     That SBI be required to pay and account to Cheekwood for any and all benefits or profits derived by SBI from the use of Cheekwood's SWAN BALL Mark and any name or mark incorporating any mark, word, designation, name, or domain name that is confusingly similar to the SWAN BALL Mark, including the sale of any and all products or services associated with any such name or mark, and for all damages sustained by Cheekwood by reason of said acts of unfair competition, false designation of origin, and/or other illegal acts complained of herein to the full extent permitted by 15 U.S.C. §§ 1117 and 1125, Tenn. Code Ann. § 47-18-101 *et seq.*, Tenn. Code Ann. § 47-25-501 *et seq.*, and Tennessee common law;

6.     That Cheekwood be awarded statutory damages under 15 U.S.C. § 1117(d), should Cheekwood so elect;

7.     That this Court award Cheekwood punitive and/or treble damages in an amount no less than three times the amount of SBI's profits or Cheekwood's damages, whichever is greater, due to the wanton, egregious, willful, deliberate, intentional, and/or malicious nature of its actions;

8.      That the Court order forfeiture or cancellation of the Infringing Domains, or transfer of the Infringing Domains to Cheekwood pursuant to 15 U.S.C. § 1125(d)(1)(C);

9.      That the costs of this action be awarded to Cheekwood;

10.     That Cheekwood be awarded its reasonable attorneys' fees due to the exceptional nature of this case and SBI's intentional, wanton, and willful illegal conduct;

11.     That SBI be liable for any award of monetary damages, statutory damages, treble damages, punitive damages, costs, and/or attorneys' fees;

12.     That pre-judgment and post-judgment interest be awarded to Cheekwood;

13.     That the Court dismiss SBI's Complaint with prejudice;

14.     That the Court deny SBI any and all relief it has requested in its Complaint;

15.     That the Court deny SBI any preliminary or permanent injunctive relief sought by SBI;

16.     That Cheekwood be awarded damages in an amount to be proven at trial sufficient to compensate Cheekwood for all damages caused by SBI's conduct in violation of the Computer Fraud and Abuse Act; and

17.     That this Court grant such other and further relief as it shall deem just.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Cheekwood hereby requests a jury trial on any issues so triable.

Dated this 30th day of July 2024.

**ADAMS AND REESE LLP**

/s/ Maia T. Woodhouse
Maia T. Woodhouse, TN BPR No. 030438
Jin Yoshikawa, TN BPR No. 038385
1600 West End Avenue, Suite 1400
Nashville, Tennessee 37203
Tel: (615) 259-1450
Fax: (615) 259-1470
maia.woodhouse@arlaw.com
jin.yoshikawa@arlaw.com

*Attorneys for Defendant/Counter-Plaintiff Cheekwood Botanical Garden and Museum of Art*

.

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2024, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

Chanelle Acheson
Jack Waddey
WADDEY ACHESON
1030 16th Avenue South
Suite 165, Second Floor
Nashville, Tennessee 37212
Tel: (615) 839-1100
Email: chanelle@waddeyacheson.com
          jack@waddeyacheson.com

/s/ Maia T. Woodhouse
Maia T. Woodhouse