**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **SB INITIATIVE, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | **CIVIL ACTION NO. 3:24-cv-00821** |
| | ) | |
| **v.** | ) | **DISTRICT JUDGE ELI J.** |
| | ) | **RICHARDSON** |
| **CHEEKWOOD BOTANICAL GARDEN** | ) | **MAGISTRATE JUDGE BARBARA D.** |
| **AND MUSEUM OF ART,** | ) | **HOLMES** |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | **JURY DEMAND** |
| | ) | |
| | ) | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF CHEEKWOOD
BOTANICAL GARDEN AND ART MUSEUM'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AGAINST SBI INITIATIVE, INC.**

_____

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

I. INTRODUCTION AND BRIEF FACTUAL OVERVIEW ................................. 1

II. LEGAL STANDARD ........................................................................... 4

III. ARGUMENT ....................................................................................... 5

    A. Cheekwood Has Demonstrated a Strong Likelihood of Success on the Merits. .... 5

        1. Cheekwood's Ownership and Priority ....................................... 6

            a. Cheekwood was the first to use and register the SWAN BALL Mark. ........................................................................ 6

            b. The Committee's use of the SWAN BALL Mark was on behalf of and inured to the benefit of Cheekwood. ...................................... 8

                i. Swan Ball volunteers are "designated agents" of Cheekwood. ....................................................... 9

                ii. All Swan Ball commercial activity is conducted under Cheekwood's banner. ...................................... 11

                    The public face of the event is connected to Cheekwood. ............................................................... 13

                    The essential business and contractual relationships belong to Cheekwood. .................................... 14

                    The financial obligations of the Swan Ball are borne by Cheekwood. ............................................... 15

                    SBI's allegations of control do not subvert Cheekwood's ownership. ...................................... 17

                    The first and only entity to use the SWAN BALL Mark is Cheekwood. ............................................ 18

        2. SBI's Unauthorized Use in Commerce ..................................... 19

        3. Likelihood of Confusion Analysis ......................................... 19

    B. Cheekwood Has Suffered, and Continues to Suffer, Irreparable Harm. .............. 20

    C. The Balance of the Equities Tips in Cheekwood's Favor. .................................. 22

    D. Injunctive Relief is in the Public Interest. .................................................. 24

    E. The Nature of SBI's Infringement, the Narrow Injunction Requested, and Lack of Threatened Harm to SBI Warrants Waiver of the Bond Requirement. ................ 25

IV. CONCLUSION ................................................................................... 25

CERTIFICATE OF SERVICE .................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allard Enters., Inc. v. Advanced Programming Resources, Inc.*,
146 F.3d 350 (6th Cir. 1998) ...................................................................... 6, 17

*Alzheimer's Found. of Am. Inc. v. Alzheimer's Disease & Related Disorders Assoc., Inc.*,
796 F. Supp. 2d 458 (S.D.N.Y. 2011) ..................................................... 21, 24

*Au Sable River Trading Post, LLC v. Dovetail Solutions, Inc.*,
2018 WL 2166161 (E.D. Mich. 2018) ............................................................ 18

*Audi AG v. D'Amato*,
469 F.3d 534 (6th Cir. 2006) ......................................................................... 24

*Baskin-Robbins Franch. LLC v. Pena*,
2020 WL 2616576 (N.D. Cal. May 7, 2020) .................................................. 20

*Bays v. City of Fairborn*,
668 F.3d 814 (6th Cir. 2012) ........................................................................... 5

*Big O Tires, LLC v. JDV, LLC*,
2008 WL 4787619 (D. Colo. Oct. 31, 2008) ................................................. 23

*Borescopes R U.S. v. 1800Endoscope.com, LLC*,
728 F. Supp. 2d 938 (M.D. Tenn. 2010) .......................................................... 6

*Brake Parts, Inc. v. Lewis*,
443 Fed. App'x 27 (6th Cir. 2011) ................................................................... 5

*Burger King Corp. v. Agad*,
911 F. Supp. 1499 (S.D. Fla. 1995) ............................................................... 20

*C=Holdings B.V. v. Asiarim Corp.*,
992 F. Supp. 2d 223 (S.D.N.Y. 2013) ........................................................... 20

*Cancer Research Inst. v. Cancer Research Soc'y, Inc.*,
694 F. Supp. 1051 (S.D.N.Y. 1988) .............................................................. 19

*Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*,
270 F. Supp. 3d 1340 (S.D. Fla. 2017) .......................................................... 20

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ........................................................................... 5

*Circuit City Stores, Inc. v. CarMax, Inc.*,
165 F.3d 1047 (6th Cir. 1999) ....................................................................... 21

*Coach, Inc. v. Goodfellow*,
717 F.3d 498 (6th Cir. 2013) ........................................................................... 6

*Compton v. Fifth Avenue Assoc., Inc.*,
7 F. Supp. 2d 1328 (M.D. Fla. 1998) ............................................................ 18

ii

Deborah Heart and Lung Ctr. v. Children of the World Found., Ltd.,
    99 F. Supp. 2d 481 (D.N.J. 2000) .................................................................... 24

Ferrellgas Partners, L.P.,
    143 F. App'x 180 (11th Cir. 2005) ................................................................ 21

Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.,
    670 F.2d 642 (6th Cir. 1982) ................................................................. 19, 23

Gemmer v. Surrey Servs. for Seniors, Inc.,
    2010 WL 5129241 (E.D. Pa. Dec. 13, 2010) ......................................... passim

Homeowners Grp., Inc. v. Home Marketing Specialists, Inc.,
    931 F.2d 1100 (6th Cir. 1991) .............................................................. 17, 20

Hungry Howie's Pizza & Subs, Inc. v. Ford Blvd. Pizza, Inc.,
    2016 WL 8115655 (E.D. Mich. July 1, 2016) ............................................. 20

Jones v. City of Monroe,
    341 F.3d 474 (6th Cir. 2003) ........................................................................ 5

L & L Wings, Inc. v. Marco–Destin, Inc.,
    676 F. Supp. 2d 179 (S.D.N.Y. 2009) .......................................................... 20

Little Caesar Enters., Inc. v. Miramar Quick Service Rest. Corp.,
    2020 WL 4516289 (6th Cir. 2020) ................................................................ 5

Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.,
    453 F.3d 377 (6th Cir. 2006) ...................................................................... 25

NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.,
    246 Fed. App'x 929 (6th Cir. 2007) ............................................................ 25

Operation Able of Greater Boston, Inc. v. National Able Network, Inc.,
    646 F. Supp. 2d 166 (D. Mass. 2009) ......................................................... 23

PGP, LLC v. TPII, LLC,
    734 F. App'x 330 (6th Cir. 2018) ............................................................... 21

Planned Parenthood Fed'n of Am., Inc. v. Bucci,
    1997 WL 133313 (S.D.N.Y. Mar. 24, 1997) ............................................... 19

Red Roof Franch., LLC v. Riverside Macon Grp., LLC,
    2020 WL 2494462 (S.D. Ohio May 14, 2020) ............................................ 20

Roth v. Bank of Commonwealth,
    583 F.2d 527 (6th Cir. 1978) ...................................................................... 25

Solis v. Tennessee Commerce Bancorp, Inc.,
    713 F. Supp. 2d 701 (M.D. Tenn. 2010) ....................................................... 4

Southern Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.,
    860 F.3d 844 (6th Cir. 2017) ...................................................................... 22

