**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SB INITIATIVE, INC. a 501(c)(3) Organization** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| **v.** | ) | |
| | ) | **Docket No. 3:24-cv-821** |
| **CHEEKWOOD BOTANICAL GARDEN** | ) | **DISTRICT JUDGE ELI J.** |
| **AND MUSEUM OF ART, a 501(c)(3)** | ) | **RICHARDSON** |
| **Organization** | ) | **MAGISTRATE JUDGE** |
| | ) | **BARBARA D. HOLMES** |
| **Defendant/Counter-Plaintiff.** | ) | |

<u>**PLAINTIFF SB INITIATIVE, INC.'S RESPONSE TO DEFENDANT'S MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND FOR EXPEDITED DISCOVERY**</u>

Plaintiff SB Initiative, Inc. ("SBI") hereby responds to Defendant Cheekwood Botanical Garden and Museum of Art ("Cheekwood")'s Motions, as follows:

## I.      INTRODUCTION

This is a trademark ownership dispute.  For six decades, both parties have used the disputed mark—SWAN BALL—to refer to the same gala event.  In situations such as these, one entity is the owner and another may have been a licensee of the mark, and the central question is, who is which?  Black-letter trademark law answers that question: "the one entity which *controls* the nature and quality of the goods sol[d] under the mark is the owner." *In re Wella A.G.*, 787

F.2d 1549, 1554 (Fed. Cir. 1986) (Nies, J., additional views) (citing J. McCarthy, Trademarks and Unfair Competition § 18.14 (2d ed. 1984)) (emphasis original).

To prove it is entitled to preliminary relief against SBI, Defendant Cheekwood must show a likelihood that it, and not SBI, has controlled the nature and quality of the goods and services offered under the SWAN BALL mark, i.e., the Swan Ball gala event itself, the Swan Ball Auction, the Swan Ball Late Party and the Swan Ball Patrons' Parties. But the record is conclusively against Cheekwood. Despite submitting a plethora of documents, Cheekwood has not submitted any evidence that Cheekwood was involved in any aspect of the planning or production of the Swan Ball events. The Swan Ball Committee—an independent unincorporated association valid under Tennessee law, and not an arm of Cheekwood—has *exclusively* controlled the nature and quality of the goods and services under the mark and has done so consistently from the first Swan Ball to today. **Unincorporated associations can own trademarks** and **can incorporate themselves**. SBI is the full successor in interest of the Swan Ball Committee, with the same membership, representation and organizational structure as the Committee has had for decades, and it is entitled to assert and exercise the Committee's rights, including its superior claim of ownership in the SWAN BALL mark. McCarthy, *supra*, § 18.15 (explaining that successors and assigns of a trademark owner benefit from the continuity of the mark and step into the shoes of the predecessor).

A question likely raised in the minds of outside observers will be—why now? Why this year did the Swan Ball Committee take the step of formalizing itself as SBI and file this Declaratory Judgment action, when it had not done so for sixty years? The answer is twofold. First, Cheekwood, through using incorrect accounting procedures, had been increasingly making statements to the Swan Ball Committee and others that the Swan Ball net ratio was negatively

2

affecting Cheekwood's statistics as a 501(c)(3) organization.[1] Just as the Antiques and Garden

show is its own 501(c)(3) organization that donates funds annually to Cheekwood, the

---

[1] Much ado has been made by Cheekwood of the alleged "poor performance" of the Swan Ball from a fundraising perspective. This is false. Whether Cheekwood is being intentionally misleading or is simply performing bad math is unclear. However, what is clear is that it appears that Cheekwood is using both donated and earned income as the basis for its calculation, which is improper accounting. When a dollar amount is sent to the Swan Ball by a donor, for instance to purchase a ticket or to purchase an auction item, a certain portion of that is classed as a donation, and a certain portion of that is classed as the value of the goods and/or services received by the donor. For fundraising net ratio purposes, only the donated amount should be used to determine the net ratio. Cheekwood, for all of its calculations, uses the total amount- even though the value of the goods and services was determined by Cheekwood accountants and listed in every single tax deduction letter issued. Take, for example, Exhibit 30 to Defendant Dan Miller's Statement, which are a number of tax deduction letters signed by Jane MacLeod. Page 3 of 4 (just to pick an example) has:

| Gift Amount: | $1,200 |
| Tax Deductible: | $850 |
| Benefits Value | $350 (Dinner, Drinks and Entertainment) |

Cheekwood has presented to this Court and to the public ratios that appear to use the total "Gift Amount". However, only the Tax Deductible amount is considered a "donation". If, based on the above, the Swan Ball Committee donated $600 of the above $1,200 to Cheekwood, by Cheekwood's calculation, using the total gift amount, the donation would be 50% net ratio. However, the donor received a benefit (Dinner, Dancing, and Entertainment) that Cheekwood itself valued at $350. Therefore, the actual donation is the amount over and above the value of what the donor paid for and received, which is $850. Using proper accounting procedures, and the amounts determined by Cheekwood's own accountants, that same $600 donation is actually a 70% net ratio donation. To use another example of an auctioned item [Defendant Cheekwood Exhibit 30 to D Miller statement, page 4 of 4]

| Gift Amount: | $10,000 |
| Tax Deductible: | $1,500 |
| Benefits Value | $8,500 (Auction Item Fair Market Value) |

Assume the Swan Ball donated $8000 of the above purchase to Cheekwood. By the math Cheekwood has presented to this Court and the public, this would be an 80% net ratio donation ($8,000 out of $10,000), when in fact it is a 94% net ratio donation ($8,000 out of $8,500). The difference is material.

Committee sought to resolve this balance sheet "issue" and the attendant friction between the entities by acquiring its own 501(c)(3) status. More importantly, however, the Committee took the steps to protect its independence when, after 60 years of receiving donations from the Swan Ball, Cheekwood employees began to attempt to exert control over the Swan Ball that it did not have the authority to exert, had never before attempted to exert, and would have been to the extreme detriment of the Swan Ball gala and surrounding events had they been successful. The Committee became concerned about Cheekwood's increasing desire to "maximize profits" and "corporatize" the historic event and by Cheekwood's refusal to provide information they were using to accuse the Committee of producing poor net ratios, among other things. [*see* Ex. 1] To protect the history and legacy of the Swan Ball and Mrs. Jane Dudley—a personal friend to many members of the Executive Committee—the Executive Committee felt that they had to move in order to protect the reputation of the event that they all love and cherish and have spent years working to produce and support.

Cheekwood continues to ignore and to mischaracterize the body that constitutes SBI. It is not a "rogue" group. SBI consists of the same people on **all levels** that have put on the Swan Ball for years. As we have stated before, SBI was formed based on a **<u>unanimous</u>** vote of the

---

Let us apply that to the 2023 Swan Ball proceeds. Based on Cheekwood's math and accusations, using the total amount received, the net ratio appears to be 38% percent, a number quoted by Cheekwood often in its court filings and quotations in the media. However, if one uses the proper donation amounts (total – benefits received / amount donated) the net ratio is actually 58%. Indeed, if one uses the proper donation amounts, and subtracts the unique costs borne by the Swan Ball- the salaries of the two office workers and the cost of constructing from scratch the venue each year- the net ratio of funds donated to the Swan Ball is actually 86%. Again, whether Cheekwood's mischaracterization of the net ratios is intentional or unintentional, the fact remains that the amount of benefits received by donors was determined by Cheekwood accountants and is known to Cheekwood. To throw around personal attacks that the organizers of the Swan Ball were "poor stewards" of donor money only interested in "lavish parties for the ultra-wealthy" is not only false but defamatory. And it seems a poor thank you to all of the volunteers that worked so hard to raise money from which Cheekwood benefited so greatly.

longstanding decision-making body of the Swan Ball Committee, the Executive Committee. [*see* Ex. 2- collective Statements by the Board of Directors] No employee or individual acting as a representative of Cheekwood has ever been a member of the Executive Committee of the Swan Ball [Ex. 2]. It is undisputed that only the Executive Committee has ever had the authority to make the decisions that affected the Swan Ball throughout its long and rich history. [Ex. 2]. *The same people* that were Executive Committee of the Swan Ball Committee, with very few changes, currently constitute the Board of Directors of SBI. [Ex. 2]. The members of the current Board of Directors of SBI are: **Beth Alexander** (involved with the Swan Ball Committee since 1978), **Jean Bottorff** (since 1987), **Kathryn Brown** (1986), **Laurel Buntin** (1990's), **Jana Davis** (2004), **Kathleen Estes**, **Karyn Frist** (1993), **Edie Johnson** (Advisor), **Peggy Kinnard** (1993), **Jennie McCabe** (1993), **Elizabeth Nichols** (mid-1980's), **Julie Stadler** (1987), **Julie Walker** (1995), and **Sissy Wilson**, all of whom are extremely well respected members of the community and have been involved with the Swan Ball for decades in various capacities.[2] Short biographies of each of these women are attached as Exhibit 3. Further, **the leadership, membership, and operations of all subordinate and attendant committees remains intact and the same**. This includes the Mini-Committee, the Gentlemen's Committee, the Nominating Committee, the Patrons' Committee, the Public Relations Committee, the Late Party Committee,

---

[2] The members of SBI would therefore respectfully request that Cheekwood cease referring to this group as a "rogue group" of volunteers, that were "poor stewards of donors money," as these women are well-regarded members of the community, who have been involved as core members of the Swan Ball Committee for decades and have worked tirelessly as volunteers to produce the event. They are also, and were at the time of the vote, the sole decision-making body of the Swan Ball Committee—and therefore by definition not a "rogue collection." Simply because Cheekwood does not like the decision made by the long-established decision-making body of Swan Ball does not make them "rogue."

the Arrangements Committee, etc. The structure of the Swan Ball Committee is the same, and is functioning the same, under its new name as SBI.

