IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SB INITIATIVE, INC.,          )
          )
    Plaintiff/Counter-Defendant,   )
          )    NO. 3:24-cv-00821
v.          )    JUDGE RICHARDSON
          )
CHEEKWOOD BOTANICAL GARDEN   )
AND MUSEUM OF ART,         )
          )
    Defendant/Counter-Plaintiff.   )

## <u>MEMORANDUM OPINION</u>

The Court issues this Memorandum to state its reasons for its order (Doc. No. 44, "Order")

denying in part Defendant/Counter-Plaintiff's motion for a temporary restraining order and

preliminary injunction (Doc. No. 17, "Motion"). As stated in the Order, the Court ruled only on

the Motion's request for a temporary restraining order, as it deferred its ruling on the Motion's

request for a preliminary injunction (Doc. No. 17).

Defendant/Counter-Plaintiff filed the Motion with an accompanying memorandum

("Memorandum") (Doc. No. 18) and supporting declarations (Doc. Nos. 19-22). Plaintiff/Counter-

Defendant ("SBI") filed a response in opposition to the Motion (Doc. No. 32, "Response") with

supporting declarations attached thereto (Doc. No. 33). Defendant/Counter-Plaintiff filed a reply

to the Response (Doc. No. 35, "Reply") and a declaration in support thereof (Doc. No. 36), to

which the Plaintiff/Counter-Defendant filed a sur-reply (Doc. No. 39, "Sur-Reply") with leave

from the Court. Via the Motion, Defendant/Counter-Plaintiff sought an order temporarily and

preliminarily prohibiting SBI from doing the following:

a. Making any unauthorized use of the SWAN BALL Mark, or any reproduction, counterfeit, copy, or colorable limitation thereof, in connection with the sale of any goods or offering of any services;

b. Manufacturing, distributing, advertising, marketing, promoting, displaying, offering for sale, and/or selling any infringing goods or services, with marks that look confusing [sic] similar to any of the SWAN BALL Mark, as well as any other forms of markings, packaging, labels, wrappers, containers, articles, products, displays, signs, circulars, kits, literature, materials, receptacles, catalogs, price lists, promotional materials, or websites and the like bearing any unauthorized, infringing, or otherwise unlawful reproduction, counterfeit, copy, or colorable imitation of the SWAN BALL Mark;

c. Using any mark, trade dress, design, statement, or representation that may be calculated to falsely represent or that has the effect of falsely representing that the services or products of SBI are in any way sponsored by, originate with, or are associated or approved by Cheekwood;

d. Falsely representing itself or its goods or services as affiliated with, connected with, associated with, or approved by Cheekwood;

e. Advertising, marketing, promoting, offering for sale, selling, importing, exporting, distributing, and/or transferring infringing and/or counterfeit goods and services and/or anything confusingly similar thereto, or any reproduction, counterfeit, copy, or colorable imitation thereof, and/or any other unauthorized, infringing, or otherwise unlawful use of the SWAN BALL Mark, through any means whatsoever, including, but not limited to, retail, wholesale, via the Internet, mail order, telephone, or any other method of interstate or intrastate commerce;

f. Doing any other act or thing calculated or likely to cause confusion or mistake in the minds of members of the public, including prospective customers of Cheekwood, as to the source of the goods or services offered, distributed, marketed, advertised, or sold by SBI, or as to whether there is a connection between Cheekwood and SBI; and

g. Assisting, aiding, or abetting any other person or entity in engaging in any of the activities set forth in paragraphs (a) through (f) above.

(Doc. No. 17-1 at 3). In summary and in broad terms, Defendant/Counter-Plaintiff seeks to temporarily and preliminarily enjoin SBI from (i) using the SWAN BALL Mark; and (ii) saying or doing anything that would suggest that anything SBI is sponsoring or offering (or otherwise doing) is affiliated with Cheekwood.

In the Order, the Court denied the Motion in part and deferred it in part. Specifically, the Court denied the Motion with respect to its request for a temporary restraining order (TRO) and deferred with respect to its request for a preliminary injunction. The Court denied the Motion for the reasons stated herein.

GENERAL FACTUAL AND PROCEDURAL BACKGROUND[1]

The Swan Ball was founded in 1962 by Jane Dudley as a premier charitable social event that aimed to benefit what is now known as the Cheekwood Botanical Garden and Museum of Art,[2] ("Cheekwood"), a Tennessee nonprofit corporation and Defendant/Counter-Plaintiff herein. (Doc. No. 32 at 9). The first ball occurred in the summer of 1963 and was very successful. Since then, it has occurred annually and has become a well-known cultural feature in Nashville. At the time she initially founded the ball, Mrs. Dudley created a Swan Ball Committee ("the Committee"), which she made responsible for the planning, execution and logistical functions of the ball. (Doc. No. 32 at 9). While Mrs. Dudley was apparently asked by the then-President of Cheekwood to have the ball for the benefit of Cheekwood, she was essentially left on her own to manage the aspects of its preparation. (Doc No. 32 at 9). She created an Advisory Committee to help her plan the event and successfully launched the ball.