Tally–Ho, Inc. v. Coast Cmty. College District,
    889 F.2d 1018 (11th Cir. 1989) .................................................................... 6

*Tri-Cnty. Wholesale Distribs., Inc. v. Wine Grp., Inc.*,
    565 F. App'x 477 (6th Cir. 2012) ................................................................. 23

*U.S. Jaycees v. Philadelphia*,
    639 F.2d 134 (3d Cir. 1981).......................................................................... 23

*U.S. Structures, Inc. v. J.P. Structures, Inc.*,
    130 F.3d 1185 (6th Cir. 1997) ....................................................................... 20

*United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*,
    128 F.3d 86 (2d Cir.1997)............................................................................. 21

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981)........................................................................................ 5

## Statutes

15 U.S.C. § 1127.................................................................................................. 6, 19

## Other Authorities

2 McCarthy on Trademarks and Unfair Competition § 16:5 (5th ed.) ............................. 17

In support of its motion, Defendant/Counter-Plaintiff Cheekwood Botanical Garden and Museum of Art ("Cheekwood") respectfully states as follows:

## I.    INTRODUCTION AND BRIEF FACTUAL OVERVIEW[1]

SB Initiative, Inc. ("SBI") was formed for the sole purpose of hosting extravagant, exclusive parties for the ultra-wealthy. Confronted with their embarrassing record of donating an average of 32 cents for every dollar raised (the national average for similar events is 60 to 70 cents), a faction of former Cheekwood volunteers formed SBI and filed this lawsuit to wrest control of the Swan Ball from Cheekwood and avoid improving charitable ratios. In doing so, they turned their back on 60 years of civility, tradition, and community spirit, and attacked the very cause they claimed, until recently, to support. Cheekwood, a nonprofit museum and botanical garden with limited resources, has no choice but to fight back.

The Swan Ball has been Cheekwood's signature event for more than six decades. MacLeod Decl. ¶¶ 19–22. Named for Cheekwood's Swan Lawn, the Swan Ball was founded in 1962 to raise funds for the then-fledgling Tennessee Botanical Gardens and Fine Arts Center at Cheekwood. *Id.* ¶¶ 19–20. Since 1963, the Swan Ball has taken place on Cheekwood's Swan Lawn, is built around Cheekwood's emblem, the famous Swan Fountain, and is universally associated with Cheekwood. Over the past 60-plus years, the Swan Ball has become so ingrained in Cheekwood's DNA and identity that the Swan Ball points uniquely and unmistakably to Cheekwood.

To protect its longstanding and valuable asset, Cheekwood registered the SWAN BALL trademark ("SWAN BALL Mark") in Tennessee in 2004—nearly two decades before SBI (and its lawsuit) existed. Miller Decl. ¶ 10, Ex. 2. Volunteers serving on Cheekwood's Swan Ball

---

[1] In support of its motion, Cheekwood has filed the Declarations of Jane MacLeod (ECF No. 19) ("MacLeod Decl."), Daniel Miller (ECF No. 20) ("Miller Decl."), Jin Yoshikawa (ECF No. 21) ("Yoshikawa Decl."), and Lucie Cammack (ECF No. 22) ("Cammack Decl."), which are cited throughout this memorandum and incorporated by reference herein.

1

Committee (the "Committee")[2] have never claimed that they owned the SWAN BALL Mark. It was only when Cheekwood attempted to reform the Swan Ball and align it with industry best practices that a newer faction of volunteers concocted a claim of ownership, formed SBI, and launched this litigation. In fact, SBI has taken several different positions to suit its new and evolving narrative:

- On March 26, 2024, SBI co-founder Elizabeth Nichols filed a trademark application for SWAN BALL averring under penalty of perjury that she owned the mark. The application was filed on a Section 1(b) intent-to-use basis (*i.e.*, claiming the SWAN BALL mark was not in use already). Yoshikawa Decl. ¶ 4, Ex. 1.

- But on May 26, 2024, SBI filed a contradictory application for SWAN BALL now claiming SBI (not Ms. Nichols) owned the SWAN BALL mark and the mark had been in use by SBI for more than 60 years. Yoshikawa Decl. ¶ 5, Ex. 2.

- On June 5, 2024, SBI applied for 501(c)(3) tax-exempt status with the IRS, admitting—under penalty of perjury—that (i) SBI is a *not* successor to any other organization, and (ii) SBI *does not* and *will not* own any rights in intellectual property, including trademarks. Yoshikawa Decl. ¶ 6, Ex. 3 (Parts II, IV).

- But on July 8, 2024, SBI filed this lawsuit claiming (i) it was a successor-in-interest to a "volunteer organization" known as the Swan Ball Committee and (ii) that it owned the SWAN BALL trademark. *See e.g.* Compl. ¶¶ 6, 8, 113.

- On August 21, 2024—*only after* Cheekwood requested copies of SBI's tax-exempt application materials on August 15, 2024—SBI sought to amend its 501(c)(3) application to claim that, contrary to its original application, (i) SBI *was* a successor to another organization (the alleged Swan Ball committee), and (ii) SBI *did* own intellectual property rights, namely, the SWAN BALL trademark. Yoshikawa Decl. ¶¶ 7,8, Exs. 4, 5. Unlike the application, the amendment was not signed under penalty of perjury.

- In its original 501(c)(3) application, SBI projected—under penalty of perjury—that SBI would raise zero dollars over the next four tax years. Yoshikawa Decl. ¶ 6, Ex. 3 (Part VI).

- But on August 20, 2024, SBI told the media it was moving "full steam ahead" to produce a Swan Ball for a new beneficiary in 2025. Yoshikawa Decl. ¶ 10, Ex. 7.

---

[2] For drafting clarity only, the committee referenced by SBI in paragraph 6 of the Complaint is referred to in this memorandum as the "Committee." Cheekwood does not adopt or admit any of the various characterizations of the Committee offered by SBI in the Complaint.

2

In view of SBI's record of mendacity and contradictory sworn statements, its claims and legal arguments not only lack credibility but also are difficult to follow. For purposes of this motion, however, it is clear that SBI intends to proceed with its attempt to co-opt Cheekwood's SWAN BALL Mark, and is quickly escalating its efforts. On August 19 and 20, 2024, SBI told the press that "the SBI Board of Directors voted . . . to proceed with plans for Swan Ball 2025" and that "[a] venue and beneficiary are being finalized." Yoshikawa Decl. ¶ 9, Ex. 6. SBI is listed on the consent agenda[3] of the Metropolitan Board of Parks and Recreation's ("Metro Parks Board") September 3 meeting, having applied for a permit to hold events for a "Swan Ball 2025" at Edwin Warner Park and Percy Warner Park on October 8, 2024 and June 7, 2025. Yoshikawa Decl. ¶ 12, Ex. 9. Assured that its venue permit is forthcoming, SBI plans to announce the details for its alleged 2025 Swan Ball thereafter on September 4, 2024. Cammack Decl. ¶ 4. After that, SBI will undoubtedly target Cheekwood's donors, corporate sponsors, underwriters, and volunteers to solicit funds as the Swan Ball—if it has not started doing so already.

SBI has now publicly confirmed that it will flout Cheekwood's registered rights and use the SWAN BALL Mark without Cheekwood's authorization, unless this Court instructs SBI to cease. SBI's imminent "announcement" (signaling that it will use Cheekwood's registered SWAN BALL Mark for charitable solicitations without compunction) demonstrates the urgent need to enjoin SBI from using Cheekwood's SWAN BALL mark while the case is pending. Each of the four preliminary injunction factors militates in favor of this conclusion.