So while Cheekwood attempts to argue that the Swan Ball Committee volunteers were agents of Cheekwood, and/or that Cheekwood controlled the nature and quality of the goods and services provided under the Swan Ball mark, the fact is that it was Cheekwood's attempt, for the first time, to exert the influence that might have led to an agency relationship or control over the quality of goods and services that prompted this lawsuit.

## II.    LEGAL STANDARDS

Defendant Cheekwood's motion for expedited discovery requires Cheekwood to show "good cause," i.e., that its "need for expedited discovery outweighs the possible prejudice or hardship to" SBI. *Valhalla Inv. Props., LLC v. 502, LLC*, Case No. 3:19-cv-00318, 9 (M.D. Tenn. Mar. 30, 2020). Accordingly, "the party requesting the expedited discovery bears the burden . . . of establishing the need for the request." *Id.*

The standard for Defendant Cheekwood's requested temporary restraining order and preliminary injunction is more demanding: "A temporary restraining order is an '*extraordinary and drastic remedy*, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *GEO Group, Inc. v. United States*, 100 Fed. Cl. 223, 226 (2011) (emphasis added) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (2011)). The same standard applies to Defendant's preliminary injunction motion, as "[a] preliminary injunction is an 'extraordinary and drastic remedy'" and "should never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)); *G.S. v. Lee*, 558 F. Supp. 3d 601, 608 (W.D. Tenn. 2021) ("A motion for a temporary restraining order

6

is considered under the same standard as a preliminary injunction."); *Hamby v. Gentry*, 2014 U.S. Dist. LEXIS 117210, *2 (M.D. Tenn. Aug. 22, 2014) ("[C]ourts consider a preliminary injunction to be an extraordinary remedy which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it.").

 The "extraordinary remedy" of a preliminary injunction "may only be awarded upon a clear showing that the four preliminary injunction factors—likelihood of success on the merits, danger of irreparable harm, balance of the equities, and the public interest—point in the [movant]'s favor." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 461 (6th Cir. 2024) (internal quotation marks omitted). "The relevant factors are to be balanced, but the balancing is governed by the movant's burden to show clearly that the factors weigh in its favor to such a degree that the extraordinary remedy of a preliminary injunction is warranted." *Id.* (explaining that it is "incomplete" to "describe the preliminary injunction inquiry as a matter of weighing the four factors listed above.").

The first factor is "a strong likelihood of success on the merits." *Northeast Oh. Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). The showing required in support of this factor is "more than a mere possibility of success;" the movant "must demonstrate a strong or substantial *likelihood* or *probability* of success on the merits." *Choate v. United States Postal Serv.*, 2011 U.S. Dist. LEXIS 107887, *7 (W.D. Tenn. Sep. 22, 2011) (internal quotation marks omitted). "[W]hen a court lacks sufficient information about facts necessary to determine the likelihood of success, a [movant] has not borne his burden with respect to this factor." *Id.* (internal quotation marks omitted). "In a trademark infringement action, the first factor is typically dispositive of the validity of the preliminary injunction." *Libertarian Nat'l Comm., Inc. v. Saliba*, 2024 U.S. App. LEXIS 21832, *4-5 (6th Cir. Aug. 28, 2024).

7

The second factor requires the movant to show irreparable injury, which entails "an injury that cannot be repaired" and "actual and imminent harm rather than harm that is speculative or unsubstantiated." *Heritage Glob. Network L. A. v. Welch*, 3:23-cv-00685, 13 (M.D. Tenn. Feb. 20, 2024); *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). The movant's showing on this factor is "indispensable: If the [movant] isn't facing imminent and irreparable injury, there's no need to grant relief now . . . ." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019).

The third factor requires the movant to show that the balance of the equities is in its favor. In trademark cases, "balancing competing interests" entails "a strong desire to protect the first user of the mark because he or she went through the necessary effort to establish the mark as a meaningful symbol." *WLWC Centers, Inc. v. Winners Corp.*, 563 F. Supp. 717, 721 (M.D. Tenn. 1983).

The fourth factor requires the movant to show that "a public interest would be advanced by the requested relief." *Faulkner v. Alexander*, NO: 3:13-0654, 4 (M.D. Tenn. Oct. 24, 2013). Prior-restraint injunctions against speech, and in particular against charitable solicitation, are highly disfavored because of the strong public interest in such speech. *County Sec. Agency v. Ohio Dept. of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002) ("Temporary restraining orders and permanent injunctions — i.e., court orders that actually forbid speech activities — are classic examples of prior restraints."); *Planet Aid v. City of St. Johns*, 782 F.3d 318, 326 (6th Cir. 2015) ("[S]peech regarding charitable giving and solicitation is entitled to strong constitutional protection . . . ."); *Lowe v. SEC*, 472 U.S. 181, 234 (1985) ("Such a flat prohibition or prior restraint on speech is, as applied to fully protected speech, presumptively invalid and may be sustained only under the most extraordinary circumstances."). Accordingly, Lanham Act

8

injunctions are only permissible when the speech at issue is "commercial and . . . worthy of lesser First Amendment protections." *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003).

### III.  STATEMENT OF FACTS

In 1962, the Swan Ball Committee was founded by Jane Dudley as an unincorporated association for the purpose of planning the first Swan Ball. Prior to Mrs. Dudley's formation of the Committee, Dr. Garth Fort, then president of the predecessor entity to Defendant Cheekwood, informed Mrs. Dudley of Cheekwood's financial needs and asked if she had any ideas for a fundraiser. In response, Mrs. Dudley proposed a ball, taking as inspiration a ball she had attended at the Waldorf Astoria and suggesting that "it could be done better." One week later, Dr. Fort and Walter Sharp asked Mrs. Dudley if she would chair a ball according to her proposal, benefiting Cheekwood, and she agreed. [*see* Ex. 4, Nfocus article]

To assist her in planning the Swan Ball, Mrs. Dudley assembled an Advisory Committee of leading Nashvillians, consisting of Hortense Ingram, Martha Lawrence, Leah Rose Werthan, Alice Earthman and Jeanne Zerfoss, as the initial membership of the Swan Ball Committee. Within the original Swan Ball Committee, Mrs. Dudley expressly retained executive authority while the other members of the Committee held advisory roles. [Ex. 4] Mrs. Dudley chose the location—the Swan Lawn—and the date, booked the tent, hired the entertainment, secured the caterer, jointly decided on décor with the florist, and designed the Swan Ball's signature wrought-iron candelabra centerpieces. She arranged for media coverage of and fashion displays at the Swan Ball, and she spoke at the event itself. After the event, she tallied the net proceeds, secured media coverage touting the Swan Ball's success, and began planning the next year's Swan Ball. As for the Committee, it made the collective decision to set the price of the tickets:

9

fifty dollars. There is no indication that Dr. Fort, Mr. Sharp, or any other Cheekwood representative sought to direct or control Mrs. Dudley or the Committee in any aspect of their planning or organization of the first Swan Ball, and accounts strongly suggest that Mrs. Dudley would not have been amenable to any such direction. The historical record indicates only that Dr. Fort mentioned Cheekwood's need, heard Mrs. Dudley's idea to put on a ball, and asked her to do what she had already proposed.