---

[1] The following facts, unless somehow qualified herein, are taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice. The Court notes that there are severe factual uncertainties and does its best to parse through them under the accelerated timelines that the Motion demands.

[2] In 1962, Cheekwood went by a different name, namely, the "Tennessee Botanical Gardens and Fine Arts Center at Cheekwood." Generally, the Court herein uses the term "Cheekwood" to refer to the organization when referring to the events and circumstances relevant to the Motion, and uses the term "Defendant/Counter-Plaintiff" when referring to the status or actions of the organization as a litigant in this case. The Court uses the term "Cheekwood premises" to refer to the location (the grounds, buildings, etc.) of the botanical gardens and art museum operated by Cheekwood.

The Committee's organizational structure developed after the initial ball. Several subcommittees were formed, including a nominating committee and an executive committee. The nominating committee was tasked with annually nominating the chairs for each year's ball and the members of the executive committee, and the executive committee was delegated decision-making authority for the Committee. While this development was occurring, Cheekwood was apparently content to allow this organization to grow without exercising much input or control over its structure or its functions. (Doc. No. 32 at 10). Although Defendant/Counter-Plaintiff disputes how much autonomy the Committee had, the Committee apparently was left to its own devices to organize the design of the ball, send invitations, contract with vendors, secure a tent and execute the logistical functions of running the large event (Doc. No. 32 at 10).

From 1963 onward, there appears to have been a harmonious existence between the Committee and Cheekwood. The Committee would plan and organize the event, Cheekwood would host the ball on its property (not least on the famed Swan Lawn on Cheekwood premises, for which the ball was named), and Cheekwood would receive the charitable proceeds of the event to be used in its maintenance and operations (Doc. No. 18 at 1). This beneficial relationship seems to have continued for decades until around 2019, when Cheekwood attempted to assert control over the Swan Ball. Around that time, Cheekwood grew dissatisfied with the charitable yield that the Swan Ball was producing.[3] (Doc. No. 18 at 1). This produced tension between Cheekwood as an organization and the Committee, specifically with Cheekwood's CEO Jane MacLeod's attempts to assert control over its functions. Ultimately, this boiled over on March 25, 2023, when Cheekwood issued directives to the Committee that purportedly subjected the Committee to

---

[3] The Court notes that both parties are using different methods to calculate what the actual numbers are. This is an active dispute.

operating procedures and required the Committee to report to Cheekwood personnel. (Doc. No. 32 at 13).

In response to these directives, the Committee unanimously decided to reject Cheekwood's demands and incorporate the Committee, which it did on May 25, 2024 using the name SB Initiative, Inc. ("SBI").[4] SBI is the Plaintiff/Counter-Defendant herein.

The Committee had elected to assign to SBI, as its purported successor in interest, all rights and interests purportedly possessed by the Committee. SBI and Cheekwood had communication over the summer of 2024 demanding respectively that the other side cease using the SWAN BALL Mark. The SWAN BALL Mark refers to the name "Swan Ball" as used in connection with the ball itself as well as other events (such as pre-ball auctions).[5]  Cheekwood has since stated that it will postpone its 2025 ball, while SBI has indicated that it plans to hold an event on June 7, 2025 at Edwin Warner Park for the benefit of Friends of Warner Parks. (Doc. No. 25-1 at 3). SBI then filed a complaint against Defendant/Counter-Plaintiff to initiate this action, seeking (among other things) a declaratory judgment and injunctive relief under the Lanham Act to vindicate SBI's purported rights in the SWAN BALL Mark (Doc. No. 1). Defendant/Counter-Plaintiff filed an answer to the complaint and a counterclaim against SBI ("Answer") seeking (among other things) a declaratory judgment and injunctive relief under the Lanham Act to vindicate Defendant/Counter-Plaintiff's purported rights in the SWAN BALL Mark (Doc. No. 12). Defendant/Counter-Plaintiff then filed the Motion on September 3, to which SBI filed its Response

---

[4]  This is reflected in online information available from the Tennessee Secretary of State. https://tnbear.tn.gov/Ecommerce/FilingDetail.aspx?CN=196220166092040117172207189150145110070 063214167 (last searched September 11, 2024).

[5] Cheekwood's state registration of the SWAN BALL Mark (which is not necessarily dispositive of the true nature of the SWAN BALL Mark) describes the mark as being used in connection with "[c]haritable fundraising services involving auction and gala events with proceeds going to Cheekwood Botanical Garden and Museum of Art." (Doc. No. 20-2 at 2).

on September 6. Defendant/Counter-Plaintiff filed its Reply on September 9, and the Sur-Reply was filed (with leave of the Court) on September 9.

LEGAL STANDARD

A party seeking a preliminary injunction (or, as here, a TRO) must meet four requirements.[6] The party must show a likelihood of success on the merits; irreparable harm in the absence of the requested preliminary injunction or TRO (a requirement that the Court generally will refer to as simply "irreparable harm"); that the balance of equities favors the party; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022).