First, Cheekwood has established a strong likelihood of success on the merits. This is a dispute over ownership of the Swan Ball trademark. Ownership turns on first use, and Cheekwood

---

[3] The inclusion of SBI's application on the consent agenda means that SBI's application may be granted without discussion of the impact of the present lawsuit or whether SBI (or its beneficiary) may lawfully use that name.

3

was the first to use and register the mark. That is enough. SBI acknowledges that it was formed 60 years too late, but claims to be a successor-in-interest to thousands of volunteers who helped stage the Swan Ball. SBI claims the volunteers owned the Swan Ball mark all along, and now the mark is owned by SBI. SBI's claims fail because the volunteers never owned the mark. Cases on point establish that even the most essential and hardworking volunteers do not own the name of the fundraiser for which they volunteer.

If SBI is allowed to use Cheekwood's SWAN BALL trademark to solicit donors and produce a competing Swan Ball in 2025, Cheekwood will lose control over the goodwill and reputation of its annual Swan Ball fundraising event, jeopardizing donor relationships and future events. Conversely, SBI has conceded it will suffer no harm from not using the SWAN BALL trademark, declaring that, "[i]n the event that the court rules in Cheekwood's favor, we will simply present our fundraiser in 2025 using another name." Yoshikawa Decl. ¶ 11, Ex. 8. Thus, the second and third factors—irreparable harm and the relative balance of harms—weigh heavily in favor of an injunction. Finally, the public interest is not served by uncertainty and confusion over a charitable fundraiser, especially when the uncertainty and confusion harm an essential Nashville nonprofit like Cheekwood. In fact, SBI's actions have already caused confusion about whether Cheekwood owns the SWAN BALL Mark and whether SBI's announcement means SBI has won its lawsuit. MacLeod Decl. ¶ 46. Because the balance of the factors weighs overwhelmingly in Cheekwood's favor, and in view of Cheekwood's status as a not-for-profit organization, Cheekwood respectfully requests that the requirement of a bond be waived.

## II.  LEGAL STANDARD

The standard for granting both a temporary restraining order and a preliminary injunction is the same. *Solis v. Tennessee Commerce Bancorp, Inc.*, 713 F. Supp. 2d 701, 716 (M.D. Tenn. 2010). A district court must balance four factors when considering a motion for a preliminary

4

injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction. *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). "A district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue." *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 28 (6th Cir. 2011) (internal citation omitted). Yet these competing elements "are factors to be balanced, not prerequisites that must be met." *Id.*.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Given this limited purpose, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). A party "is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits." *Id.*; *see also Little Caesar Enters., Inc. v. Miramar Quick Service Rest. Corp.*, 2020 WL 4516289, at *2 (6th Cir. 2020).

### III.  ARGUMENT

### A.  Cheekwood Has Demonstrated a Strong Likelihood of Success on the Merits.

The Lanham Act protects against trademark infringement and a range of activities generally called "unfair competition." To demonstrate a likelihood of success on the merits of its Lanham Act claims, Cheekwood must show that: (1) it owns a valid, protectable trademark; (2) SBI used the trademark in commerce without authorization; and (3) SBI's use of the trademark is likely to confuse consumers as to source or origin of SBI's services. *Coach, Inc. v. Goodfellow*,

717 F.3d 498, 502 (6th Cir. 2013). "Tennessee unfair competition claims, common law infringement claims and claims for violation of the Tennessee Consumer Protection Act are analyzed under the same standards as federal claims." *Borescopes R U.S. v. 1800Endoscope.com, LLC*, 728 F. Supp. 2d 938, 945 (M.D. Tenn. 2010). Thus, Counts I, III, V, VI, and IX of Cheekwood's Counterclaims may be analyzed together.

Cheekwood's ownership of the SWAN BALL mark is established by the by the authorities and evidence submitted below. SBI has admitted it is using the mark. The third factor is not seriously in dispute, as SBI has confirmed its plans to use the SWAN BALL mark for a kickoff event in October 2024 and benefit gala in June 2025, and use of the identical mark for identical services establishes likely confusion without further analysis. Cheekwood can thus establish a strong likelihood of success on the merits of Counterclaim Counts I, III, V, VI, and IX.

1.      **Cheekwood's Ownership and Priority**

A party establishes ownership of a mark by being the first to use the mark in commerce. *Allard Enters., Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 358 (6th Cir. 1998) ("[t]he exclusive right to a trademark belongs to one who first uses it in connection with specified goods."). "Use in commerce" is defined as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "Trademark ownership is always appurtenant to commercial activity," rather than creative activity, … "[and] actual and continuous use is required to acquire and retain a protectible interest in a mark." *Tally–Ho, Inc. v. Coast Cmty. College District*, 889 F.2d 1018, 1022–23 (11th Cir. 1989).

a.      **Cheekwood was the first to use and register the SWAN BALL Mark.**

There is no question that Cheekwood's use of the SWAN BALL Mark predates SBI's first infringing use of the same. SBI is a new entity incorporated on May 23, 2024. SBI could not have used the SWAN BALL Mark before it existed.

6

The Swan Ball is an annual white-tie charity event established to raise funds for Cheekwood. MacLeod Decl. ¶ 19. In 1961, a Cheekwood Board member, Thomas K. Connor, "proposed a fancy dress bell be incorporated" into Cheekwood's "annual solicitation of funds" campaign. Miller Decl. ¶ 16, Ex. 6. The Board approved a "summer ball" to take place in June 1963, and, in 1962, asked Jane Dudley, a leading hostess and philanthropist, "to take charge of the event, which was envisioned as a grand gala on Cheekwood's Swan Lawn overlooking the rolling hills of Nashville." *Id.* ¶ 16, Exs. 7, 19. Mrs. Dudley "accepted the chairmanship of the Cheekwood Ball to be held in the spring of 1963," *id.* Ex. 9, and held that position for the first two Swan Balls. *Id.* Ex. 12; MacLeod Decl. ¶ 26. The Swan Ball was named for Cheekwood's Swan Lawn, where Cheekwood has hosted the eponymous event since 1963, and is built around Cheekwood's famous emblem, the Swan Fountain. *Id.* ¶¶ 20–22. Over the years, additional events and activities leading up to the Swan Ball have been organized for Cheekwood under the SWAN BALL Mark. *Id.* ¶ 23.

Since the first Swan Ball in 1963, Cheekwood has used its SWAN BALL Mark to promote the Swan Ball, solicit donors and in-kind donations, procure art exhibits for display during and after the Swan Ball, and raise funds for Cheekwood's operations. *See* MacLeod Decl. ¶¶ 31–34, Ex. 2; Miller Decl. ¶ 16, Exs. 11, 16, 17, 18; Yoshikawa Decl. ¶ 13, Ex. 10. Through its longstanding and continuous use for more than 60 years, as well as immense media coverage, the SWAN BALL Mark has become a well-known source identifier that consumers associate exclusively with Cheekwood. There is no Swan Ball without Cheekwood, the Swan Lawn, the Swan Fountain, or the newly restored Petite Swan Fountain in the adjacent Swan Garden. MacLeod Decl. ¶ 21; Yoshikawa Decl. ¶ 13, Ex. 10.