After two years of successfully chairing the Swan Ball, Mrs. Dudley ceded the chairmanship but remained heavily involved with the Committee as honorary chair. Then, and thereafter, persons holding executive authority within the Committee—not Cheekwood—have appointed the next Swan Ball's chair (or Co-Chairmen) and determined the membership of the Executive Committee, which consists of a select group of past Swan Ball Co-Chairmen selected by the Nominating Committee. As the event has grown, certain sub-committees—both functional and honorary—have been created, with certain authority delegated to these committees, but ultimate decision-making authority always resting with the Executive Committee. [Ex. 5, 2018 Policies and Procedures]  At all times, the organization and planning of all events bearing the SWAN BALL mark have been conducted by the Committee, primarily acting through the Executive Committee as main decision-making body, without direction or control by Cheekwood or its employees. And prior to the recent attempted takeover, this understanding has been shared by both the Committee and Cheekwood: Jack Becker, Cheekwood's immediately prior CEO, from 2004 to 2010, understood "the Committee as a volunteer organization separate and apart from Cheekwood" and that "the Committee . . . made all decisions with respect to the nature and quality of the [Swan Ball] event."  He further attests that, during his tenure as CEO, "*[n]either I nor any member of the Cheekwood staff had any input or control over the Swan Ball*

*operations.*" [Ex. 6, Becker Statement] (emphasis added). Martha Flanagan, Development Director of Cheekwood during the 1990s, attests that the relationship between Cheekwood and the Committee was the same during her tenure, with Cheekwood exercising no control over the Committee. [Ex. 7, Flanagan Statement].

In understanding the Committee as a separate organization, not an arm of Cheekwood, Mr. Becker's and Ms. Flanagan's views reflect the common knowledge that the Committee and Cheekwood have shared from 1962 until the present. Cheekwood's knowledge of this fact has not really changed, even now—but Cheekwood has become increasingly unhappy about it. Jane MacLeod, early in her tenure as Cheekwood's CEO, approached Jean Bottorf, then head of the Nominations Committee, to ask how Ms. MacLeod could become more involved in the Swan Ball, at which time Ms. Bottorf "suggested she get to know Cheekwood and her new community better and leave the Swan Ball to the Advisory Committee, as the Swan Ball had been running very well for a long time, and the Advisory Committee would continue to select the chairs." [see Ex. 2, Bottorf Statement] In 2019, Cheekwood CEO Jane MacLeod proposed to that year's Co-Chairman, Jana Davis, that "this should be the year when the Swan Ball was rolled under" the CEO's control. [Ex. 2, Davis Statement] In response, Mrs. Davis "made it clear that while we would be happy to keep her in the loop regarding our progress on the Ball, we did not intend to report to her. The conversation ended abruptly." So, Ms. McCloud herself, despite her attempts now to allege to that the Committee was somehow an arm of Cheekwood, was well aware in 2019 that the Committee controlled the (nature and quality of the goods and services provided under the) SWAN BALL mark, and nothing has changed since that date. In recent years, Cheekwood has attempted to assume a larger role in various, mostly ministerial, Swan Ball administrative operations—administering the website, requesting that it co-sign the bank

account, etc.—but has never attempted to control the substantive content of the gala itself, or any of the other events hosted under the SWAN BALL mark. Instead, Cheekwood has taken to voicing its displeasure with the ratio between funds donated to Cheekwood and funds provided by Swan Ball donors.

Cheekwood had to make requests to the Swan Ball Committee, rather than issue directives, because it has never controlled the operations of the Committee or any aspect of the Committee's planning or organizing of the Swan Ball events. Neither the Co-Chairmen nor the Executive Committee, nor any member of any committee with decision-making authority within the Swan Ball Committee, ever reported to anyone at Cheekwood with respect to any Swan Ball-related function. [see collective Ex. 8. Statements of Former Co-Chairmen] The Co-Chairmen, acting on behalf of the Committee, signed all vendor contracts in the name of the Swan Ball. Among the thousand-plus pages of evidence submitted by Cheekwood, ***not one* includes a single example of an affirmative directive by Cheekwood** that was accepted by the Co-Chairs or the Committee. Cheekwood made requests that the relevant subcommittee either approved or denied, in its sole discretion. For example, Ms. MacLeod's request to include a special solicitation in the Swan Ball invitations for donations to replace the boxwood trees at Cheekwood [Ex. 9, 2024 Meeting Minutes] was considered by the Executive Committee and denied, as was her request to attend PR meetings with the media [see collective Ex. 10, Statements of Committee Chairs], and even occasionally Ms. MacLeod's requests for additions to the Patron's Committee [Ex. 9]. There were also requests that the Committee considered, and in its discretion, voluntarily chose to grant, such as a request for an early donation from the Swan Ball to fix the Mansion roof [Ex. 2, Nichols Statement] or an early donation during the COVID-19 pandemic. [see Ex. 11]

12

The first time that Cheekwood presumed to issue directives to the Committee, the Executive Committee unanimously rejected them, and this lawsuit followed. [Ex. 1] Cheekwood proposed on March 25, 2023, to reorganize the Swan Ball Committee as an instrumentality of Cheekwood, subject to operating procedures prescribed by Cheekwood and requiring the Co-Chairmen and Executive Committee members to report to Cheekwood personnel. [See Ex. 12, SOP, and Ex. 13, proposed Directives Documents]

The changes that Cheekwood proposed would have fundamentally changed the relationship between the Swan Ball and Cheekwood, and the Executive Committee voted unanimously to reject them, to incorporate the Committee as Plaintiff SBI, and to assign all right, title, and interest in its SWAN BALL mark to SBI. [see Ex. 2, Nichols Statement, Ex. 14, Incorporation documents, and Ex. 15, Assignment]. The mere fact that the request was made destroys Cheekwood's attempt to claim control of the event and ownership of the mark—if they controlled the event, why did they need to make this request. Among SBI's directors are the 2025 Swan Ball Co-Chairmen, Melanie Baker and Laura Niewod, who were chosen by the Nominating Committee with the approval of the Executive Committee, as their predecessors have been for decades, and all sitting members of the Executive Committee at the time the vote to incorporate was taken.

Every year, the net proceeds of that year's Swan Ball events have been donated to Defendant Cheekwood. The first Swan Ball raised $36,000 and donated it to Cheekwood in its time of need, and recent years have seen annual contributions to Cheekwood of over $1 million. Apparently dissatisfied with the Committee's history of logistically complex, independent, unpaid work on a titanic undertaking of a series of annual events for which Cheekwood was

beneficiary, Cheekwood now seeks to break a six-decade Nashville tradition and stop the Committee—incorporated as SBI—from continuing to plan this year's Swan Ball.

## IV. ARGUMENT

To obtain a temporary restraining order (TRO) or preliminary injunction, a plaintiff must demonstrate four elements: (1) a substantial likelihood of success on the merits, (2) irreparable harm absent the injunction, (3) the balance of equities tips in its favor, and (4) that the public interest would be served by the injunction. Cheekwood fails to meet these elements, especially regarding its lack of control over the nature and quality of the goods and services provided under the "Swan Ball" mark.

### a. Likelihood of success

Cheekwood is unlikely to succeed on the merits for three distinct reasons. First, its agency theory is factually unsupported and legally insufficient. Second, Cheekwood has never controlled the nature and quality of the goods and services provided under the SWAN BALL mark. Third, SBI has validly succeeded the Swan Ball Committee and acceded to its trademark rights under the law governing the nature and activities of unincorporated associations in Tennessee, and the Swan Ball Committee, via its officers, validly assigned all title and right to the mark to SBI.

Since the Committee, as predecessor in interest to SBI, has consistently and exclusively controlled the nature and quality of the goods and services provided under the SWAN BALL mark, Cheekwood must show that the acts that entitle the Committee to the mark should be vicariously attributed to Cheekwood under an agency theory. But neither the Committee nor any Co-Chairman or individual member holding decision-making authority ever assented to act

subject to Cheekwood's control, an essential requirement for agency. Even if an agency relationship could be somehow implied, the scope of such a relationship could not have extended to control of the Swan Ball events and would not work the assignment of the Committee's preexisting trademark rights.

Cheekwood has never controlled the nature and quality of the goods and services provided under the SWAN BALL mark, cannot be the owner of the mark, and (as its then-CEO admits) it **exercised *no control whatsoever* for *six years* after filing its 2004 registration application,** so the state trademark registration in Cheekwood's name is **void *ab initio*** as a matter of law and does not suffice to show Cheekwood owns the mark. McCarthy, *supra*, § 19.53. Cheekwood will not be able to present any evidence at trial to show that it gave any directives to the Swan Ball Committee or that the Committee sought its approval for anything related to the Swan Ball *because there is none*.

### i. Agency

The evidence adduced by both parties consistently shows that the Swan Ball Committee was the first user of the SWAN BALL mark, consistently used that mark to promote the SWAN BALL galas and maintained exclusive control over the nature and quality of the SWAN BALL galas, auction, and other events held under the SWAN BALL mark. E.g., [Exs. 4, 6, 7 and 10]. Defendant Cheekwood asserts that it nonetheless acquired, maintained, and currently owns title to the mark based on an agency theory, under which all of the Committee's activities to build goodwill in and buttress its claim to the SWAN BALL mark for the last sixty-one years are vicariously credited to Cheekwood. D.I. 18 at 9. That theory founders on two separate obstacles, each of which is independently sufficient to defeat Cheekwood's showing on likelihood of success: 1) no agency relationship existed; and 2) even if the Committee were deemed

Cheekwood's fundraising agent under the 1990s-era policies and procedures that Cheekwood has proffered, such policies and procedures would not operate to transfer the Committee's preexisting intellectual property rights in the mark to Cheekwood.