Parties seeking a TRO may not merely rely on unsupported allegations, but rather must come forward with more than "scant evidence" to substantiate their allegations.[7] *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of COVID-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915,

---

[6] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are *factors* rather than *requirements,* except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g.,* *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with more recent Sixth Circuit case law and with Supreme Court case law describing these as all being requirements. The Court believes that it is constrained the follow the latter line of cases.

[7] The Court here cites case law framed in terms of a preliminary injunction even though the Court here is addressing only Defendant/Counter-Plaintiff's request for a TRO. This is appropriate inasmuch as such case law is applicable to a request for a TRO because "[a] motion for temporary restraining order is considered under the same standard as a preliminary injunction." *G.S. v. Lee*, 558 F. Supp. 3d 601, 608 (W.D. Tenn. 2021).

*1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)). In deciding a motion for preliminary injunction, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.,* 368 F. Supp. 3d 723, 725 n.2 (S.D. N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018). In conducting the preliminary injunction analysis, the Court is not limited to the four corners of the complaint but rather may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

<u>ANALYSIS</u>

## I.     **Likelihood of Success on the Merits**[8]

Defendant/Counter-Plaintiff is seeking relief from this Court in connection with Counts I, III, V, VI, and IX of its counterclaims. (Doc. No. 17 at 3). These are infringement claims under

---

[8] In this section, the Court states various facts in an unqualified manner, for ease of reading. But to be clear, these statements are based on the current state of the record, are subject to change, and do not reflect the Court's final conclusion as to the applicable facts. Instead, they represent only the Court's view, based solely on the current record, of facts that are *likely* to be established.

the Lanham Act and Tennessee law. In order to succeed on these claims, Defendant/Counter-Plaintiff needs to prove, (at least) that it owns a valid, protectable trademark (or service mark). *Coach, Inc. v. Goodfellow* 717 F.3d 498, 502 (6th Cir. 2013). Furthermore, "Tennessee unfair competition claims, common law infringement claims and claims for violation of the Tennessee Consumer Protection Act are analyzed under the same standards as federal claims." *Borescopes R U.S. v. 1800Endoscope.com, LLC*, 728 F. Supp. 2d 938, 945 (M.D. Tenn. 2010). Therefore, the federal and Tennessee claims can be addressed in a single analysis.

At this stage, the Court does not find that Defendant/Counter-Plaintiff has a likelihood of success on the merits. That is because, as discussed below, SBI has provided sufficient evidence to impair the likelihood that Defendant/Counter-Plaintiff in fact is the owner of the SWAN BALL Mark.[9]

<u>First To Use</u>

Trademarks are governed by a "first to use" standard. *Allard Enters., Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 358 (6th Cir. 1998) ("[t]he exclusive right to a trademark belongs to one who first uses it in connection with specified goods."). "The cases are legion to the effect that for inherently distinctive marks, ownership is governed by priority of use. For such marks, the first to use a designation as a mark in the sale of goods is the 'owner' and the

---

[9] A mark can be either a trademark or a service mark. The SWAN BALL Mark is, at least according to its state registration (which is not necessarily dispositive on which kind of mark the SWAN BALL Mark actually is), a service mark. (Doc. No. 20-2 at 2) (describing the SWAN BALL Mark as being used in connection with "[c]haritable fundraising services involving auction and gala events with proceeds going to Cheekwood Botanical Garden and Museum of Arts"). This seems to make sense given the use(s) to which the SWAN BALL Mark has been put. However, the wording in the parties' respective discussions of the SWAN BALL Mark seemingly implies that the mark is a trademark rather than a service mark — i.e., a mark used on or in connection with "goods" rather than on or in connection with "services"—and the parties cite cases involving trademarks. The Court will follow the parties' lead in this regard (including by referring at times to the use of the SWAN BALL Mark in connection with "goods" rather than "services"), and it notes that its analysis herein would be the same irrespective of whether the SWAN BALL Mark is properly deemed a service mark or properly deemed a trademark.

'senior user.' These marks are given legal protection against infringement immediately upon adoption and use in trade." 2 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 16:4 (5th ed. 2021).

Defendant/Counter-Plaintiff claims that because SBI did not exist before May 2024, it could not have been the first to use the mark. (Doc. No. 18 at 6). It supports this point by stating that the Committee was merely an "unincorporated fund raising agent" and therefore had no mark to grant its successor in interest, SBI. (*Id.* at 6). SBI, however, responds with a persuasive argument that the Committee was an unincorporated association under Tennessee law and therefore existed as an entity (distinguishable from Cheekwood) that could be deemed to have used the SWAN BALL Mark prior to Cheekwood. "The United States Supreme Court has defined an unincorporated association as 'a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise.'" *Boynton v. Headwaters, Inc.,* 252 F.R.D. 397, 401 (W.D. Tenn. 2008) (citing *Hecht v. Malley*, 265 U.S. 144, 157 (1924)); *see also Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 485 (1st Cir.1985) (defining an unincorporated association as "a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise"); *Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 222 (8th Cir.1941) ("The individuals who form an unincorporated association certainly should know what sort of an organization it is, how it happened to be formed, who influenced its formation, and who controls it."). Further "as a review of Tennessee and other jurisdictions' case law reveals, voluntary and knowing membership is the hallmark of an unincorporated association." *Boynton v. Headwaters, Inc.,* 252 F.R.D. 397, 401 (W.D. Tenn. 2008).