In addition to its common law rights, Cheekwood owns Tennessee trademark reg. no. 42241 for its SWAN BALL Mark, for "[c]haritable fundraising services involving auction and

gala events with proceeds going to Cheekwood Botanical Garden and Museum of Art" (the "Registration"). Miller Decl. ¶ 10 Ex. 2. Cheekwood applied to register the SWAN BALL Mark on July 1, 2004.[4] *See id.* Cheekwood has timely renewed the Registration, which remains valid and subsisting. *Id.* ¶ 12 Ex. 5. Cheekwood also consistently registers "SWAN BALL" as one of the names under which Cheekwood solicits funds pursuant to its charitable solicitations permit and registration renewals required by the Tennessee Secretary of State. *Id.* ¶ 9, Ex. 1. Cheekwood thus has both priority of use and registration of the SWAN BALL Mark over SBI, and a strong likelihood of success in proving Cheekwood's ownership rights on the merits.

> **b.    The Committee's use of the SWAN BALL Mark was on behalf of and inured to the benefit of Cheekwood.**

Despite its sworn statement that it owns no trademarks and is not a successor-in-interest, SBI now claims it owns the SWAN BALL Mark as successor-in-interest to the Committee.[5] *Cf.* Yoshikawa Decl. Ex. 3 *with* Compl. ¶¶ 113. The Committee is not a legal entity under Tennessee law.[6] It is not a registered 501(c)(3) nonprofit. It is not a professional solicitor. It is not even a

---

[4] Cheekwood's Board of Trustees ("Board") includes a seat for Committee representatives. MacLeod Decl. ¶ 32. The 2004 Committee representative attended the Board meeting when Cheekwood's Botanical Garden Committee reported that the process to register the SWAN BALL Mark was complete. Miller Decl. ¶ 16, Ex. 31. At no time did the Committee or any volunteer object to Cheekwood's registration or claim the volunteers or the Committee owned the mark. Thus, even assuming any volunteer(s) owned the SWAN BALL Mark (which they did not), they have waived any claim of ownership through their unreasonable 20-year delay in asserting alleged trademark rights against Cheekwood. *See* Cheekwood's Answer, ¶ 219.

[5] SBI has not explained how, as a matter of trademark law, the shifting "group of friends" acquired trademark rights dating to 1962, nor how it maintained them through 2024. SBI has not explained how, as a matter of corporate law, SBI became a successor-in interest to the rotating group of volunteers SBI calls "the Committee," and how the decision to form SBI, transfer all assets to SBI, and attack Cheekwood was authorized and approved. The mechanics of the alleged assignment remain obscure. None of this is relevant because the volunteers owned no rights in the mark. However, to the extent the claims are maintained by SBI, and if the Court grants leave to do so, Cheekwood will probe the issues in expedited discovery.

[6] *See e.g.* Tennessee Secretary of State Business Information Search records.

commercial co-venture.  It is, as SBI admits, a group of volunteers.  Compl. ¶ 35.

Volunteers are agents of the nonprofit for which they volunteer; indeed, many nonprofits are entirely volunteer-run.[7] That does not mean the volunteers acquire ownership in the nonprofit's assets, nor have the right to continuing using the nonprofit's assets when they cease to be volunteers.  Yet that is precisely what SBI asks the Court to endorse by declaring that the volunteers owned the SWAN BALL Mark.  At most, Cheekwood granted Committee members an implied license to use the SWAN BALL Mark while volunteering for Cheekwood, and thus Committee members had no rights to convey to SBI.

### i.   Swan Ball volunteers are "designated agents" of Cheekwood.

The Swan Ball volunteers' use of the SWAN BALL Mark constitutes use by Cheekwood because the volunteers' actions are and have always been on behalf of, with the permission of, and for the benefit of Cheekwood. The Swan Ball is one of many "internal committees & functions" of Cheekwood's Board. Miller Decl. ¶ 17, Ex. 23.  Committee members operate under the auspices of Cheekwood, and Cheekwood is legally and financially responsible for the actions of the Swan Ball.  *Id.* ¶ 18, Ex. 25.  Both Cheekwood and the Committee have long recognized that the Committee is an "unincorporated fund raising agent" (and its volunteer members, "designated agents") of Cheekwood.  *Id.* ¶ 19, Ex. 26.

Because "[t]he Swan Ball is considered to be a function of the Tennessee Botanical Gardens and Fine Arts Center, Inc." and "a substantial number of volunteers have donated significant amounts of their time in the event's fund-raising campaign," Miller Decl. ¶ 18, Ex. 24, Cheekwood requires that its volunteers act in accordance with Cheekwood's philanthropic

---

[7] *See e.g.* "Volunteers" page of the National Council of Non-Profits website, located at https://www.councilofnonprofits.org/running-nonprofit/employment-hr/volunteers (last accessed September 1, 2024).

9

mission, guiding principles, policies and procedures, and as needed, specific instructions. Miller Decl. ¶ 20. For 60-plus years, Swan Ball volunteers must (and do) request Board approval for various aspects of the Swan Ball, such as use of the Cheek Mansion, Swan Lawn, and Cheekwood garden areas, Swan Ball events other than the ball itself (and the details of those events), scheduling, and other event logistics. MacLeod Decl. ¶¶ 31–38, Ex. 2; Miller Decl. Exs. _ Cheekwood has historically required its departments (including Swan Ball) to coordinate their soliciting efforts, (*see e.g.* Miller Dec. Exs. 14, 20, 21) and provided incentives and solicitation materials for patrons (*id.* Exs. 13, 15, 22). *See also* MacLeod Decl. ¶¶ 33, 41, 45, Ex. 2. Cheekwood also maintains control over the nature and quality of the charitable services offered under its SWAN BALL Mark by, among other means, requiring annual and other reports on material aspects of the Swan Ball and associated events, assessing the financial outcomes of the Swan Ball and associated events and meeting with Swan Ball volunteers to implement new procedures and improve outcomes, as needed, Miller Decl. ¶ 21, and establishing cash controls and accounting procedures. Miller Decl. ¶ 22, Exs. 27, 28.

Cheekwood formalized and augmented these quality control measures on February 16, 1993, when its Board approved "The Swan Ball of Cheekwood – Tennessee Botanical Gardens and Museum of Art Policies and Procedures" (the "Swan Ball of Cheekwood Policies").[8] *Id.* ¶ 19, Ex. 26. The stated purpose of the Swan Ball of Cheekwood Policies "is to preserve open communications between Cheekwood's administration/governing board and the Swan Ball organizers <u>as well as to provide appropriate fiscal management and financial information that meets the highest standards of the museum profession.</u>" *Id.* (emphasis added). The Swan Ball of

---

[8] The title of the document confirms the subsidiary status of the Swan Ball: "The Swan Ball <u>of</u> <u>Cheekwood.</u>" *See* Miller Decl. Ex. 26 (emphasis added).

Cheekwood Policies further provide, in pertinent part:

- "Cheekwood recognizes the existence and contributions of the Swan Ball as an <u>unincorporated fund raising agent of Cheekwood</u>."

- "<u>In accordance with the overall policies of Cheekwood and to maintain the highest professional standards of the institution, members of the Swan Ball, as designated agents of Cheekwood</u>, agree to the following policies and procedures . . . [.]"

- "While involved in fund raising or other activities, <u>the Swan Ball will meet and maintain Cheekwood's highest standards of professionalism and ethics of operation</u>."