### 1. The Committee was not Cheekwood's agent

Black-letter agency law requires that a principal have the right to control an agent, and that the agent assents to act on the principal's behalf. No member of the Swan Ball Committee's decision-making body, the Executive Committee, ever assented to act subject to Cheekwood's control—no agency relationship existed. [Ex. 2] "Agency is the fiduciary relationship that arises when one-person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf *and subject to the principal's control*, and the agent *manifests assent or otherwise consents so to act*." Restatement (3d) of Agency § 1.01 (emphasis added). "The right of control is the primary or essential test of an agency relationship without which no agency exists." *John J. Heirigs Const. Co., Inc. v. Exide*, 709 S.W.2d 604, 608 (Tenn. Ct. App. 1986); *see also Gordon v. Greenview Hosp.*, 300 S.W.3d 635, 653 (Tenn. 2009) ("The analysis hinges on the right to control the agent's actions, and, ultimately, the fact of actual control over the agent.") (citation omitted).

Here, not only has Cheekwood failed to show it had a right to control over the Committee, but the evidence uniformly shows an utter absence of control. Forty-nine former Ball Co-Chairmen, all members of the Executive Committee, and other members of key instrumentalities of the Swan Ball Committee attest that the Committee was independent, and that Cheekwood did not have the right to control and did not control the Swan Ball Committee in any decision-making function. [Ex. 2]. Cheekwood's former CEO from 2004 to 2010 and former Development Director confirm this understanding. [Ex 6, Becker Statement; Ex. 7, Flanagan

Statement.] Further, the evidence uniformly shows that Cheekwood **never** issued directives to the Co-Chairmen, the Executive Committee, or any other decision-making subcommittee of the Committee regarding any matter relating to the Swan Ball, before March 25, 2023—and the directives proposed then were rejected unanimously. [Exs. 2 and 8, All Chair and BOD declarations]. If, after sixty years of a productive fundraiser/beneficiary relationship, the first attempt by the beneficiary to control the fundraiser results in breakdown of the relationship, the natural inference is that no "right of control" characterized the relationship at all.

Undaunted, Cheekwood proffers a supposed internal "policies and procedures" document referring to the Swan Ball Committee's purported "agent" status, D.I. 20.26, as well as a general understanding that the term "volunteer" typically connotes agency. PI Mot. at 9. Cheekwood ignores that "[w]hether a relationship is characterized as agency . . . in the context of industry or popular usage is not controlling." Restatement (3d) of Agency § 1.02. Even if assent to the characterization "volunteer" could qualify as evidence of assent to control, Cheekwood has not shown that the Committee or any Co-Chairman or Executive Committee member assented to this characterization or even knew about the policies and procedures that supposedly governed the Committee. In fact, Cheekwood has offered no evidence that this internal document was ever presented or provided to any member or representative of the Swan Ball Committee, and all evidence suggests that no decision-making member of the Committee even knew of these policies, followed them, or considered themselves bound by them. [E.g., Ex. 2, Board of Directors Statements].

Cheekwood further claims that it maintained an approved vendor list that the Swan Ball was required to use, but this is false: the Committee on multiple occasions used vendors that were not on the list, with no special approval or objection from Cheekwood. [see Ex. 16, Vendor

17

Declarations and Ex. 17, Vendor Contracts]. Again, the evidence shows a lack of control, not a right to control.

Cheekwood's other evidence, relating to its tax accounting and financial administration procedures, does not establish the Committee's agency either. None of the ways in which Cheekwood represented its own activities, as well as those of the Committee, to state and federal charity regulators suggest that the Committee assented to act subject to Cheekwood's control. Absent control, there can be no agency relationship implied in law on the basis of the tax characterization of the Committee's activities. "The same standard applies when the agency relationship is implied: the right of the principal to control the agent's conduct or the actual exercise of such control is the essential test." *Nidiffer v. Clinchfield R.R. Co.*, 600 S.W.2d 242, 245 (Tenn. Ct. App. 1980). Nor did Cheekwood's appropriation of the name "Swan Ball" as a name under which it represented to raise funds affect the separate and independent status of the Committee, especially when there is no indication in the record that any member of the Committee was aware of Cheekwood's listing, much less affirmatively acquiesced in it.

Finally, Cheekwood relies on an unpublished magistrate report and recommendation, *Gemmer v. Surrey Services for Seniors, Inc.*, but that case is straightforwardly inapposite, as the beneficiary in that case directly controlled numerous aspects of the fundraiser, including recruiting additional volunteers, reciting itself as host on the invitations, conducting solicitations, and signing the contracts for the actual antiques to be shown, and jointly administered the fundraiser with the volunteers. 2010 WL 5129241 at *2, 5, 16. Moreover, one of the plaintiffs in *Gemmer* also served as an employee of the beneficiary for two of the three years that the fundraiser was active, so there was no dispute about the beneficiary's right of control. *Id.* at *3.

There is no comparison between the three-year history of joint organization of the fundraiser in *Gemmer* and the six-decade legacy of independence maintained by the Swan Ball Committee.

To the extent that any agency relationship ever existed between any individual Swan Ball Committee member and Cheekwood, for which Cheekwood has provided no evidence, such relationship cannot be imputed to the Committee as a whole, which consistently acted under the independent direction of the Executive Committee with respect to all major decisions. [Ex. 10].Cheekwood makes much of the fact that its CEO, Jane MacLeod, was listed as a member of the "leadership committee" of the Swan Ball Committee in the Swan Ball program.  But membership on the "leadership committee" is an honorary designation given at the Committee's discretion to a large group of Swan Ball honorees each year, typically between 50 and 150. This committee does not meet and exercises no decision-making authority. [See Ex. 5, 2018 Swan Ball Policies and Procedures] (no duties assigned to leadership committee). The fact that Cheekwood relies on this "leadership committee" form letter so heavily demonstrates Cheekwood's clear lack of knowledge with regard to the actual workings and responsibilities of and within the Swan Ball Committee.

"[I]n the absence of any evidence of the" purported principal's "right to or exercise of control over" the purported agent, "there is no basis to support the conclusion that an agency relationship existed." *Gordon*, 300 S.W.3d at 654. Therefore, Cheekwood's contention that the Committee acted as its agent when developing and maintaining the Committee's ownership rights in the SWAN BALL mark must be rejected.

## 2. Even total agency is insufficient as a matter of law to assign preexisting trademark rights

Second, even if Cheekwood were to prove that the Committee as a whole acted as Cheekwood's agent under certain Cheekwood policies and procedures at the time those policies and procedures were adopted by Cheekwood, such agency would not operate to assign the Committee's preexisting ownership interest in the SWAN BALL mark to Cheekwood. Cheekwood does not proffer any policies or procedures purportedly governing the Swan Ball from prior to 1994 and does not suggest that any such policies exist. The only record evidence indicates that the Swan Ball operated independently starting in 1962, when Jane Dudley and her initial Advisory Committee began to plan the inaugural Swan Ball gala. Therefore, even if an agency relationship arose later (it did not), Cheekwood would have to show that this relationship operated to strip the preexisting trademark rights held by the Swan Ball Committee for over 30 years and assign them to Cheekwood.

The problem with Cheekwood's theory is that an agency relationship is insufficient as a matter of law to strip trademark rights from the first user of a mark in commerce. In *Gabb Wireless v. Troomi Wireless*, 2023 U.S. Dist. LEXIS 9746 (D. Utah 2023), a contractor was hired to create brand materials for a telecom company, Gabb, as work for hire—i.e., as an agent for creative services. One of the materials created as work for hire was the name "Troomi," which the contractor then used in starting his own company, Troomi Wireless, prior to the announcement of any Troomi products by Gabb. The court rejected Gabb's contention that it was the owner of the mark because the contractor had developed the mark as its agent and on its behalf, holding that, because the contractor was the first to use "Troomi" in commerce in relation to its own goods and services, it owned the trademark rights regardless of any agency relationship or related obligation to assign other intellectual property rights. 2023 U.S. Dist. LEXIS 9746 at *7-8. *A fortiori*, here, where the Swan Ball Committee was the first user of the

mark and has used it consistently since 1962 to refer to the gala event it controls, any inference of agency based on later-promulgated policies and procedures of Cheekwood's cannot disturb the Committee's title to the mark.