SBI has produced evidence supporting its claim that the Committee was an unincorporated association. First, SBI has produced the sworn statements of 49 previous Committee chairs

attesting to the Committee's high level of organizational sophistication. (Doc. No. 33-8). The numerous subcommittees (including the executive committee, the nominating committee, the mini-committee, the patrons' committee, etc.) and internal architecture of the broader Committee indicate that it undertook a coordinated effort aimed at producing the annual Swan Ball (and its attendant pre-ball events). The individuals who composed the Committee seemed keenly aware of how the Committee was formed, who influenced its formation and who controlled it. Many people that served on the executive committee, including Beth Alexander, Jean Bottorff and Kathryn Brown, had been involved with the Committee for decades and now serve on SBI's board of directors. (Doc. No. 34 at 5). The statements of the 49 previous co-chairs declaring that the Committee (and not Cheekwood) produced the Swan Ball further demonstrate that the leadership viewed the Committee as being a standalone, distinct organization with a "special purpose" to organize the Swan Ball (so much so, in fact, that they decided to file this lawsuit in order to keep this purported independence intact). (Doc. No. 33-8). Finally, SBI's evidence suggests that the members of the Committee were volunteers and also knowing of the Committee (as a distinct organization), which are the "hallmarks of an unincorporated association" as they explicitly dedicated themselves to producing the Swan Ball each year and viewed the Committee, with its internal operating structures and independent decision-making power, as being distinct from Cheekwood. Therefore, under this record SBI has produced substantial evidence that the Committee existed as an unincorporated association.

Unincorporated associations can own trademarks. *Southern California Darts Ass'n v. Zaffina*, 762 F. 3d 921, 930 (9th Cir. 2014) ("We hold that unincorporated associations do, indeed, have the capacity to own trademarks.") And "[t]he incorporation of a voluntary association, if the act of the association and not the unauthorized step of some of its members, merges the association in

the corporation, and its property becomes the property of the corporation." *Third Education Group, Inc. v. Phelps*, 675 F. Supp. 2d 916, 921 (E.D. Wis. 2009) (quoting 8 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations*, § 4004). This means that the property of an unincorporated association (including any trademarks) becomes the property of the corporation, which is essentially the successor-in-interest to the unincorporated association.

SBI has produced substantial evidence that the executive committee unanimously voted to incorporate and transfer the Committee's interests to SBI. (Doc. No. 32 at 35). This means that if there is also substantial evidence that the Committee existed as an unincorporated association, then there is substantial evidence that the Committee's rights in the SWAN BALL Mark (to the extent that the Committee had any) were validly transferred to SBI as the Committee's successor in interest. At this juncture, Defendant/Counter-Plaintiff has not adequately shown that SBI's predecessor in interest, the Committee, is affirmatively unlikely to have used the SWAN BALL Mark first.

In its Reply, Defendant/Counter-Plaintiff raises a fair point countering SBI's assertion that the Committee was an unincorporated association (rather than an internal committee within Cheekwood's governing structure). Specifically, Defendant/Counter-Plaintiff notes that if the Committee was an unincorporated association under Tennessee law, then it would have been subject to certain filing requirements. Specifically, if it was a for-profit unincorporated association, then it would have had to file tax returns with the State of Tennessee or the IRS. *See e.g.*, 26 U.S.C. § 6011. And if it was instead an unincorporated nonprofit association that received over $5,000 annually (an amount that the Committee surely would have received), then it would have been required to file information returns as a tax-exempt entity. *See e.g.* 26 U.S.C. § 6033. At this time, SBI has presented no evidence of the filing of such reports and no explanations for why SBI is

properly deemed an unincorporated association despite not taking actions it likely would have been legally required to take if indeed it were an unincorporated association as claimed. As this litigation proceeds, SBI potentially will need to address this issue in order to substantiate its assertion that it is the successor to an unincorporated association under Tennessee law.[10]

If the Committee did not take actions legally required by an unincorporated for-profit association or an unincorporated nonprofit association that received over $5,000 annually (as presumably the Committee did), that would tend to impair the credibility of SBI's claim that the Committee was indeed an unincorporated association. However, it would not necessarily mean that the Committee was not an unincorporated association; it could mean instead that the Committee was a *noncompliant* unincorporated association.

Moreover, because Defendant/Counter-Plaintiff here must show that it is the owner of the SWAN BALL Mark, the primary (not to say exclusive) focus here should be on the current strength of Defendant/Counter-Plaintiff's claim that it was the first to use the mark, and not on the weaknesses of SBI's claim that it (SBI) was an unincorporated association that was the first to use the mark. So even if there are grounds to challenge SBI's assertion that the Committee was an unincorporated association (that was the predecessor-in-interest to SBI),[11] this does not necessarily

---

[10] The issue well might be relevant to questions other than the question of who was the first to use the SWAN BALL Mark. But the Court here discusses this issue in connection with the question of who was the first to use the SWAN BALL Mark, because both Plaintiff-Counter-Defendant (in its Response) and Defendant/Counter-Plaintiff (in its Sur-Reply) did so.