- "<u>The Vice President of Finance of Cheekwood will meet quarterly with the Swan Ball Treasurer and Secretary for a financial review</u>."

- "Fundraising, public relations and/or advertising efforts will be coordinated with Cheekwood's Development and Public Relations Department."

- "<u>The President of Cheekwood and his staff representatives will meet regularly with the Swan Ball Chairman</u>. The Swan Ball will review its annual plan with the President of Cheekwood as it is available. The plan should include brief descriptions of", among other things: "anticipated revenue, outlining all sources and expenses within a budget format"; "fund raising plan"; "marketing plan"; and "contractual arrangements with vendors or subcontractors".

*Id.* (emphasis added). The Swan Ball of Cheekwood Policies and exemplary historical evidence demonstrate that, long before SBI's *recently discovered* claims of its alleged ownership, the Committee members were aware of and acknowledged their status as agents of Cheekwood, that Cheekwood exercised control over the services provided under the SWAN BALL mark, and that the Committee members' actions were performed in their capacity as volunteers for Cheekwood.

### ii. All Swan Ball commercial activity is conducted under Cheekwood's banner.

The crux of SBI's claims is that, because the Swan Ball is largely produced by volunteers, rights in the SWAN BALL Mark vested in the volunteers (not Cheekwood). Courts have rejected this "sweat of the brow" argument in similar trademark cases involving nonprofit volunteers.

*Gemmer v. Surrey Servs. for Seniors, Inc.*, 2010 WL 5129241 (E.D. Pa. Dec. 13, 2010) is

11

directly on point.[9] There, former volunteers sued a non-profit alleging ownership of the mark "The Main Line Antiques Show" by virtue of their "control" over the planning of the fundraising event. *Gemmer*, 2010 WL 5129241, at *1. The court rejected the volunteers' "contention that Ms. Gemmer's efforts in producing The Main Line Antiques Show means that the [volunteers] own the mark" and found that "an exhaustive review of case law leads to the conclusion that [the volunteers] cannot establish that they are likely to succeed on this claim[.]" *Id.* at *20.

The similarity to the case at bar is remarkable. Like SBI, the *Gemmer* plaintiffs argued that they owned the trademark because the plaintiffs "offered to chair a special event," "organized and chaired" the fundraising event, developed the "committee to work on [the] fundraiser," and the mark "was created by [the] fall fundraising committee." *Id.* at *5–6. The nonprofit defendant conceded that it "[did] not control its volunteers" but "place[d] a high degree of trust in its volunteers' abilities and good intentions, and relie[d] on the volunteers to conduct themselves in an appropriate manner." *Id.* at *3. The court also noted the volunteers' "dedication to and work on the show," including that they "'oversaw the work of [the committee]"; created and supervised the event's logistics; "kept track of . . . deposit payments;" "decided whether a dealer could participate in the show"; "developed an advertising plan for each year's show"; "created the budget for the show each year"; "reviewed and approved all show-related invoices"; "was the signatory on behalf of the Show to some of the Show's contracts"; and "maintained the show's records[.]" *Id.* at *9–11.

Despite recognizing the volunteers' "tremendous involvement in the show" and considerable discretion, *id.* at *1 n.1, the court rejected the contention that such efforts conferred *trademark ownership* on the volunteers. *Id.* at *17. Instead, the court found that the volunteers'

---

[9] Cheekwood respectfully attaches a copy of the *Gemmer* opinion for the Court's convenience.

actions "were performed in the capacity of volunteers for Surrey. As volunteers, the [Gemmers'] use of the MLAS mark <u>would be more appropriately attributed to Surrey rather than vice versa</u>." *Id.* at *1 n.1 (emphasis added) (granting nonprofit's motion for injunction).

In reaching its conclusion, the court made several findings that are directly applicable to the present case, discussed in detail below.

**<u>The public face of the event is connected to Cheekwood.</u>** The *Gemmer* court found that "the commercial activity in which the mark was used—solicitation and acknowledgment of sponsors; publicizing the event to the public; contractual agreements—<u>was under [the non-profit's] banner</u>." *Gemmer*, 2010 WL 5129241, at *17 (emphasis added). The court explained:

> . . . [V]irtually *all* of the evidence relating to the *use in commerce* of the name "The Main Line Antiques Show" connects the show to Surrey. The invitations, advertising materials, sponsorship letters, and everything else that constituted the "public face" of The Main Line Antiques Show" connected the event to Surrey Services for Seniors. . . . To the extent Plaintiffs are mentioned in any of these materials, they are listed by their committee participation, and as a contact person.

*Id.* at *15–16 (emphasis in original).

Here, just as in *Gemmer*, the invitations, promotional materials, sponsorship letters, Swan Ball website located at [www.swanball.com](www.swanball.com) (the "Swan Ball Website"), and everything else that constitutes the "public face" of the Swan Ball connects the event to Cheekwood. Solicitation packets sent for the Swan Ball auction contain Cheekwood fact sheets, refer to Cheekwood in the cover letter and other materials, confirm that the Swan Ball benefits Cheekwood, and direct donors to send any requested forms or checks to Cheekwood's Swan Ball Office. MacLeod Decl. ¶¶ 41, 44, Ex. 6, 8. SBI is not mentioned in any of these materials. As in *Gemmer*, the Swan Ball volunteers are identified only by their Committee participation and capacity as volunteers. *Id.* The Swan Ball Website does not refer to the Committee or any individual volunteers other than the first Swan Ball chair, Mrs. Dudley, and 2024 Ball Chairs. *See generally*, [www.swanball.com](www.swanball.com).

13

Thus, "virtually *all* of the evidence relating to the *use in commerce*" of the name SWAN BALL connects the event to Cheekwood. *See Gemmer*, 2010 WL 5129241, at *16.

**The essential business and contractual relationships belong to Cheekwood.** The *Gemmer* court also found that "the business relationships essential to producing the Main Line Antiques Show were between Surrey and the various third parties," noting that event sponsors "received solicitations . . . and thank you letters . . . on Surrey letterhead, signed by Surrey President Jeanne LaRouche and by [one of the plaintiff volunteers], as Chair of the event," and that the non-profit "retain[ed] all of the contractual rights and obligations" for the show's contracts. *Gemmer*, 2010 WL 5129241, at *16.

This is how "the business relationships essential to producing" the Swan Ball for Cheekwood are structured. *Id.* Swan Ball donors receive tax acknowledgement letters on Cheekwood letterhead, signed by the Cheekwood CEO or Development Staff member, pursuant to Cheekwood's tax-exempt status. MacLeod Decl. ¶ 42, Ex. 7. The business of the Swan Ball is conducted under Cheekwood's 501(c)(3) tax-exempt status and charitable solicitations permit. Miller Decl. ¶ 23. The expenses and revenues of the Swan Ball are included in Cheekwood's audited financial statements and are accounted for within Cheekwood's annual Form 990 submitted to the IRS. *Id.* ¶ 24. Cheekwood issues all IRS Form 1099 tax documents required to report payments to vendors and contractors in connection with the Swan Ball. *Id.* ¶ 26. Cheekwood registers the raffles conducted in connection with the Swan Ball (the "Swan Ball Raffle") with the Tennessee Secretary of State. The Swan Ball Raffle is subject to approval of, registered in the name of, and held on behalf of Cheekwood. Miller Decl. ¶ 29, Exs. 4, 31.