### ii. The Swan Ball Committee exclusively controlled the nature and quality of the goods and services provided under the SWAN BALL mark

Having failed to prove that the Swan Ball Committee and its participants were "agents" of Cheekwood, in order to own the Swan Ball mark Cheekwood must show that it *controlled the nature and quality of the goods and services provided under the mark.* "The critical issue is whether the trademark owner exercises a sufficient degree of control over the nature and quality of the goods or services [provided] under the mark." McCarthy on Trademarks and Unfair Competition (4th Edition); *see also Bell v. Streetwise Records, Ltd.*, 640 F. Supp. 575, 580 (D. Mass. 1986) ("where prior ownership . . . cannot be established" court must determine "which party controls or determines the nature and quality of the goods which have been marketed under the mark . . .") This Cheekwood cannot do.

It is undisputed that Cheekwood controlled **absolutely no aspect** of the annual Swan Ball gala. As established in previous pleadings and below, the Co-Chairmen of each year's Swan Ball gala made all decisions with regard to each year's event, and the Swan Ball Executive Committee made all decisions that affected circumstances beyond a single year. [Ex. 2] Cheekwood has neither alleged nor proven that it was a participant in either of these bodies, as in fact it was not. As laid out below, neither the Chairmen of the annual Swan Ball gala, the Executive Committee members of the Swan Ball, the vendors involved in the production of the Swan Ball gala, the Treasurers of the Swan Ball, the Jewelers for the annual Swan Ball, *nor even*

*the prior CEO of Cheekwood* believe or believed that, nor operated as though, Cheekwood controlled the nature and quality of the Swan Ball.

Support for the Swan Ball Committee's position that it alone controlled the nature and quality of the goods and services provided under the Swan Ball mark can be found in the attached [49] statements[3] signed under penalty of perjury by former Swan Ball Chairmen that establish the following:

- Each year's Swan Ball Chairmen were selected by the Nominating Committee. No employee of Cheekwood was a member of or participated in the Nominating process or was a member of the Nominating Committee.
- Each year's Co-Chairmen made all decisions concerning all aspects of the gala event, including but not limited to the volunteer committee chairmen and party hosts, the event theme, the event coordinator and/or designer, the logo design, the invitation design, the décor, the floral arrangements, the entertainment, the caterer, and menu, etc. No Cheekwood employee was involved in these decisions, nor did they have the right of refusal.
- If the Co-Chairs needed guidance as to specific decisions, they consulted the "Mini Committee" (a small group of former Swan Ball Chairmen). Occasionally the Mini-Committee would seek guidance and a vote from the governing body of Swan Ball, the Executive Committee. The Co-Chairs did not seek guidance from Cheekwood or any employee or representative of Cheekwood.
- At no time did the Swan Ball Co-Chairs consult a Cheekwood employee for approval on any issue related to the Swan Ball gala, unless it was related to physical logistics (activities in the mansion).
- The Chairmen signed a number of contracts for the vendors in either their individual capacity or on behalf of the Swan Ball/Swan Ball Committee. No Cheekwood employee was a part of the negotiation of those contracts, did not approve the contracts, did not review the contracts prior to its execution, nor was it a party to the contracts or bound by the terms of the contracts.
- A volunteer treasurer opened a bank account for the use of that individual ball year only. Until 2022, only the Co-Chairs and the volunteer treasurer had signatory authority on the year's account.

---

[3] This number is reflective only of the limited time Respondents were permitted to draft this Response and collect evidence in support thereof, not of the universe of individuals available and willing to sign similar declarations. Other individuals have indicated their willingness to sign similar declarations, but this number was limited due to time.

- None of the 49 Co-Chairmen at any time believed that they reported to the Cheekwood organization, or any employee associated with that organization.
- To the best of all 49 previous Co-Chairs' knowledge, neither Cheekwood nor any employee ever had approval or veto authority over any aspect of the Swan Ball, aside from a list of approved vendors permitted on the property that is provided for any event held on the property, and decisions related to the physical plant.

In further support of the fact that Cheekwood controlled no aspect of the nature and quality of the goods and services provided under the Swan Ball mark are twelve (12) statements from long-time vendors to the Swan Ball. These vendors cover the waterfront of the services required to produce the Swan Ball gala, including: lighting, tent, event designer/coordinator, designer, floral design and implementation, caterer, invitation engraving and design, calligrapher, plates and crystal, invitation design and production.[4] These statements establish that:

- The vendor's participation in each year's Swan Ball gala and surrounding events was at the request of and in collaboration with that year's Swan Ball Chairmen.
- Each vendor only communicated with the Swan Ball chairmen, Swan Ball Committee members and or the Swan Ball Designer/Coordinator.
- The vendor did not report to, interact with, or seek approval from any Cheekwood staff member or employee regarding that vendor's services to the Swan Ball.
- To the extent a vendor interacted with a Cheekwood employee it was to coordinate physical access or logistics.
- Any financial discussions regarding the cost of services were had with that year's Swan Ball chairmen, not with Cheekwood staff members or employees.
- The vendor's invoices were sent to the Swan Ball, and not to Cheekwood.

Further attached are statements from two jewelers[5] that have served as the Jeweler for the Swan Ball in various years. These statements establish that:

---

[4] Again, this number is reflective only of the limited time Respondents had to draft this Response and collect evidence in support thereof, not of the universe of individuals available and willing to sign similar declarations. Other individuals have indicated their willingness to sign similar declarations, but this number was limited due to time.

[5] See supra nn. 3, 4.

- The jeweler chose to be the jeweler for the Swan Ball for exposure to the Swan Ball audience, not for the Swan Ball's connection with Cheekwood.
- The jeweler and the jewelers' team worked with the Swan Ball Co-Chairmen, the Swan Ball Jewelry Co-Chairmen and the Swan Ball Event Coordinator
- The jeweler did not contract with or report to any Cheekwood staff member.
- All financial and legal arrangements were negotiated with the Swan Ball Chairmen.
- The jeweler's contracts were executed by the Swan Ball Chairmen.

No employee or representative acting on behalf of Cheekwood participated in any of the key committees. Attached as part of Exhibit 10 is the Declaration of Elizabeth Nichols, the Nominating Committee Chairman for the last ten (10) years, the Statement of Laurel Buntin and Jennie McCabe [Ex. 10], Co-Chairs of the Patrons Committee for the last eight (8) years, and the statement of Sylvia Bradbury, the chair of the Public Relations Committee for the Swan Ball for the last twenty (20) years [Ex. 10]. In each of these declarations, the Chairs of these pivotal committees make clear that no Cheekwood employee or representative acting on Cheekwood's behalf participated in any capacity in their respective committees. In her declaration, Ms. Nichols makes clear that in the last ten years:

- No Cheekwood employee or staff member has ever participated in a Nominating Committee meeting
- No Cheekwood employee or staff member has ever attended a 'call' on which the Nominating Committee extended an invitation to a potential Chairman
- Cheekwood has never had the right to approve or disapprove a Chairman
- The selection, invitation and acceptance process do not involve Cheekwood or a Cheekwood staff member
- Cheekwood was not allowed to make suggestions about candidates to chair the Ball

In support of the fact that Cheekwood had no participation, influence or control over the Nomination of the annual Swan Ball Co-Chairs, the attached Exhibit 18 is a collection of emails from Ms. Nichols to Ms. MacLeod, informing her, as a courtesy, of the selection of that year's

Swan Ball Co-Chairmen. Ms. MacLeod was always informed after, sometimes days after, the information was disseminated to the Swan Ball Committee organization, via the Advisory Committee.

Ms. Buntin and Ms. McCabe state that the Patron's Committee is made up entirely of former Swan Ball Chairmen, and that:

- Neither they nor the committee have ever reported to any employee or staff member at Cheekwood.
- No Cheekwood employee or staff member has ever participated in a Swan Ball Patrons Committee Meeting.
- No Cheekwood staff member or employee has ever had the right to approve or disapprove a candidate who has been submitted for consideration to the Patrons List for The Swan Ball
- Jane Macleod, Cheekwood CEO, has from time to time requested that someone be considered for the Patron's Committee, and that request is reviewed in the same way as all other candidates. The decision is made by the Patron's Committee. **For the year 2024, Ms. Macleod's request was denied.**

Ms. Bradbury, the head of the Public Relations Committee of the Swan Ball for the last *twenty years*, states the following:

- Each year the PR Committee seeks to meet with members of the social publications to discuss coverage angles and provide updates, as well as to apprise them of critical events related to Swan Ball to which they will be invited.
- Our PR meetings only include members of the volunteer PR Committee, current Swan Ball Chairs for the given year, and members of the press (on occasion).
- We have never included any staff member or employee of Cheekwood in these PR meetings, as this is a Swan Ball matter, and we do not report to anyone at Cheekwood.
- In one instance, the CEO of Cheekwood asked to participate in a PR meeting with The Tennessean, but **she was told that she was not invited to attend as this meeting was solely to discuss Swan Ball, not Cheekwood**. This was the one and only time a request was made by Cheekwood during my tenure to join a Swan Ball PR media meeting.
- In 20+ years on the PR committee:
  - no Cheekwood employee or staff member has ever participated in a Swan Ball PR Committee Meeting
  - no Cheekwood employee or staff member has ever attended a group 'call' between members of the press and the PR volunteer committee