[11] The Court is aware that such grounds extend beyond merely the Committee's apparent non-compliance with legal requirements for unincorporated associations; other circumstances tends to undermine SBI's assertion that the Committee was an unincorporated association. But these grounds, even considered collectively, do not currently establish conclusively that the Committee was not an unincorporated association under Tennessee law.

The Court also is aware that (as SBI has acknowledged at least to an extent) there have been various hiccups (to speak euphemistically) in SBI's multi-filing response to the Motion. The Court's decision here accounts for such hiccups. The Court understands SBI's explanation for these hiccups—the compressed time frame for responding to the Motion (and perhaps the absence of a deep intra-firm bench to deal with

mean that Defendant/Counter-Plaintiff possesses the right to use the mark. Despite Defendant/Counter-Plaintiff's characterization to the contrary, (Doc. No. 35 at 1),[12] SBI has not conceded that Defendant/Counter-Plaintiff has used the SWAN BALL Mark for more than 60 years.[13] Defendant/Counter-Plaintiff still must establish the likelihood of its ownership—something it has not yet done, in the view of the Court.

To put this conclusion differently, the identity of the first user of the Swan Ball Mark cannot yet be established via materials in the record. More to the point for purposes of the request for a TRO, not even the *likely* first user can be established at the instant stage; the record precludes the Court from finding an affirmative likelihood that either party's position on this point is likely to prevail.

<u>Control</u>

---

that time frame); in response, the Court at this time would say simply that although sympathetic to the reality that litigation under some circumstances can be difficult indeed, the Court is constrained to expect that filings be free of substantive errors (and, for that matter, reasonably free of non-substantive errors).

[12] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page ___ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

[13] In claiming that "SBI concedes that Cheekwood has used the SWAN BALL Mark for more than six decades," (Doc. No. 35 at 3), Defendant/Counter-Plaintiff apparently is referring to SBI's statement that "[f]or six decades, both parties have used the disputed mark—SWAN BALL—to refer to the same gala event [i.e., the gala event known as the Swan Ball]." (Doc. No. 32 at 1). But that statement is not s statement about use of *the SWAN BALL Mark as a mark in connection with the particular gala event known as the Swan Ball*; it is instead a statement about use of the use of *the term "Swan Ball" to refer, in whatever context the reference is made*, *to the particular gala event known as the Swan Ball.* The "use" at issue here is the use of the SWAN BALL Mark in connection with that gala event, not the use of the term "Swan Ball" to make reference (in various kinds of communications) to that gala event. Just as a term is not necessarily a trademark, *Gabb Wireless, Inc. v. Troomi Wireless, Inc.*, No. 2:21-CV-253-TC-DAO, 2023 WL 258548, at *3, *4 (D. Utah Jan. 18, 2023), a *reference to a term* is not necessarily the *use of a trademark*.

Arguably,[14] Defendant/Counter-Plaintiff could prevail on its request for a TRO under an alternative theory—applicable whenever the identity of the first user of the mark cannot be established—that it (and not SBI and its alleged predecessor in interest, the Committee) was the one to control the nature and quality of the goods in connection with which the SWAN BALL Mark has been used. "In the case of joint endeavors, where prior ownership by one of several claimants cannot be established, the legal task is to determine which party 'controls or determines the nature and quality of the goods which have been marketed under the mark in question.'" *Bell v. Streetwise Records, Ltd.*, 640 F. Supp. 575, 580 (D. Mass. 1986) (quoting *In re Polar Music International AB,* 714 F.2d 1567 (Fed. Cir.1983)). Given that first use (or even mere *likely* first use) of the SWAN BALL Mark cannot presently be established, and given that Cheekwood and the Committee are fairly characterized as having until very recently been engaged in a joint endeavor in putting on the Swan Ball, the Court will analyze who controls the nature and quality of the goods in order to determine who owns the mark.

Defendant/Counter-Plaintiff claims that the Committee was an internal committee of Cheekwood and that therefore (even assuming that the Committee controlled the major aspects of the Swan Ball), Cheekwood controlled the major aspects of the Swan Ball. However, SBI presents compelling evidence that this was not the case and that the Committee was an organization distinct and separate from Cheekwood. Particularly notable is the statement by Jack Becker, the most-recent former CEO of Cheekwood, who stated that "neither I nor any member of the Cheekwood staff had any input or control over the Swan Ball operations." (Doc. No. 32 at 10). SBI also

---

[14] For reasons the Court need not lay out in detail here, there is reason to question whether Defendant/Counter-Plaintiff could prevail on the request for a TRO under this theory (as opposed to its primary theory that it was the first to use the SWAN BALL Mark) were it able to show a likelihood of success on the theory that Cheekwood was the one to control the nature and quality of the goods. However, the Court assumes herein, to Defendant/Counter-Plaintiff's benefit, that Defendant/Counter-Plaintiff could prevail on the request for a TRO were it able to make this showing.

provides other evidence that the Committee was responsible for all of the main logistical operations of the ball, such as selecting the theme, the invitations, the entertainment, the caterer, and arranging for contracts with the vendors. (*Id.* at 22). Furthermore, according to Becker, the Swan Ball's annual chairs were selected by the nominating committee without input from Cheekwood, the Committee did not seek approval for its decisions from Cheekwood and, according to the 49 former chairs of the ball, none ever believed they reported to Cheekwood as an organization. (*Id.* at 22-23.)