In line with *Gemmer*, Cheekwood also "retain[s] all of the contractual rights and obligations" for the Swan Ball's contracts. 2010 WL 5129241, at *16. As its "designated agents,"

14

Cheekwood authorizes certain Swan Ball volunteers—primarily the co-chairs, with assistance from Cheekwood's Swan Ball Office employees—to negotiate and sign Swan Ball contracts on behalf of Cheekwood, and Cheekwood accepts the contractual rights and obligations. *See e.g.*, Miller Decl. ¶ 42. The primary obligations of the purchaser under Swan Ball contracts are to provide evidence of insurance, and to make payment when due. It is Cheekwood, not the volunteers, that provides insurance coverage and issues certificates of insurance to vendors when required by contract; and vendors similarly provide certificates of insurance to Cheekwood, not its volunteers. *Id.* ¶ 49, Ex. 37. And it is Cheekwood that pays the bills. Payments for event-related expenses are disbursed from Cheekwood's SWAN BALL Bank Account. *Id.* ¶ 34. Indeed, contrary to SBI's claims, no reasonable person would volunteer to chair the Committee if she believed that she was <u>personally</u> liable for all contractual rights and obligations for the Swan Ball (such as footing the bill for the $2M+ in expenses).[10] Swan Ball volunteers look to Cheekwood— not to themselves individually—to satisfy contractual obligations. *See e.g.* Miller Decl. ¶ 44, Ex. 36 (requesting Cheekwood pay the deposit owed by the "Purchaser" of the 2024 contract); *id.* (requesting Cheekwood provide its certificate of insurance required by the 2023 contract). SBI's admission that it did not know that Cheekwood handled these contractual obligations (*see e.g.* SBI Answer ¶¶ 81, 82, 123) only underscores that Cheekwood was and is operationally and legally responsible for the operations of the Swan Ball. *Gemmer*, 2010 WL 5129241, at *16.

**The financial obligations of the Swan Ball are borne by Cheekwood.** The *Gemmer* court also found that the nonprofit "was responsible for all financial obligations of the show, including reimbursement of the [volunteers]" and "continued to pay all MLAS expenses from 2006 to the

---

[10] Notably, the "individual chairman" of the 2024 Swan Ball deleted her name from the "[c]ontract[] for the entertainer" along with the assumption of personal liability. Miller Decl. ¶ 44.

present." *Id.* at *1 n.1. The court explained that the bank account used to pay expenses "was a Surrey bank account" and that "Surrey uploaded its Articles of Incorporation, IRS determination letter and Surrey's banking and checking account information to establish this account." *Id.* at *9.

Just as in *Gemmer*, and as noted by independent auditors, "the Swan Ball operates under the auspices" of Cheekwood, and "Cheekwood management remains financially and legally responsible for the actions of the Swan Ball." Miller Decl. ¶ 18, Exs. 24, 25. As in *Gemmer*, Cheekwood owns and establishes the annual bank account used for the Swan Ball (the "Swan Ball Bank Account"), under Cheekwood's master services agreement with Truist Bank and using Cheekwood's taxpayer identification number and tax-exempt status. *Id.* ¶ 30, Ex. 32. The Swan Ball Bank Account is funded, initially, by a loan from proceeds donated to Cheekwood for the prior year's Swan Ball, which is later repaid by funds raised by that year's Swan Ball. *Id.* ¶¶ 31–32, Ex. 33. Expenses for the Swan Ball are paid from the SWAN BALL Bank Account. *Id.* ¶ 34. After all expenses are reconciled for the year (typically by December or January), the net proceeds are transferred to Cheekwood's operating accounts and that year's SWAN BALL Bank Account is closed. *Id.* ¶ 36. And, just as in *Gemmer*, Cheekwood has continued to pay Swan Ball expenses, even after SBI filed suit. *Id.* ¶ 43.

SBI has made bizarre—and false—assertions that, "[n]ot only did Cheekwood not open the bank accounts for the majority of the years, they didn't even have access to those bank accounts[.]" Yoshikawa Decl. ¶ 9, Ex. 6. The evidence shows that Cheekwood does in fact open and own the accounts under Cheekwood's taxpayer identification number and tax-exempt status. Miller Decl. ¶ 30, Ex. 32. Cheekwood's CFO signs the forms required to open the accounts and is the authorized signer for treasury implementations on all Cheekwood account levels. *Id.* ¶ 31, Ex. 33. Past Swan Ball chairs and volunteers know the accounts are owned by Cheekwood from the

16

paperwork they sign each year. *See id.* ¶ 30, Ex. 32. SBI's lack of familiarity with the accounts is unsurprising, *see* SBI Answer ¶¶ 99, 102, as the banking relationship is within the purview of Cheekwood and not its volunteers.

**SBI's allegations of control do not subvert Cheekwood's ownership.** One of the bedrock principles of trademark law is that "ownership rights flow only from prior appropriation and actual use in the market." *Homeowners Grp., Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991); *Allard Enters.*, 146 F.3d 358; 2 MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋꜱ ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 16:5 (5th ed.). SBI nevertheless argues that the volunteers' alleged control over "the nature and quality of goods sold" (see SBI Answer ¶ 181) is enough to establish trademark ownership. Based on the "significant factual record," the *Gemmer* court rejected the argument SBI makes here. *See Gemmer*, 2010 WL 5129241, at *1 n.1. The court explained:

> . . . [A]n exhaustive review of case law leads to the conclusion that Plaintiffs cannot establish that they are likely to succeed on this claim. <u>We have not found (nor have the parties cited) any case law that holds that disputed ownership of a mark—in a situation where neither party has registered the mark[11]—can be determined based on "control" of the "nature and quality" of the goods sold.</u>"

*Id.* at *20 (cleaned up) (emphasis added). Thus, SBI's argument is contrary to black letter law and has been rejected on nearly identical facts by *Gemmer*. It is also inconsistent with the facts of this case. Cheekwood did indeed place a high degree of trust in its volunteers' abilities and good intentions, and afforded them considerable discretion; however, as exhaustively detailed above, the volunteers were acting in their capacity as "designated agents" of Cheekwood, and Cheekwood maintained policies, procedures, and review adequate for controlling the nature and quality of the services provided under the SWAN BALL Mark. *See* Section III(A)(1) *supra*. Thus, "while it is

---

[11] Unlike the *Gemmer* case, Cheekwood registered the SWAN BALL Mark in 2004, with the actual knowledge of the members of the Committee at that time. *See* Section III(A)(1) *supra*.

undisputed that [Swan Ball volunteers] in fact used the [SWAN BALL] mark while volunteering in her role as chairperson of the … committee, that use constituted commercial activity properly attributed to [Cheekwood]." *Gemmer*, 2010 WL 5129241, at *1 n.1 (emphasis added).

**The first and only entity to use the SWAN BALL Mark is Cheekwood.** These principles of trademark use and ownership are echoed in *Compton v. Fifth Avenue Assoc., Inc.*, 7 F. Supp. 2d 1328 (M.D. Fla. 1998). In *Compton*, the plaintiff was a member of the Board of Directors of the defendant nonprofit ("the Shelter") and former chairman of its fund-raising committee. *Id.* at 1329. The plaintiff came up with the idea to produce a non-profit, street-painting festival and conceived of the name "Via Colori" for the event. *Id.* The plaintiff presented the idea to the Shelter. *Id.* For the next three years, the festival was held annually, the Shelter funded and staffed the festival, all advertisements indicated that the festival was to benefit the Shelter, and all proceeds went to the Shelter. *Id.* During that time, the plaintiff registered the "Via Colori" mark under his own name. *Id.* After a disagreement over acceptable use of the mark, Compton sued the Shelter for trademark infringement. *Id.* Despite the presumptions of validity and ownership that flowed from his registration—which SBI lacks here—the *Compton* court found that Compton did not own the mark because "the first and only entity to use the mark 'Via Colori' was and is the Shelter"; the "Via Colori" event "was successfully established as [the Shelter's] signature event"; and the evidence showed that "Via Colori" events "were intended as fund-raisers for the Shelter[.]" *Id.* at 1331-32.