25

- no Cheekwood employee or staff member has ever had the right to approve or disapprove a Swan Ball media advisory or press release
- Cheekwood has never had the right to approve or disapprove a potential publication with whom the PR committee chose to work
- Cheekwood has not been offered the opportunity to make suggestions about the inclusion of or selection of representative publications

Perhaps most damning to Cheekwood's claim that it controlled the nature and quality of the Swan Ball gala event is the statement of the immediately prior CEO of Cheekwood, Mr. Jack Becker. Mr. Becker's statement illustrates that prior to the recent attempted takeover by Ms. MacLeod, nobody, *to include the immediately prior CEO of Cheekwood* believed that Cheekwood owned or controlled the Swan Ball. Attached as Exhibit 6 is the Declaration of Jack Becker in which Mr. Becker states that during his tenure as CEO:

- He recognized the Swan Ball Committee as a volunteer organization separate and apart from Cheekwood.
- The Swan Ball Committee annually planned and produced the Swan Ball gala.
- The Committee did not report to him (the Cheekwood CEO) or any other Cheekwood staff member.
- The Committee was totally in charge of planning and producing the gala event and auction on an annual basis and made all decisions related to the nature and quality of the event.
- Neither Mr. Becker nor any member of the Cheekwood staff had any input or control over the Swan Ball operations, to include: the selection of the chairmen, the selection of the theme, the selection of the Event Designer, the selection of the entertainment, the selection of the caterer, the selection of the design of the invitation, the selection of the flowers, the selection of the vendors engaged to assist with the production of the gala or the determination of those individuals who would receive an invitation to the gala.

Martha Flanagan, Development Director for Cheekwood in the 1990's has also submitted a statement that attests to the above.

Finally, however, to illustrate the ultimate autonomy of the Swan Ball Committee from any authority or influence of Cheekwood, Plaintiff submits the statements of each member of the SBI Board of Directors. Each Director states that:

- The Executive Committee was the decision-making body of the Swan Ball Committee.
- Most of the members of the Board of the Directors were a member of the Executive Committee of the Swan Ball when that body voted unanimously to form SB Initiative, Inc. (SBI) as the formal incorporation of the independent Swan Ball Committee, and to assign all right, title, and interest in the SWAN BALL mark held by the Swan Ball, Committee to SBI, and so state if applicable.
- The Executive Committee has been for decades the only body that makes large decisions for the Swan Ball. Selection for, and membership on, the Executive Committee has followed a set procedure. No Cheekwood employee or representative is involved in the nomination of, voting for, or any other aspect of membership on the Executive Committee. No employee of Cheekwood was ever a member of the Executive Committee, nor was any employee of Cheekwood invited to or present at Executive Committee meetings. At no time did the Executive Committee consult, request permission, report to, or were subject to the authority of a Cheekwood employee or representative.
- Any communication sent to Cheekwood with regard to decisions made by the Executive Committee was as a courtesy only. Permission was never requested nor granted by Cheekwood, nor did Cheekwood ever veto an Executive Committee Decision, nor did Cheekwood have the authority to do so.
- All guests have attended the gala by invitation only. This included any and all invitations issued to persons associated with Cheekwood. Cheekwood employees and representatives, to include the Cheekwood CEO, have attended only at the permission and approval of the Committee. Cheekwood was permitted to submit names for consideration by the committee that determined who was to receive an invitation, but no Cheekwood employee or representative was involved with the Committee, Cheekwood was not represented on that committee nor invited to the meetings. Cheekwood had no authority, nor did it ever attempt to assert authority over the invitations list.
- At no time during my involvement in a leadership role with the Swan Ball did I report to any employee of Cheekwood, nor would I have initiated, agreed to or continued my involvement with Swan Ball if reporting to an employee of Cheekwood was a requirement.
- As to Cheekwood's assertion that the Swan Ball Committee has been an "unincorporated fund raising agent" of Cheekwood and that Committee volunteers were considered "designated agents" of Cheekwood. I was unaware of these characterizations and never agreed to them, and they are inaccurate; as to my knowledge the Swan Ball Committee has always operated independently, not under the control of Cheekwood.
- Contrary to Ms. MacLeod's sworn statement, when I was co-chair of the event, I did not meet "on a monthly basis" with the CEO of Cheekwood, did not coordinate underwriter solicitations and benefits with the CEO of Cheekwood, did not request or receive approval of materials describing underwriter funds, did not solicit or take any recommendations for Swan Ball invitees or prospective Swan Ball Patrons from the Cheekwood CEO, nor did we solicit or receive input on Swan Ball entertainment or Swan Award winners from the Cheekwood CEO. No employee of Cheekwood had approval or

veto authority over any of the above. All of these areas remained the sole purview of the co-chairs or the Executive Committee of the Swan Ball

- Also contrary to Ms. MacLeod's sworn statement, the COO of Cheekwood was never the "lead point person" on operations for "all logistics and production" did not attend *any* preproduction or production meetings with event planners, did not review plans policies or conflicts, did not advise on access or vendor guidelines, parking transportation lighting or sound etc. No employee of Cheekwood had approval or veto authority over any of the above. All of this remained the sole purview of the co-chairs or the Executive Committee.

- I did not at any time believe that I reported to the Cheekwood organization, or any employee associated with that organization.

- To the best of my knowledge, neither Cheekwood nor any employee ever had approval or veto authority over any aspect of the Swan Ball, aside from a list of approved vendors permitted on the property that is provided for any event held on the property, and decisions related to the physical plant.

Attached as Exhibit 17 are also a number of contracts executed by members of the Swan Ball Committee in the name of Swan Ball, not Cheekwood, to which Cheekwood is not a party, no employee or representative of Cheekwood is a signatory, and if Cheekwood is mentioned at all, it is as the venue of the Swan Ball [Collective Ex. 17].

Courts have consistently held that control over key aspects such as vendor selection, contract negotiation, and quality assurance is critical to maintaining trademark rights. In *Stanfield v. Osborne Industries, Inc.*, 52 F.3d 867 (10th Cir. 1995), the court emphasized that a trademark owner must be actively involved in selecting vendors and controlling the services provided under the mark. In this case, however, it is undisputed that Cheekwood had no involvement in selecting or negotiating with vendors. The volunteer Co-Chairs independently chose the caterers, florists, event designers, and other service providers without any participation or approval from Cheekwood. The contracts for these services were signed by the co-chairs in their individual capacities or on behalf of the Swan Ball Committee, and Cheekwood had no signatory authority or right to modify or cancel these contracts.

28

Additionally, *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002) makes clear that maintaining a quality assurance mechanism is essential for a trademark owner to retain control. Yet, Cheekwood implemented no such mechanisms for the Swan Ball. The Co-Chairmen, along with the vendors, were solely responsible for ensuring the quality of the event, including the décor, catering, and entertainment. Cheekwood neither reviewed nor approved the quality of any goods or services provided, nor did it have the right to do so. Without the power to review or monitor these key elements, Cheekwood failed to establish the necessary control over the event's quality.

Moreover, in *Tally-Ho, Inc. v. Coast Cmty. College District*, 889 F.2d 1018 (11th Cir. 1989), the court found that the trademark owner must have signatory or final approval authority on key contracts to demonstrate control. In the case of the Swan Ball, the financial and contractual arrangements were handled entirely by the Co-Chairmen and the Swan Ball Committee. Cheekwood will be unable to produce a single contract over the course of the six decades of the Swan Ball that was signed by a Cheekwood employee for the production of the Swan Ball—because there are none. Nor will Cheekwood be able to produce any evidence that it retained final approval authority over any contract- because it exercised no authority at all. Invoices were sent directly to the committee, and until recently, no Cheekwood employee had access to Swan Ball's finances. Cheekwood's absence from these critical operational decisions further demonstrates its lack of control.

Cheekwood submits in support of its claim of control certain documents from the 2024 Ball year. However, these documents only reflect the inappropriate takeover of Swan Ball accounts by Cheekwood that resulted in this lawsuit, not the historical state of the relationship of the parties. For instance, Cheekwood's illegitimate takeover of the Swan Ball bank account and

budgeting software is what caused the Committee members to have to reach out after the 2024 Ball to ensure certain bills had been paid. By producing these documents in lieu of any evidence of control prior to the lockout Cheekwood presents the "officer, I can't have stolen the car, it's in my garage" argument. This is neither historically accurate, nor legally sufficient.