As discussed above, SBI has produced evidence that it was a distinct "unincorporated association" and therefore not simply "internal" to Cheekwood as argued by Defendant/Counter-Plaintiff. When this evidence is combined with Becker's testimony, SBI has colorable support for a claim that the Committee functioned independently from Cheekwood—in that it was neither an internal committee of Cheekwood nor (even if an organization external to Cheekwood) subject to control by Cheekwood—and can therefore refute Defendant/Counter-Plaintiff's claim that Cheekwood exhibited control over the SWAN BALL Mark.[15]

On this record, with the highly disputed factual background of this case, the Court finds that Defendant/Counter-Plaintiff has not met its burden of proving a likelihood of success on this issue. SBI simply has raised too much evidence for the Court to make that determination at this point.

Agency

---

[15] Notably, the discussion here (which is not geared to whether Cheekwood had control over the Swan Ball specifically by virtue of supposedly being the principal of which the Committee was an agent) is mirrored somewhat in the discussion below that addresses the analytically distinct question of whether the Committee was an agent of Cheekwood.

Defendant/Counter-Plaintiff claims that the Committee and its volunteers constituted designated agents of Cheekwood, such that the Committee (and its volunteers) acted on Cheekwood's behalf with respect to the use of the SWAN BALL Mark.[16] Defendant/Counter-Plaintiff's argument here seems to be that even if the Committee at some point had rights to the SWAN BALL Mark, those rights were effectively transferred to Cheekwood due to the Committee (at some point) becoming an agent of Cheekwood. In its Memorandum, Defendant/Counter-Plaintiff claims that the Swan Ball is "one of many internal committees & functions" of Cheekwood's Board.[17] (Doc. No. 18 at 9). Defendant/Counter-Plaintiff also claims that Cheekwood maintains control over the Committee by way of "requiring annual and other reports . . . and assessing the financial outcomes of the Swan Ball." (*Id.* at 10). Defendant/Counter-Plaintiff also refers to its 1993 "The Swan Ball of Cheekwood Policies" as evidence that the Committee

---

[16] In its Memorandum, Defendant/Counter-Plaintiff was unclear in its distinction between its "first-to-use" and "agency" arguments. Defendant/Counter-Plaintiff asserted (with no citation to legal authority) that "volunteers are agents of the nonprofit for which they volunteer," while also asserting on the same page that "the Swan Ball is one of many 'internal committees & functions' of Cheekwood's board" (Doc. No. 18 at 9). Notably, Defendant/Counter-Plaintiff does not suggest that these assertions are alternatives to one another, i.e., that the Committee is *either* an internal committee of Cheekwood *or* an agent of Cheekwood. Instead, Defendant/Counter-Plaintiff seemingly suggests that both are simultaneously true—a suggestion the Court finds problematic because one cannot be agent of oneself. The agency relationship is a relationship between a principal and an agent that necessarily implies a degree of separation between the two entities. *See e.g., Bowman v. Benouttas*, 519 S.W.3d 586 (Tenn. Ct. App. 2016). It strikes the Court that no such separation would exist between an entity like Cheekwood and one of its committees. Defendant/Counter-Plaintiff's assertions that the Committee was an "agent" of Cheekwood *and* "internal" to Cheekwood appear to be inconsistent with one another, and this inconsistency hardly helps Defendant/Counter-Plaintiff convince the Court of the strength of its position on the merits. In analyzing the arguments, the Court has therefore separated the "first-to-use" and "agency" arguments advanced by Defendant/Counter-Plaintiff.

[17] As noted in the above footnote, this claim that the Committee was "internal" does not support Defendant/Counter-Plaintiff's argument that the Committee was an agent of Cheekwood. Agency implies separation or distinction between the principal and the agent, something that would not exist if the Committee was not distinct from Cheekwood.

accepted its status as a designated agent. (Doc. No. 18 at 11). The Court finds that SBI's Response provides evidence that refutes Defendant/Counter-Plaintiff's agency theory.

According to Tennessee law of agency, "The [principal's] right of control is the primary or essential test of an agency relationship without which no agency exists." *John J. Heirigs Const. Co., Inc. v. Exide*, 709 S.W.2d 604, 608 (Tenn. Ct. App. 1986); *see also Gordon v. Greenview Hosp.*, 300 S.W.3d 635, 653 (Tenn. 2009) ("The analysis hinges on the right to control the agent's actions, and, ultimately, the fact of actual control over the agent.") (citation omitted). SBI refutes the notion that Cheekwood maintained control over the Committee throughout the 60-plus year history of the Swan Ball.[18] As before, the statement of former CEO Becker is persuasive on this point. He stated in his declaration that:

> Neither I nor any member of the Cheekwood staff had any input or control over the Swan Ball operations such as: the selection of the chairmen… selection of the theme… selection of the Event Designer or Coordinator… selection of the entertainment… selection of the caterer… selection of the design of the invitation… the selection of the flowers… the selection of the vendors engaged to assist with the production of the gala… the determination of those individuals who would receive an invitation to the gala.