*Gemmer* and *Compton* are directly on point. Simply put, "[v]olunteerism is a vital part of any festival, but no reasonable person would believe that volunteers for a festival thereby obtain trademark rights in the festival's name." *Au Sable River Trading Post, LLC v. Dovetail Solutions, Inc.*, 2018 WL 2166161, at *7 (E.D. Mich. 2018) (emphasis added). Thus, not only has Cheekwood demonstrated a strong likelihood of success on the merits on Counterclaim Counts I-

18

IX, but SBI's argument that it has inherited rights from an amorphous "group of friends" fails because the Committee had no trademark rights to convey. SBI therefore lacks standing to maintain any of its claims, and Cheekwood is likely to succeed on the merits of its standing defense. *See* Cheekwood's Answer to SBI's Complaint (ECF No. 12), ¶ 213.

### 2. SBI's Unauthorized Use in Commerce

A defendant uses a trademark "in commerce" any time it is used in connection with the offering for sale of goods or services in interstate commerce. 15 U.S.C. § 1127. The exploitation of another nonprofit's name is an actionable basis for trademark infringement. *See*, *e.g.*, *Cancer Research Inst. v. Cancer Research Soc'y, Inc.*, 694 F. Supp. 1051 (S.D.N.Y. 1988). "[F]und-raising activities may bring a defendant's actions within the scope of the Lanham Act." *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, at *6 (S.D.N.Y. Mar. 24, 1997).

As demonstrated by SBI's Answer, the Metro Parks Board agenda, and SBI's recent statements to the media, SBI has been and is using the SWAN BALL Mark in commerce to advertise, promote, and market SBI's charitable fundraising services. SBI admits that it registered various website domains, social media, and email accounts using the SWAN BALL Mark (SBI Answer ¶¶ 230, 236, 255); "is planning Swan Ball 2025 and related events" (*id.* ¶ 267); and "has an immediate capability and intent to provide charitable fundraising services" under the SWAN BALL Mark (*id.* ¶ 270). SBI has thus made and will continue to make unauthorized use of Cheekwood's SWAN BALL Mark in commerce, unless enjoined by this Court.

### 3. Likelihood of Confusion Analysis

In the Sixth Circuit, courts generally apply an eight-factor balancing test in assessing likelihood of confusion under the Lanham Act. *See Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). However, these factors "'are more geared towards comparing two distinct, albeit similar, marks.'" *C=Holdings B.V. v. Asiarim Corp.*, 992

19

F. Supp. 2d 223, 240–41 (S.D.N.Y. 2013) (internal citation omitted).  It is "unnecessary to undertake an extended analysis to infer confusion" when "there is no difference between the marks of directly competitive goods/services." *Homeowners Grp.*, 931 F.2d at 1107 n.4.  This is because such a mark is "inherently confusing," thus "consumer confusion is presumed in such cases." *C=Holdings B.V.*, 992 F. Supp. 2d at 241.

The Court can dispense with the factor-by-factor analysis in this case because SBI is not merely operating a comparable or similar charity event under a similar mark; it is purporting to conduct identical charitable fundraising services under *the same mark* Cheekwood has used for 61 years.  The Sixth Circuit and other courts have found that, in analogous cases involving ex-licensees or hold-over franchisees, the "continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'" *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997).[12] In such instances, "likelihood of confusion is an inevitable result of the concurrent use of the subject trademark." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1504 (S.D. Fla. 1995) (citation and internal quotation marks omitted). Cheekwood has thus shown a strong likelihood of success on the merits and entry of an injunction is not only appropriate, but necessary.

**B.    Cheekwood Has Suffered, and Continues to Suffer, Irreparable Harm.**

SBI's infringing activities must be stopped immediately in order to prevent further and irreparable harm to Cheekwood. As an initial matter, Cheekwood is entitled to a presumption of

---

[12] *See e.g.*, *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1359–60 (S.D. Fla. 2017) (collecting cases); *Red Roof Franch., LLC v. Riverside Macon Grp., LLC*, 2020 WL 2494462, at *8 (S.D. Ohio May 14, 2020); *Hungry Howie's Pizza & Subs, Inc. v. Ford Blvd. Pizza, Inc.*, 2016 WL 8115655, at *2 (E.D. Mich. July 1, 2016) (noting it is "'unnecessary to undertake an extended analysis to infer confusion' because 'there is no difference between the marks of directly competitive goods/services.'"); *Baskin-Robbins Franch. LLC v. Pena*, 2020 WL 2616576, at *8 (N.D. Cal. May 7, 2020); *L & L Wings, Inc. v. Marco–Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009).

irreparable harm because it has shown a strong likelihood of success on the merits of claims. 15 U.S.C. § 1116; *see also PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 332 (6th Cir. 2018) ("If the movant is likely to succeed on an infringement claim, irreparable injury is ordinarily presumed, and the public interest will usually favor injunctive relief.").

This prong weighs in Cheekwood's favor even absent a presumption. Not-for-profit and public service organizations like Cheekwood are entitled to the use and protection of their trademarks. *See United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86, 89–90 (2d Cir.1997) ("The right to enjoin infringement of a trade or service mark 'is as available to public service organizations as to merchants and manufacturers.'") (citations omitted). Indeed, courts have noted that "although no explicit legal theory supports the proposition, public service or benefit entities appear to receive greater protection than for-profit business organizations." *Alzheimer's Found. of Am. Inc. v. Alzheimer's Disease & Related Disorders Assoc., Inc.*, 796 F. Supp. 2d 458, 465 (S.D.N.Y. 2011) (citations omitted). Yet, due to SBI's actions, Cheekwood is forced to postpone its own 2025 Swan Ball—potentially losing donors, funding, and goodwill— and forgo lawful use of its registered SWAN BALL Mark.

Moreover, "[t]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's [services]," regardless of the actual quality of those services. *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190–91 (11th Cir. 2005) (quotation omitted). Consequently, "irreparable injury 'ordinarily follows when a likelihood of confusion or possible risk to reputation appears' from infringement or unfair competition." *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999) (quotation omitted). Indeed, as explained above, this case and arguably the very creation of SBI are an attack on Cheekwood's efforts to control the quality of its service and its

21

reputation.  And, as mentioned, SBI's actions have already caused confusion among existing and potential donors. MacLeod Decl. ¶ 46.  If SBI's infringing conduct continues, Cheekwood will lose control of its reputation associated with its SWAN BALL Mark, lose control of the SWAN BALL Mark itself, and lose its established goodwill in the marketplace. These injuries are irreparable and are not compensable by money damages.