Finally, *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431 (7th Cir. 1989), underscores that trademark owners must approve the marketing, branding, and public relations efforts associated with the mark. Here, all branding decisions, including logo design, invitation creation, and public relations outreach, were handled by the Swan Ball Committee. Testimony from the public relations and marketing teams involved with the event confirmed that no Cheekwood employee participated in these discussions, and Cheekwood had no authority to approve or disapprove any press materials. [Ex. 10, PR Committee Declaration]

Cheekwood submitted a number of documents in support of its claim to control the nature and quality of the goods and services provided under the Swan Ball mark. What it has failed to produce, however, is a single directive from a Cheekwood representative to a Swan Ball volunteer with regard to any aspect of the Swan Ball gala over sixty years. What it has failed to produce is a single correspondence requesting input or approval on any aspect of the Swan Ball gala from a Swan Ball volunteer to Cheekwood.[6] It is undisputed that the Swan Ball was a volunteer run event, with multiple committees volunteering hundreds of hours, with thousands of unique individual decisions made every year. If Cheekwood controlled the nature and quality of these decisions, where are the contemporaneous notes, the meeting invites, the meeting minutes

---

[6] The sole exception being one request for floating votive candles inside the mansion, which was denied by Ms. MacLeod. However, each declaration submitted today acknowledges that with regard to the physical use of the plant, coordination was made, if necessary.

of decision-making committees, the detailed ongoing correspondence between Swan Ball volunteers and Co-Chairs and employees of Cheekwood? Cheekwood has provided none, because there are none. Instead, it has submitted form letters sent to hundreds of people welcoming them to the "leadership committee" at the beginning of the planning season (the leadership committee was an honorary committee with no decision-making authority or practical function), a few Swan Ball brochures in which Ms. MacLeod is listed with close to or over a hundred other individuals, an asking for a quote about a Swan Ball recipient, an email from 2012 suggesting a meeting, and internal Cheekwood meeting minutes. No directives. No consultation. No control. Because the Swan Ball Committee, and only the Swan Ball Committee, made every decision that determined the nature and quality of each Swan Ball gala.

Ms. MacLeod submitted a sworn statement that she was heavily involved in the planning of the annual Swan Ball event. Attached hereto are almost one hundred sworn statements that refute her claim in its entirety. Each of these statements say that Ms. MacLeod was never involved in any aspect of the planning and execution of the Swan Ball gala, and certain statements give details of times she requested to participate and was rejected. Each one of the statements from the current Board of Directors, women who have each been involved in the annual Swan Ball Gala for multiple decades, specifically refute Ms. MacLeod's claim that she "met on a monthly basis" with the Swan Ball Committee, that she approved materials, or provided input on Swan Ball decisions. Ms. MacLeod was permitted to make requests of the Invitations committee and Patrons committee, which were considered and approved or rejected in the sole discretion of those committees. Ms. MacLeod could not even have the right to attend the Ball itself if the Arrangements Committee had determined not to extend her an invite.

Cheekwood's sole claim to control the nature and quality of the goods and services provided under the Swan Ball is that it "among other things assess[ed] the financial outcomes of the Swan Ball and associated events and [met] with Swan Ball volunteers to implement new procedures and improve outcomes." [see docket entry 20, Declaration of Dan Miller, filed on 9/3] Aside from being false, in that the sole attempt by Cheekwood to attempt to meet with Swan Ball volunteers to implement new procedures and improve outcomes resulted in this lawsuit, it seems curious that there is an internationally renowned gala event that takes thousands of hours to design and produce and involves hundreds of volunteers and dozens of vendors and millions of dollars, with headline entertainment and big name invitees—and Cheekwood's sole claim to control the nature and quality is… bookkeeping. With such a grand, public, famous, international affair, surely in order to control the nature and quality, there must be more involvement than what can be done with a calculator. Even if Cheekwood did provide that service (which Swan Ball disputes and does not hereby concede) with a giant public facing event such as the Swan Ball, bookkeeping, without more, does not meet the standard of control necessary for Cheekwood to own the mark.

Cheekwood did not, has not and does not control the nature and quality of the goods and services provided under the "Swan Ball" mark. The independent actions of the Swan Ball Committee in all key areas, including vendor selection, contract negotiation, financial management, and event production, conclusively demonstrate that Cheekwood lacked the necessary control to claim ownership of the mark. Moreover, after Cheekwood registered the mark with the State of Tennessee in 2004, its CEO, Jack Becker, admitted that it did not control the nature and quality of the goods and services at all during his entire tenure, which lasted from 2004 to 2010. [Ex. 6, Becker Declaration].  In light of Cheekwood's failure to meet this

prerequisite to trademark ownership, its registration does not establish that it owns the SWAN BALL mark.

Under the standards set forth in *Stanfield*, *Barcamerica*, *Tally-Ho*, and *Gorenstein*, Cheekwood's failure to exercise control over these essential elements precludes it from asserting rights in the "Swan Ball" mark, and at the very least, strongly indicate against any "likelihood of success on the merits" at trial. For this reason, Cheekwood's motion must be denied.

### iii. SBI's valid succession from the Swan Ball Committee

Cheekwood's apparent confusion as to the relationship between the Swan Ball Committee and Plaintiff SBI (e.g., PI Mot. at 8 n.5) is not warranted. The Swan Ball Committee constituted an unincorporated association, which is a type of entity recognized under Tennessee law. Unincorporated associations are empowered to act according to standards and procedures that their members choose; are capable of owning property, including trademarks; and are capable of choosing to convert themselves into other entity forms. And, as SBI recited in its Complaint, it was incorporated by an act of its predecessor in interest, the Swan Ball Committee.

The United States Supreme Court has defined an unincorporated association as "a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise." *Hecht v. Malley*, 265 U.S. 144, 157 (1924) (citing, *inter alia*, *Allen v. Stevens*, 33 A.D. 485, 54 N.Y.S. 8 (N.Y. App. Div. 1898); BOUVIER'S LAW DICTIONARY & ENCYCLOPEDIA 269 (8th ed. 1914)); *see also Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 485 (1st Cir. 1985) (defining an unincorporated association as "a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise"); *Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 222 (8th

33

Cir.1941) ("The individuals who form an unincorporated association certainly should know what sort of an organization it is, how it happened to be formed, who influenced its formation, and who controls it."). Accordingly, under Tennessee law, "voluntary and knowing membership is the hallmark of an unincorporated association." *Boynton v. Headwaters, Inc.*, 252 F.R.D. 397, 401 (W.D. Tenn. 2008). The large group of volunteers that have tirelessly served on the Swan Ball Committee for decades were certainly both voluntary and knowing.

The Swan Ball Committee thus qualified as a Tennessee unincorporated association. It is undisputed that Committee membership was both voluntary and knowing—ever since Jane Dudley assembled her Advisory Committee, all members of the Committee have been selected by existing members and have voluntarily chosen to serve. [Ex. 3, Board Declarations; Ex. 5, 2018 Policies and Procedures]. And as an unincorporated association, the Swan Ball Committee was thus capable of owning trademarks, including the SWAN BALL mark. *Southern California Darts Ass'n v. Zaffina*, 762 F. 3d 921, 930 (9th Cir. 2014) ("We hold that unincorporated associations do, indeed, have the capacity to own trademarks."); *see generally Gen. Conference Corp. of Seventh Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010) (tacitly finding that unincorporated associations may maintain trademark claims).

Unincorporated associations may act collectively, by adopting bylaws or similar institutional norms that allocate control to particular decision-making bodies within the association. "As a general rule, courts will not interfere with the internal affairs of voluntary associations. In the absence of mistake, fraud, collusion or arbitrariness, the decisions of the governing body of an association will be accepted by the courts as conclusive." *Kentucky H.S. Ath. v. Hopkins Cty. B.O.E*, 552 S.W.2d 685, 687 (Ky. Ct. App. 1977) (citing 6 Am. Jur. 2d Associations and Clubs § 27). Within the Swan Ball Committee, the governing body was the

Executive Committee, which was empowered to make decisions for the entire Committee by majority vote of Executive Committee members. [Ex. 5, 2018 Policies and Procedures]. That the Executive Committee had this power was the unanimous understanding of the Swan Ball Committee. [Exs. 2, 8, and 10].

On May 25, 2024, the Executive Committee of the Swan Ball Committee unanimously voted to incorporate the Swan Ball Committee as SBI and to assign all right, title, and interest held by the Swan Ball Committee to the SWAN BALL mark to SBI. These actions effected the transfer of all property held by the Swan Ball Committee in its capacity as an organization, including the SWAN BALL mark, to SBI. "The incorporation of a voluntary association, if the act of the association and not the unauthorized step of some of its members, merges the association in the corporation, and its property becomes the property of the corporation." *Third Education Group, Inc. v. Phelps*, 675 F. Supp. 2d 916, 921 (E.D. Wis. 2009) (quoting 8 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations*, § 4004).

Plaintiff SBI thus possesses the same rights to use and enforce the SWAN BALL mark as the Committee held prior to its incorporation. Accordingly, Cheekwood's assertion that SBI has never used the mark or has not used it continuously for 61 years is, simply, wrong.