(Doc. No. 33-6 at 113). Additionally, SBI presents 49 sworn statements of former Committee chairs attesting to the Committee's independence from Cheekwood. (Doc. No. 32 at 22). At this stage in the litigation, the Court finds that these statements taken together strongly (albeit not conclusively) support SBI's claim of the Committee's autonomy and separation from Cheekwood.

---

[18] The Court notes that the bulk of this analysis focuses on "actual control" over "right to control", which is an important tenet of establishing an agency relationship. This is because in its Response Defendant/Counter-Plaintiff does not mention this distinction in their agency argument and SBI focuses most closely on this "actual control" analysis. The Court follows the parties' lead in not fully addressing the "right to control" prong of proving an agency relationship and notes that "it is the principal's actual exercise of… control, rather than its mere right to control, that is most important to this analysis." *Nave v. Life Bank*, 334 B.R. 586, 591 (M.D. Tenn. 2005).

Furthermore, a principal-agent relationship is a "fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests or otherwise consents to do so." *Savage v. City of Memphis*, 464 S.W.3d 326, 332 (Tenn. Ct. App. 2015). This consent can be express or implied. Consent may be implied "by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties." *Penmont, LLC v. Blue Ridge Piedmont, LLC*, 607 F. Supp. 2d 1266, 1272 (M.D. Ala. 2009) (citing *Fisher v. Comer Plantation, Inc.,* 772 So.2d 455, 466 (Ala. 2000)).

SBI has produced evidence sufficient to strongly (albeit, again, not conclusively) refute Defendant/Counter-Plaintiff's claim that the Committee was acting (at least in more recent years) as an agent of Cheekwood. SBI claims that it never expressly agreed to become Cheekwood's agent (in 1993 or otherwise). (Doc. No. 33 at 17). In particular, SBI cites to the statements of previous chairs indicating that they did not report to Cheekwood, never received directives from Cheekwood, and did not believe themselves to be bound by any decision Cheekwood made. (Doc. No. 33-5). These statements are persuasive at this juncture in casting doubt that either an express or implied agency relationship existed between Cheekwood and the Committee.

Furthermore, Defendant/Counter-Plaintiff has not produced sufficient evidence at this juncture that they defined the scope of the agency relationship with the Committee. When examining the scope of the relationship the inquiry "is placed upon the actions and consent of the principal, rather than upon the agent's actions or the willingness of the agent to perform those actions." *White v. Revco Disc. Drug Centers, Inc.,* 33 S.W.3d 713 (Tenn. 2000) (citing *Jack Daniel Distillery, et al. v. Jackson*, 740 S.W.2d 413, 416 (Tenn.1987)). Defendant/Counter-Plaintiff refers to its 1993 policies but does not provide sufficient evidence, at this stage, that Cheekwood (as

principal) outlined the scope of the relationship with the purported agent (SBI). While not necessarily dispositive, this lends against Defendant/Counter-Plaintiff's argument that the Committee was in fact Cheekwood's agent.

Therefore, on this early record, Defendant/Counter-Plaintiff has not established a likelihood that an agency relationship existed between Cheekwood and the Committee.

Summary

Overall, Defendant/Counter-Plaintiff has not shown a likelihood of success on the merits of its claims, which is a requirement for a temporary restraining order and is dispositive in this instance. Simply put, SBI has produced enough evidence to cast doubt on whether Cheekwood owns the disputed mark.

## II.    Irreparable Harm

Defendant/Counter-Plaintiff must also prove that it will suffer irreparable harm. This harm must be "actual and imminent rather than . . . speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Under the Lanham Act, a claimant seeking a temporary restraining order is entitled to a rebuttable presumption of irreparable harm if it shows a likelihood of success in establishing particular trademark-related violations specified in 15 U.S.C. § 1116(a). *See* 15 U.S.C. § 1116(a). But even assuming that Defendant/Counter-Plaintiff has sought to show a likelihood of success in establishing one or more of such specified violations in particular, it has failed to do so because it has failed to show a likelihood of success in establishing that it is the owner of the SWAN BALL Mark. Given that the Court does not find that Defendant/Counter-Plaintiff has shown a strong likelihood of success on the merits of its claims, Defendant/Counter-Plaintiff is not entitled to a rebuttable presumption of irreparable harm.