Finally, "SWAN BALL" is not just a registered trademark owned by Cheekwood; it is also a name Cheekwood registers to solicit charitable contributions in Tennessee.  Miller Decl. 9, Ex. 1. Vendors engaging with SBI fundraisers (some of whom were previously agents of Cheekwood) are likely to be confused as to SBI's relationship with Cheekwood and may believe that contracts for or with the "Swan Ball 2025" are contracts guaranteed by or on behalf of Cheekwood.  Thus, there is significant risk that, if not enjoined, SBI will contract with vendors who mistakenly believe Cheekwood stands behind the contracts (as it has for 61 years)—and will seek to hold Cheekwood responsible for the contractual obligations. Should SBI fail to meet its obligations under those contracts, Cheekwood's reputation will be irreparably damaged and its finances imperiled.  Any additional loss of donor and volunteer goodwill and trust is immeasurable, and thus appropriately remedied through injunctive relief.

C.    **The Balance of the Equities Tips in Cheekwood's Favor.**

The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits. *Southern Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017).  The status quo for the last 61 years is that the Swan Ball is a fundraiser hosted by Cheekwood to benefit its not-for-profit museum and botanical gardens.  SBI did not participate in the planning of—and even exist for most of—the past 61 Swan Balls.  Thus, an injunction "would only maintain the status quo and would not place [SBI], or any other party, 'in a worse position than they were in before the injunction.'" *Tri-Cnty. Wholesale Distribs., Inc. v. Wine Grp., Inc.*,

22

565 F. App'x 477, 483 (6th Cir. 2012).

Generally, the equities of trademark infringement favor granting injunctive relief for the trademark owner. *See*, *e.g.*, *Frisch's Rests., Inc.*, 670 F.2d at 651. Conversely, "[p]rotection of infringers is not a purpose of the Lanham Act ... [t]hus, avoidance of confusion to the infringer's interests cannot support an order permitting the [infringer's] continued use of the trademark." *U.S. Jaycees v. Philadelphia*, 639 F.2d 134, 142 (3d Cir. 1981).

Neither SBI nor any third party will suffer substantial harm if an injunction were to issue. An injunction would not preclude SBI from operating lawfully in Tennessee, "but rather only preclude it from using marks confusingly similar to those used by [Cheekwood]." *Operation Able of Greater Boston, Inc. v. National Able Network, Inc.*, 646 F. Supp. 2d 166, 177 (D. Mass. 2009). SBI faces no hardship in refraining from willful trademark infringement and complying with their obligations under the Lanham Act and Tennessee law. *Big O Tires, LLC v. JDV, LLC*, 2008 WL 4787619, at *6 (D. Colo. Oct. 31, 2008) ("[t]he hardship of requiring one who willfully infringes another's mark or trade dress to cease that infringement merits little equitable consideration"). SBI has admitted as much in a public statement. Yoshikawa Decl. Ex. 8 "Accordingly, the interest in avoiding confusion among participants, potential donors and the public favors an injunction[.]" *Operation Able of Greater Boston*, 646 F. Supp. 2d at 177.

Consumers will also benefit from an injunction because the likelihood of confusion caused by SBI's unauthorized use of Cheekwood's mark will be diminished, if not avoided entirely. In fact, given the strong likelihood that Cheekwood will succeed on the merits, the *absence* of an injunction has more potential to harm SBI and consumers than its entry. SBI's alleged "2025 Swan Ball" has been placed on the "consent agenda" for approval by Metro Parks Board on September 3, 2024, after which SBI plans to announce the details for its alleged 2025 Swan Ball on September

23

4, 2024. Yoshikawa Decl. Ex. 9, Cammack Decl. ¶ 4. At that point, it will only become more difficult and costly for SBI—and its alleged new beneficiary—to "present our fundraiser in 2025 using another name" after final resolution of this case. If SBI persists in using SWAN BALL (knowing that it may be ordered to cease before the event takes place), then funds raised for SBI's new beneficiary would have to be spent rebranding the event, rather than furthering the cause.

By continuing to use the mark, SBI seeks to exacerbate confusion among potential donors, patrons, and sponsors, to the detriment of Cheekwood *and* SBI's purported new beneficiary. Thus, the significant and irreparable harm that Cheekwood will suffer far outweighs any inconvenience that SBI may incur in complying with an injunction.

## D.  Injunctive Relief is in the Public Interest.

It is "in the public's interest to issue the injunction in order to prevent consumers from being misled." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006). Here, "[d]onors are the consuming public for charitable fundraising activities and are deceived, when a check intended for one charity is cashed by another." *Alzheimer's Found. of Am.*, 796 F. Supp. 2d at 466. Thus, "[a] compelling reason for the enhanced judicial protection of a charity's trademarks is the public interest in ensuring their contributions to charitable organizations are received by the correct charity." *Id.*

Immediate injunctive relief promotes the public interest by ensuring donors know where—and to whom—their contributions are going and eliminating the risk of consumer confusion. "[T]he public . . . has a right to know to whom they are giving their money and who is administering these services. When donors choose to give money to support [a particular charity], they should be assured they are giving it to the [intended organization]." *Deborah Heart and Lung Ctr. v. Children of the World Found., Ltd.,* 99 F. Supp. 2d 481, 494 (D.N.J. 2000). Because Cheekwood has shown that there is a likelihood that consumers will be confused by SBI's continued use of the

24

SWAN BALL Mark, this factor weighs heavily in Cheekwood's favor. "Such an injunction . . . would advance two fundamental purposes of trademark law: preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381 (6th Cir. 2006).

**E.     The Nature of SBI's Infringement, the Narrow Injunction Requested, and Lack of Threatened Harm to SBI Warrants Waiver of the Bond Requirement.**

Although the Federal Rules of Civil Procedure normally call for the Court to require the applicant to post security, the Sixth Circuit has found that a court "has no mandatory duty to impose a bond as a condition for issuance of injunctive relief." *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 952–53 (6th Cir. 2007). Whether a bond is needed is up to the discretion of the district court. *Roth v. Bank of Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978). A bond is not required here because all the injunction asks of SBI is to stop using the SWAN BALL Mark until the lawsuit—that SBI filed—is resolved. SBI has already admitted it would be easy for it to comply. *See* Yoshikawa Decl. ¶ 11, Ex. 8. Because the balance of equities weighs overwhelmingly in favor of Cheekwood, because the public is best served by minimizing confusion and ensuring donor contributions to charitable organizations are received by the correct charity, and because there is no cognizable harm to SBI in obeying the law and respecting the legal process that SBI started, Cheekwood respectfully requests that this Court exercise its discretion and waive the requirement that Cheekwood post a bond.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Cheekwood respectfully requests the Court grant its Motion and enjoin SBI from their infringing acts.

Dated this 3rd day of September 2024.

ADAMS AND REESE LLP

/s/ Maia T. Woodhouse
Maia T. Woodhouse, TN BPR No. 030438
Jin Yoshikawa, TN BPR No. 038385
1600 West End Avenue, Suite 1400
Nashville, Tennessee 37203
Tel: (615) 259-1450
Fax: (615) 259-1470
maia.woodhouse@arlaw.com
jin.yoshikawa@arlaw.com

*Attorneys for Defendant/Counter-Plaintiff Cheekwood Botanical Garden and Museum of Art*

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024, a copy of the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

Chanelle Acheson
Jack Waddey
WADDEYACHESON
1030 16th Avenue South
Suite 165, Second Floor
Nashville, Tennessee 37212
Tel: (615) 839-1100
Email: chanelle@waddeyacheson.com
        jack@waddeyacheson.com

/s/ Maia T. Woodhouse
Maia T. Woodhouse

26