\* \* \*

**Cheekwood has failed to establish any of the other elements required for a Temporary Restraining Order or a Preliminary Injunction**

   **i.  Cheekwood has not proven a likelihood of success on the merits.**

Cheekwood has not demonstrated a likelihood of success on the merits, as it cannot prove essential elements of ownership of the SWAN BALL mark. The most critical element Cheekwood must establish for a TRO or preliminary injunction is a substantial likelihood of

35

success on the merits of its claim that it owns the "Swan Ball" trademark, for the reasons stated in the above sections. Ownership of a trademark hinges on the ability to control the nature and quality of the goods or services provided under the mark (*Stanfield v. Osborne Industries, Inc.*, 52 F.3d 867, 871 (10th Cir. 1995)). However, as demonstrated, Cheekwood exercised no such control over the Swan Ball event.

Cheekwood cannot point to any evidence that it was involved in essential elements such as vendor selection, contract negotiation, or quality assurance. The Co-Chairs and Swan Ball Committee handled all decisions regarding the event, from the design of the invitations to the selection of entertainment, without consulting or seeking approval from Cheekwood. In *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002), the court made clear that lack of quality assurance and failure to monitor goods and services under a mark leads to a loss of ownership rights. Given that Cheekwood had no involvement in these critical areas, it cannot reasonably argue that it controlled the Swan Ball event or the goods and services associated with it.

Further, Cheekwood has failed to demonstrate that it had final approval authority—or any authority—on contracts or the public-facing elements of the event, such as marketing and public relations. The case of *Tally-Ho, Inc. v. Coast Cmty. College District*, 889 F.2d 1018 (11th Cir. 1989), emphasizes that signatory authority on contracts is a crucial indicator of control. Cheekwood did not have this authority; the volunteer Co-Chairs handled all negotiations, and invoices were paid from accounts over which Cheekwood had no access or oversight. Therefore, Cheekwood is unlikely to succeed on the merits of its trademark claim.

### ii. Cheekwood cannot prove irreparable harm.

Moreover, Cheekwood has not demonstrated irreparable harm. Irreparable harm requires a showing that monetary damages or other legal remedies would be insufficient to address the injury. In trademark disputes, courts often look for evidence that the plaintiff's reputation or goodwill is at risk. However, in this case, Cheekwood cannot show irreparable harm, as it did not at any point control the Swan Ball's reputation or quality. The reputation and goodwill of the Swan Ball have long been associated with the Swan Ball committee and its Co-Chairs, not Cheekwood. The vendors, jewelers, and PR professionals who worked on the event all testified that they coordinated exclusively with the Swan Ball committee, further distancing Cheekwood from any claim of damage to its reputation or control over the event.

### iii. The reputation of the SWAN BALL will not be damaged.

Equally, to the extent that Cheekwood is concerned with the reputation and goodwill associated with the Swan Ball mark itself, there is no cause for concern. The Swan Ball 2025 event will be produced by the same group of volunteers, serving in the same committees, functioning in the same roles, using the same vendors as has been done for decades. Not one of the members of the Board of Directors of SBI has been involved with the Swan Ball for less than two decades. Each of the women involved in the Board of Directors, the individual committees, and the outstanding Co-Chairs (selected in 2024 before the current dispute, and still serving in their chosen position) are deeply dedicated to the reputation and legacy of the Swan Ball, and will do everything in their power, as they have always done, to produce an event worthy of the name and its history.

In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), the Supreme Court held that a plaintiff must provide concrete evidence of harm that cannot be remedied by monetary damages. Cheekwood has failed to demonstrate how it would suffer

irreparable harm from the Swan Ball's continued operation under the same leadership that has managed it for decades. Moreover, any harm Cheekwood claims could be compensated with monetary damages, as this is fundamentally a trademark dispute, not a question of existential risk to its operations. This factor favors SBI.

### iv. There is no risk of confusion.

Conveniently, there is no risk of confusion. Cheekwood has announced publicly that it has "stopped all planning for a 2025 Swan Ball" and will not attempt to hold a Swan Ball event in the year 2025. As Cheekwood will not attempt to hold an event named "Swan Ball" there is no risk of confusion to donors as to which event would be held by the traditional organizers of the event (SBI) and which event would be attempted by Cheekwood.

### v. The balance of the equities favors SBI.

The balance of equities tips strongly in favor of SBI. Cheekwood has shown no evidence that it has invested *any* time, effort, or resources in producing or managing the Swan Ball event. By contrast, the Swan Ball Committee and its volunteers have spent hundreds of thousands of hours organizing and overseeing the event for over 60 years, establishing the event's reputation and goodwill. The committee's efforts in managing vendor relationships, maintaining high event standards, and executing contracts without Cheekwood's involvement demonstrate that any disruption caused by the injunction would harm the very entity responsible for the event's success.

### vi. The status quo is the production of the Swan Ball gala and the attendant events by the Swan Ball Committee.

In *Taffy Original Designs, Inc. v. Taffy's, Inc.*, 968 F. Supp. 1200 (D. Colo. 1997), the court weighed the balance of equities by considering which party had been responsible for

maintaining the quality and reputation of the services offered under the mark. Here, it is the Swan Ball Committee, not Cheekwood, that has performed these duties. If the purpose of a TRO is to maintain the status quo, the **status quo in this case is in fact the production of the event by the group that has produced the event for decades**, albeit under a different name. Granting an injunction would unfairly disrupt the committee's ability to continue managing the event and would undoubtedly damage the event's reputation by shifting control to an entity that has not historically managed it, does not understand the magnitude of the undertaking to produce the event, and does not have the resources nor the volunteer base to undertake such an event. As Cheekwood will come to find out, if it has not already, the volunteer base established by the Swan Ball Committee is responsive to the historical Swan Ball committee, even if under a new name. Cheekwood, even if it desired to, would be highly likely to be unable to put on a Swan Ball event in 2025 or any other year without them.

> **vii.    Public interest favors charitable fundraising for the benefit of the citizens of Nashville.**

Finally, the public interest weighs heavily against granting a preliminary injunction. The public cares about the Swan Ball as an annual tradition and an institution. The Nashville social calendar, and many summer vacations, are planned around attending the event. Public confusion is more likely to result from an injunction that would disrupt the continuity of the event's organization. In *Winter*, the Supreme Court emphasized that the public interest is a key factor in deciding whether to issue an injunction. Here, the public's interest lies in the continued successful operation of the Swan Ball by those who have historically managed its quality and reputation—namely, the Swan Ball Committee, now SBI. Further, SBI has already announced a new beneficiary, Friends of Warner Parks, whose work is universally admired, to protect and improve the parks enjoyed by thousands of Nashvillians yearly. There can be no public interest

in preventing an entity from fundraising for the public good. The harm to the public interest from the requested injunction would be significant, as it would constitute a prior restraint on SBI's speech and prevent it from accurately describing itself as the entity that had organized the previous Swan Balls.

Disrupting the longstanding organization of the Swan Ball would cause confusion among vendors, donors, and attendees, all of whom have relied on the committee's leadership and planning. Cheekwood, having played no role in controlling the goods and services provided at the event, cannot credibly claim that its involvement would better serve the public interest.

### V. Conclusion

Cheekwood has failed to meet the high burden required for a TRO or preliminary injunction. It has not demonstrated a likelihood of success on the merits, as it exercised no control over the nature and quality of the goods and services provided under the Swan Ball mark. Cheekwood also cannot show irreparable harm, as any injury it claims could be addressed through monetary damages. The balance of equities and the public interest both favor SBI, as the Swan Ball Committee has been responsible for the event's success and reputation. For these reasons, Cheekwood's request for a TRO and preliminary injunction should be denied.

### VI. No entitlement to expedited discovery

Cheekwood's request for expedited discovery is not supported by good cause, as any additional discovery would be futile in light of the clear record already produced.

Respectfully submitted,


/s/ *Chanelle Acheson*
Chanelle Acheson
Attorney for Plaintiff/Counter-Defendant
Waddey Acheson, LLC
1030 16th Ave S.
Floor 3, Suite 300
Nashville, TN 37212
chanelle@waddeyacheson.com
Bar # 30008

Jack Waddey
Waddey Acheson, LLC
Attorney for Plaintiff/Counter-Defendant
1030 16th Ave S.
Floor 3, Suite 300
Nashville, TN 37212
Jack@waddeyacheson.com
Bar # 00002665

# CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2024 a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Maia Woodhouse
Adams & Reese
1600 West End Avenue
#1400
Nashville, TN 37203

/s/ *Chanelle Acheson*

Chanelle Acheson
Attorney for Plaintiff/Counter-Defendant
Waddey Acheson, LLC
1030 16th Ave S.
Floor 3, Suite 300
Nashville, TN 37212
chanelle@waddeyacheson.com