Seeking to establish irreparable harm irrespective of any presumption of such, Defendant/Counter-Plaintiff asserts (and the Court here accepts arguendo) that Cheekwood was forced to postpone the 2025 Swan Ball[19] and that therefore Cheekwood will be "potentially losing donors, funding, and goodwill." (Doc. No. 18 at 21). The Court does not find that this suffices to show the harm required in these circumstances. First, Defendant/Counter-Plaintiff itself notes that these losses are merely "potential" in nature. It has not supplied evidence that it will in fact suffer such losses, which (at least in the absence of the statutory presumption under 15 U.S.C. § 1116(a)) is necessary to demonstrate irreparable harm. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

Furthermore, the Court is not convinced that the requested TRO would help prevent the harm (loss of donors, funding, and goodwill for Cheekwood) allegedly flowing from Defendant/Counter-Plaintiff having been "forced" to postpone the 2025 ball. Defendant/Counter-Plaintiff points to alleged harm that has, in effect, already been done. Injunctive relief, including TROs and preliminary injunctions, are meant to prevent harm that would ensue in the future if the court does not enjoin the conduct that the movant seeks to enjoin. Although Defendant/Counter-Plaintiff may claim that SBI's actions have already prevented it from hosting one annual ball on Cheekwood's property, that has already occurred and the harm allegedly flowing from it cannot be prevented by the requested injunction—which, naturally, is forward-looking.[20]

---

[19] Although the Court is not entirely clear what Defendant/Counter-Plaintiff means by saying that the 2025 Swan Ball was "postponed," the Court assumes it means not that the 2025 Swan Ball was postponed until later in 2025, but rather that it was canceled altogether (i.e, that the Swan Ball would not be held until sometime in 2026, with the annual event being skipped entirely for 2025). This assumption seems sound, because unless "postponement" means that one iteration (the 2025 iteration) of this annual event will be skipped in its entirety, rather than merely delayed until later in the year (2025), it is somewhat difficult to see how "postponement" would cause the loss of donors, funding, and good will.

[20] Whether such harm can and should be remedied by an award of monetary damages is a separate question—one the Court need not address herein.

Defendant/Counter-Plaintiff further argues that donors will be confused if SBI hosts a ball at a different location for a different beneficiary (reportedly, Edwin Warner Park for the benefit of Friends of Warner Parks) (Doc. No. 18 at 22). It claims that attendees of the Swan Ball (or other persons) donating in connection with the Swan Ball will think they are donating to Cheekwood, given Cheekwood's historical association with the Swan Ball. (*Id.* at 22). While this might be possible, the Court finds it too speculative to support a finding of irreparable harm. Were SBI to host the Swan Ball in June 2025 as currently planned, SBI would likely highlight (in a very public manner) both the identity of the new beneficiary (Friends of Warner Parks) and the fact that the event is not being held on Cheekwood premises (as it is slated to be held at Edwin Warner Park). Indeed, SBI already has gone public with its plans to hold a Swan Ball that is held away from Cheekwood premises and is otherwise unassociated with Cheekwood. (Doc. No. 25-1 at 3). Furthermore, given the invitation-only nature of the Swan Ball (with invitations coming previously from the Committee and now from SBI), many potential donors and attendees likely are generally informed about matters concerning the Swan Ball, and the Committee and/or SBI, and are thus aware of the dispute between SBI and Defendant/Counter-Plaintiff—especially given that (as is judicially noticeable) there has been substantial local media coverage of the dispute. The public and extensive nature of this dispute supports the inference that most if not all donors would know that their money would not be going to Cheekwood as in years past.

One final point regarding irreparable injury. The Court's analysis above has focused almost exclusively on Defendant/Counter-Plaintiff's request to enjoin SBI's use of the SWAN BALL Mark, and not on Defendant/Counter-Plaintiff's request to enjoin SBI from doing anything that would suggest that SBI and its activities are affiliated with Cheekwood. As to the latter request, any suggestion of irreparable injury is a non-starter because Defendant-Counter-Plaintiff's whole

theory is that SBI is (improperly, according to Defendant/Counter-Plaintiff) disassociating itself—in a very public way—with Cheekwood. Based on Defendant/Counter-Plaintiff's own premise, there is no identifiable risk that SBI, if not enjoined, will do things that would suggest an affiliation with Cheekwood. So this latter request must be denied based solely on the lack of irreparable injury.

Therefore, the Court finds that Defendant/Counter-Plaintiff has not shown irreparable harm at this juncture. Defendant/Counter-Plaintiff has not met two of the four requirements necessary for its requested relief. In the interest of judicial economy, the Court will not examine the remaining two requirements at this time.

<u>CONCLUSION</u>

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary*, 228 F.3d at 739). The same is true for a TRO. *See Stein v. Thomas*, 672 F. App'x 565, 572 (6th Cir. 2016) (noting that "a temporary restraining order is an extraordinary remedy").

It bears emphasizing why a TRO (or preliminary injunction) is deemed an extraordinary remedy subject to stringent requirements: the party receiving it is treated in some respects, for a period of time while the litigation is ongoing, as if it had prevailed on its claims even though it has not yet done so and could not possibly do so (if ever) until the litigation is concluded. It is no small thing for a party to be treated (even if only temporarily and for a limited purpose) as if it had ultimately prevailed on the merits of its claims when in fact it has not yet done so. On the instant record, Defendant/Counter-Plaintiff simply has not met the heavy burden required to obtain such extraordinary relief.

It was for these reasons that Defendant/Counter-Plaintiff's Motion (Doc. No. 17) was denied as to its request for a TRO.


_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE